1   Gerald P. Kennedy (CA #105887)
    Geraldine A. Valdez  (CA #174305)
2   PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
    530 B Street, Suite 2100
3   San Diego, California 92101
    Telephone: 619-238-1900
4   Fax: 619-235-0398
    E-mail: gpk@procopio.com; gav@procopio.com
5

6   Susan G. Boswell (AZ #004791)
    Kasey C. Nye (AZ #020610)
7   Lori L. Winkelman (AZ #021400)
    QUARLES & BRADY LLP
8   Firm State Bar No. 00443101
    One South Church Avenue
9   Suite 1700
    Tucson, AZ  85701-1621
10  Telephone 520.770.8700
    Facsimile 520.770.2222
11  E-mail: sboswell@quarles.com; knye@quarles.com

12  Attorneys for Debtor,
    The Roman Catholic Bishop of San Diego

13                  UNITED STATES BANKRUPTCY COURT

14                  SOUTHERN DISTRICT OF CALIFORNIA

15

16  In re:                              In Proceedings Under Chapter 11

17  THE ROMAN CATHOLIC BISHOP OF        Case No. 07-00939-LA11
    SAN DIEGO, a California corporation
18  sole,                               **DISCLOSURE STATEMENT DATED**
                                        **MARCH 27, 2007**
19              Debtor.

20

21  **THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE
    BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN
22  THE MEANING OF BANKRUPTCY CODE § 1125. IF YOU HAVE REQUESTED AND
    RECEIVED A COPY OF THIS DISCLOSURE STATEMENT IN CONNECTION WITH
23  THE COURT'S HEARING TO CONSIDER APPROVAL OF THIS DISCLOSURE
    STATEMENT, NOTHING CONTAINED HEREIN IS OR WILL BE DEEMED A
24  SOLICITATION OF ACCEPTANCE OF THE DEBTOR'S PLAN OF
    REORGANIZATION FILED BY THE DEBTOR.**

25

26

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

    A. Overview of RCBSD's Reorganization Case ......................................... 1

        1. The Filing of the Reorganization Case ........................................ 1

        2. RCBSD and the Diocese of San Diego ....................................... 2

        3. Childhood Sexual Abuse Crisis .................................................. 4

        4. The California Window ............................................................... 6

        5. Constitutional Issues .................................................................. 7

        6. Need for Reorganization ............................................................ 7

    B. The Purpose of this Disclosure Statement .............................................. 8

        1. Definitions and Plan Supremacy ................................................ 9

        2. Limited Representations ............................................................. 9

II. CONFIRMATION REQUIREMENTS: VOTE REQUIRED FOR APPROVAL
OF THE PLAN ................................................................................................... 11

    A. Who may Vote or Object ....................................................................... 11

        1. Who May Object to Confirmation of the Plan .......................... 11

        2. Who May Vote to Accept/Reject the Plan ................................ 11

            (a) What is an Allowed Claim/Interest ............................... 11

            (b) What is an impaired Claim/Interest ............................... 12

        3. Who is Not Entitled to Vote ..................................................... 13

        4. Who can Vote in More than One Class ...................................... 14

        5. Votes Necessary to Confirm the Plan ....................................... 14

        6. Votes Necessary for a Class to Accept the Plan ....................... 14

        7. Treatment of Nonaccepting Classes: Absolute Priority Rule .... 14

            (a) Secured Claims: .............................................................. 14

            (b) Unsecured Claims: ......................................................... 15

    B. Voting Procedures ................................................................................. 16

        1. Generally ................................................................................... 16

        2. Incomplete Ballots .................................................................... 16

        3. Withdrawal of Ballots; Revocation ........................................... 16

        4. Submission of Ballots ................................................................ 17

III. DESCRIPTION OF THE PLAN ...................................................................... 18

    A. General Overview of The Plan ............................................................... 18

    B. What Creditors Will Receive Under the Proposed Plan ........................ 20

    C. Unclassified Claims .............................................................................. 20

# TABLE OF CONTENTS
## (continued)

Page

1.   Administrative Claims ........................................................ 20
2.   Priority Unsecured Claims ................................................. 21
3.   Priority Tax Claims ........................................................... 21

D. Treatment of Classes of Claims Which Are Not Impaired Under The Plan ......... 22
1.   Priority Employee Unsecured Claims – Class 1 .............. 22
2.   Bank of America Claim - Class 6 ..................................... 22
3.   Insurance and Benefit Claims – Class 13 ........................ 23

E. Treatment of Classes of Claims Which are Impaired Under the Plan .......... 23
1.   Classes of Secured Claims ................................................ 23
    (a) Class 2: Prepetition Date Secured Tax Claims .......... 23
    (b) Class 3: Union Bank Claims .................................... 24
    (c) Class 4: ALSAM Foundation ................................... 25
2.   Treatment of Unsecured Claims ...................................... 26
    (a) Class 5: Allied Irish Claim ....................................... 26
    (b) Class 7: General Unsecured Convenience Claims ....... 26
    (c) Class 8: Parish And School Deposit And Loan Trust Claims ....... 27
    (d) Class 9: Parish and Related Entity Unsecured Claims ......... 27
    (e) Class 10: General Unsecured Claims ........................ 28
    (f) Class 11: Other Tort And Employee Claims .............. 29
    (g) Class 12: Tort Claims ............................................... 29
    (h) Class 14: Penalty Claims ......................................... 35

IV. MEANS OF IMPLEMENTATION OF THE PLAN ............................ 36
A. Procedure for Determining Torts Claims of Settling Tort Claimants and Unknown Tort Claimants ....... 36
1.   Criteria for Determining Validity of Tort Claims ......... 37
2.   Criteria for Determining Tiers for Allowed Tort Claims ......... 38
3.   Notice of Allowance ........................................................ 38
B. Litigation Protocol ..................................................................... 39
C. Procedure for Determination of Claims Other Than Tort Claims ......... 40
1.   Objections to Claims ........................................................ 40
2.   Disputed Claims ............................................................... 40
3.   Treatment of Contingent Claims ..................................... 40
D. Funding on the Effective Date ................................................... 40
E. Payments Effective Upon Tender ............................................... 40

# TABLE OF CONTENTS
**(continued)**

| | | | Page |
|---|---|---|---|
| | F. | Preservation of Debtor's Claims, Demands, and Causes of Action | 41 |
| | G. | Operative Documents | 41 |
| | H. | Return of Deposits | 42 |
| | I. | Administrative Claims Bar Date | 42 |
| | J. | Delivery of Distributions | 42 |
| V. | | TREATMENT OF EXECUTORY CONTRACTS | 42 |
| | A. | Assumption and Rejection of Executory Contracts | 42 |
| | B. | Claims Based on Rejection of Executory Contracts | 43 |
| | C. | Indemnification of Members, Managers, Officers, and Employees | 43 |
| VI. | | DESCRIPTION OF THE DEBTOR | 43 |
| | A. | The History and Mission of RCBSD | 43 |
| | B. | Organizational Structure of the Diocese | 46 |
| | | 1. Diocese | 47 |
| | | 2. Parishes | 50 |
| | C. | Legal Structure of RCBSD | 51 |
| | | 1. Organizational | 51 |
| | | 2. Property | 51 |
| | D. | The Financial Structure and Operations of RCBSD | 54 |
| | E. | RCBSD's Assets and Liabilities | 55 |
| | | 1. Assets | 55 |
| | | (a) Real Property | 55 |
| | | (b) Personal Property | 56 |
| | | (i) Cash, and cash equivalents | 56 |
| | | (ii) Accounts Receivable | 56 |
| | | (iii) Marketable Securities | 56 |
| | | (iv) Equivalent or Future Interests | 57 |
| | | (v) Avoidance Actions | 57 |
| | | (vi) Insurance Actions | 60 |
| | | (vii) Other Assets | 61 |
| | | (viii) Restricted Assets | 61 |
| | | 2. Liabilities | 61 |
| | | (a) Parish and Related Entity Claims | 61 |
| | | (b) ALSAM Loan | 61 |
| | | (c) Cathedral Catholic High School Guaranty Claims | 62 |

# TABLE OF CONTENTS
## (continued)

|  |  | | Page |
|---|---|---|---|
| | (d) | Other Guaranty Claims | 62 |
| | (e) | Parish and School Deposit and Loan Trust Claims | 62 |
| | (f) | General Unsecured Debt | 62 |
| | (g) | St. Augustine High School Pledge | 62 |
| | (h) | Tort Claims | 63 |
| VII. | SIGNIFICANT EVENTS PRIOR TO THE REORGANIZATION CASE | | 64 |
| | A. | The Response to Childhood Sexual Abuse Crisis | 64 |
| | B. | Constitutional Issues | 65 |
| | C. | Best Interests of Creditors and Liquidation Analysis | 66 |
| | | 1. Alternatives to The Plan | 67 |
| | | 2. Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 67 |
| VIII. | SIGNIFICANT EVENTS IN CHAPTER 11 | | 68 |
| IX. | EFFECT OF CONFIRMATION | | 69 |
| | A. | Discharge | 69 |
| | B. | Vesting | 69 |
| | C. | Channeled Claims | 70 |
| | D. | Permanent Injunction Against Prosecution of Released and Channeled Claims | 70 |
| | E. | Exculpation and Limitation of Liability | 71 |
| X. | REORGANIZATION OF RCBSD | | 72 |
| | A. | Continued Corporate Existence and Vesting of Assets in the Reorganized Debtor | 72 |
| | B. | Management of Reorganized Debtor | 72 |
| | C. | Reorganization of Parishes | 72 |
| XI. | RETENTION OF JURISIDCTION | | 73 |
| XII. | MISCELLANEOUS PROVISIONS | | 74 |
| | A. | General | 74 |
| | B. | Payment Of Statutory Fees And Filing of Quarterly Reports | 74 |
| | C. | Reservation of Rights | 75 |
| | D. | Dissolution of Unsecured Committee and Release of Unknown Claims Representative | 75 |
| | E. | Successors and Assigns | 75 |
| XIII. | FEDERAL TAX CONSEQUENCES | | 75 |
| XIV. | RECOMMENDATIONS OF THE DEBTOR AND CONCLUSIONS | | 78 |

# I.

## **INTRODUCTION**

The Roman Catholic Bishop of San Diego, a California corporation sole (the "Debtor" or "RCBSD")[1], is the debtor and debtor in possession in a Chapter 11 reorganization case ("Reorganization Case"). On February 27, 2007 (the "Petition Date"), RCBSD commenced a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et. seq., in the United States Bankruptcy Court for the Southern District of California ("Court"). Chapter 11 allows the Debtor, and under certain circumstances, Creditors and other parties (not relevant to this Disclosure Statement or the Reorganization Case, to propose a plan of reorganization. RCBSD is the proponent of "Debtor's Plan of Reorganization" dated March 27, 2007 (the "Plan"), and has prepared this Disclosure Statement ("Disclosure Statement") in connection with the solicitation of acceptances of the Plan. A true and correct copy of the Plan is attached as Exhibit "1" to this Disclosure Statement.

A.   **Overview of RCBSD's Reorganization Case**

   **1.**      **The Filing of the Reorganization Case**

RCBSD filed the Reorganization Case in order to reorganize its financial affairs pursuant to a plan of reorganization that will, among other things, fairly, justly and equitably compensate the victims of sexual abuse by clergy or others associated with RCBSD without compromising RCBSD's stewardship and its mission and ministry to the Catholic faith community of parishes, parishioners, religious workers, volunteers and students within the territory of the Diocese. In proposing the Plan, RCBSD seeks to provide a mechanism by which those who have endured harm because of the violation of the position of trust by clergy and others in the Church, can be provided with care, compassion, and compensation. RCBSD seeks to: (1) finally and

---

[1] RCBSD is the civil entity that conducts the business of the Roman Catholic Diocese of San Diego ("Diocese"). The Diocese is the canonical entity that is a territory subject to the jurisdiction of Bishop Robert H. Brom, his predecessors and successors ("Bishop") and through which the Bishop carries out his canonical duties in accordance with the Code of Canon Law which is the ecclesiastical law of the Roman Catholic Church.

QUARLES & BRADY LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4

CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1   comprehensively address the issues resulting from the abuse crisis that has caused great harm to
2   the victims and affected the Catholic Church's traditional ministries; (2) compensate victims of
3   sexual abuse with credible Claims as a whole under a plan of reorganization; and (3) reorganize
4   the civil structure and financial affairs of RCBSD to further its stewardship and ministry to the
5   Catholic community in San Diego and Imperial Counties.

6       To that end the Plan establishes a fund for those victims who have presently identified
7   themselves or for those who identify themselves in the future. At the same time the Plan
8   restructures the financial affairs and civil institutions of RCBSD and those within the territory of
9   the Diocese to better fulfill its stewardship and ministry responsibilities under Canon law.
10  RCBSD believes that the Plan is the only vehicle available to it to ensure an equitable and fair
11  distribution of compensation to all victims while recognizing the financial limitations of RCBSD
12  and, at the same time balancing its other obligations and responsibilities.  The Plan maintains
13  funding of programs within RCBSD which are essential to the financial reorganization of this
14  religious organization and the continuation of its mission and ministry, maintains funding for the
15  programs of pastoral outreach to assist victims which must continue, and provides for the
16  continuation of the programs that RCBSD has put in place to educate and screen people working
17  with RCBSD.

18      **2.**        **RCBSD and the Diocese of San Diego**

19      The roots of the Diocese can be traced to Fr. Junipero Serra's founding of the Mission San
20  Diego de Alcala on July 16, 1769, which was the first of 21 missions between San Diego and
21  Sonoma.  In the 237 years since the founding of the Mission San Diego de Alcala, which remains
22  an active parish to this day, the Diocese has grown to serve the ecclesiastical, spiritual and
23  educational needs of more than 980,000 Roman Catholics who practice, learn and grow in their
24  faith in 98 parishes, 16 missions, 43 elementary schools, and $3^2$ high schools in San Diego and
25  Imperial counties which are part of the territory of the Diocese.

26

27      [2] RCBSD owns two of the high schools.  The other is owned by Catholic Secondary
28  Education - Diocese of San Diego Incorporated ("CSE").

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                          -2-                          CASE NO. 07-00939-LA11
                                                          DISCLOSURE STATEMENT DATED MARCH 27, 2007

RCBSD employs 246 people, who serve in a variety of pastoral offices. Those offices include, *inter alia*, social ministry, schools, civil affairs, finance and accounting, Chancery, marriage and family life, Hispanic ministry, youth ministry, young adult ministry, evangelization and catechetical ministry, diocesan institute, permanent diaconate, secondary education initiative, stewardship and development, tribunal, Southern Cross (biweekly diocesan newspaper), and human relations. RCBSD owns and operates Holy Cross Catholic Cemetery and Mausoleum as well as two high schools, Marian Catholic High School in Chula Vista ("Marian") and Vincent Memorial High School in El Centro. RCBSD is in the process of constructing a new high school, Mater Dei which will replace Marian when it is completed. RCBSD, through its various offices and functions, provides assistance and pastoral outreach to all of the parishes and schools and other Catholic entities operating within the territory of the Diocese.

As part of its mission, RCBSD and the Diocese provide spiritual and other support to Catholic education within the territory of the Diocese. To that end, in the 1990's, RCBSD began the Secondary Education Initiative for the construction of three new high schools that are strategically located to address the current enrollment limitations of the existing schools, to meet the needs of the population growth and to ensure access to all students desiring a Catholic secondary education. This initiative benefits not only the Catholic youth within the territory of RCBSD, but also all youth in this area who want such an education.[3]

In addition to the spiritual and ministry functions of the Diocese, RCBSD also provides a variety of administrative, management and custodial services for the parishes, schools and other Catholic entities within the territory of the Diocese. These services include, but are not limited to, payroll services, investment advisory and management services, construction management

---

[3] Enrollment in the schools within the territory of the Diocese and to which RCBSD provides financial and other support is not limited to Catholic youth. There are over 17,500 students who are provided an education at Catholic schools. The existence and operation of the schools provides a substantial benefit to San Diego and Imperial counties beyond just the Catholic community. If those 17,500 students had to be absorbed into the public school system, there would be an immediate impact on the relevant school districts and the citizens of these counties with respect to their ability to absorb and provide education to those students.

1    services and insurance services.

2        RCBSD is a religious institution and not a traditional commercial enterprise. It does not

3    carry on any unrelated commercial business activities, nor does it own commercial real estate

4    such as apartments, office buildings and the like. Diocesan funds come from donations by

5    Catholic laity and faithful and from a tax imposed on the Parishes known as the "Chancery Tax."

6    Many of the donations given to RCBSD are restricted by the donor for certain specific and

7    restricted uses.

8        **3.**    **Childhood Sexual Abuse Crisis**

9        A tragedy that runs contrary to every teaching and tradition of the Roman Catholic Church

10    has unfolded in the Roman Catholic Church as a whole and in the Diocese in particular occurred

11    within the church: a small number clergy and others took advantage of their positions of trust and

12    respect in the community to sexually abuse children. RCBSD experienced the same tragedy and

13    crisis. RCBSD has responded to this crisis pastorally and, in some cases, through compensation.

14        Bishop Robert H. Brom was appointed Coadjutor of the Diocese with right of succession

15    on April 22, 1989 and succeeded as the fourth Bishop of San Diego on July 10, 1990. Since

16    Bishop Brom's appointment, RCBSD has taken numerous proactive steps to respond to the sexual

17    abuse crisis including:

18        •    Forming a victim assistance program in the 1990's, so victims of abuse seeking

19    assistance receive appropriate care through a process that respects victims' requests for privacy.

20    When a report is received, pastoral resources are made available to the victim. RCBSD also

21    entered into an agreement with the San Diego District Attorney's office pursuant to which

22    RCBSD reports allegations of sexual abuse of children directly to the District Attorney's office

23    for investigation. Every allegation is also investigated by pastoral staff, and all possible

24    assistance is given to law enforcement officials to complete their investigation. Victims are

25    offered counseling, either through Diocesan resources or independent mental health practitioners,

26    the cost of which is paid by RCBSD. In appropriate circumstances, compensation is offered to

27    victims.

28

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4

-4-

CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1    • Participating in the national John Jay Study to determine the scope and causes of

2    childhood sexual abuse by clergy.

3    • Participating in annual compliance audits by the Gavin Group of Boston, an

4    independent compliance auditing firm, regarding RCBSD's implementation of policies and

5    procedures for the response to allegations of sexual abuse of minors, for the creation of safe

6    environment programs, and for the pastoral response and outreach to victims.

7    • Establishing a Sexual Misconduct Review Board in 2002,[4] made up of community

8    members, parishioners and professionals. The Sexual Misconduct Review Boards reviews all

9    Diocesan policies and procedures related to childhood sexual abuse, reporting, prevention,

10    response to victims and makes recommendations on how to strengthen policies and procedures.

11    The Sexual Misconduct Review Board also reviews and advises the Bishop on appropriate

12    responses to allegations of childhood sexual abuse allegations against Church personnel.

13    • Creating and implementing a Safe Environment Program, which involves: (i)

14    mandatory training sessions for all parish and school employees; (ii) background checks of all

15    current and prospective employees of RCBSD, parishes and schools, including priests, religious

16    men and women, deacons and seminarians; (iii) background checks of all volunteers who work

17    with children; and (iv) education on recognition and prevention of sexual abuse to all parishioners

18    and parents, as well as age appropriate education programs for children. Through 2006 more than

19    3000 priests, deacons, and employees, more than 6000 volunteers and more than 62,000 school

20    children had been trained. In addition, all priests, deacons, teachers, parish or Diocesan

21    employees and volunteers that work with or around children have received background checks.

22    Many of these programs were instituted by Bishop Brom in the 1990's, long before the

23    historic meeting of the Bishops in Dallas, Texas which resulted in the Charter for the Protection

24    of Children and Young People. However, these steps taken by RCBSD to respond to the sexual

25

26    ───────────

[4] The members of the Sexual Misconduct Review Board are: Deacon James Scull, Anne
Hendershott, PhD, John Shean, Adlin deCardi, MFT, Rodrigo Valdivia, Gayle Askren, Reverend
27    Monsignor John Dickie, and Sister JoCeal Young.

28

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                    -5-                    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1  abuse crisis, to bring pastoral care and healing to victims of abuse and to prevent abuse in the

2  future are threatened by the present weight of litigation.

3      **4.**        **The California Window**

4      In 2002, the California legislature enacted 2002 CA Senate Bill 1779 ("SB 1779"), which

5  amended the civil limitations period for childhood sexual abuse actions stated in California Code

6  Civ. P. § 340.1. The relevant effect of SB 1779 was, among other things, to open a one year

7  window (January 1, 2003 – December 31, 2003), during which previously expired Claims of

8  childhood sexual abuse were revived as against third parties such as employers, principals, etc.,

9  but not perpetrators.[5] By the time the window closed, there were 143 Claims asserted against

10  RCBSD.[6]

11      In March 2003, RCBSD moved to have a coordinated proceeding for the SB 1779 cases

12  against RCBSD and the Diocese of San Bernardino. The motion was approved, and coordinated

13  proceeding JCCP 4297, Clergy II, was created ("Clergy II"). All the cases were stayed pending

14  attempts to settle on a global basis and to allow for coordination. In November 2005, 23 Claims

15  were released from this omnibus stay for limited discovery, 5 of which were subsequently

16  released for unlimited discovery and trial. It has taken all of RCBSD's available legal and other

17  resources to meet the discovery obligations and prepare the first 5 cases for trial. In addition, the

18  Court recently released another 60 cases for pretrial discovery and trial.

19      RCBSD is experiencing both the financial burden of responding to these cases as well as

20  the significant time that is needed to respond to discovery, mount a defense and still carry on the

21  mission and ministry of the Church. Also, this system of having one case after another go to trial

22

23      [5] The only other state to have enacted a statute to revive Claims that had previously

24  expired because of the running of the statute of limitations was Virginia. That law has been
struck down as unconstitutional. While other state legislatures have considered such laws, no

25  other state has passed a retroactive extension of the statute of limitations to revive expired claims.

26      [6] Recently another 9 cases have been filed against RCBSD alleging childhood sexual

27  abuse, and RCBSD has been advised that there are two (2) additional cases to be filed. In
addition, there are 13 claims against the Diocese of San Bernardino for which RCBSD has

28  received notice that the Diocese of San Bernardino expects to seek indemnification from RCBSD.

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4    -6-    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1   simply means, for the plaintiffs, it is first come, first served.  If the financial resources of RCBSD
2   are exhausted with the first, second or third verdicts, the rest of the 143 Claimants will not be
3   treated the same, nor will RCBSD be in a position to respond to new claims or the claims for
4   indemnification from third parties who assert such rights.  The Bankruptcy Court provides a
5   forum and the Bankruptcy Code provides a mechanism whereby all the Claims can be determined
6   and paid on a fair and equitable basis and ensures that all Claimants with similarly situated
7   Claims are essentially treated the same.

8        **5.**          **Constitutional Issues**

9        In 2004, RCBSD was named as a third party defendant in an action that had been removed
10  from Clergy II to the United States District Court for the Southern District of California, *Melanie*
11  *H vs. The Sisters of Precious Blood*, CASE NO. 04 CV 1596 WQH (JFS).  On September 8,
12  2005, the Judge Court heard a summary judgment motion proffered by both the Sisters of
13  Precious Blood and RCBSD, challenging the constitutionality of SB 1779 on the bases that it
14  violated the Due Process, Ex Post Facto, and Bill of Attainder clauses of the United States
15  Constitution and elements of the First Amendment to the Constitution.  Summary judgment was
16  denied.  However, the Debtor believes that the claims remain viable.  The merits of the challenge
17  will either be determined in the Bankruptcy Court or the United States District Court and will be
18  asserted as a defense to the Claims of the victims who filed their previously expired but revived
19  Claims under SB 1779 under the circumstances set forth in the Plan.  In addition, the
20  Constitutional Challenge is applicable to persons who attempt to revive previously expired claims
21  based on Calif. Code Civ. P. § 340.1.  The Constitutional Challenge could also arise in the
22  context of any estimation proceeding which might occur as part of the confirmation process.

23       **6.**          **Need for Reorganization**

24       Prior to filing the Reorganization Case, RCBSD and the Diocese of San Bernardino
25  engaged in extensive settlement negotiations with the 154[7] alleged victims involved in Clergy II.[8]

26
27         [7] Two of the cases have been dismissed.
28         [8] Clergy II includes 13 cases involving the Diocese of San Bernardino.

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4         -7-         CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1   In those negotiations, mindful of the harm that the victims of abuse have suffered, RCBSD sought

2   to treat all of the victims fairly and equitably while recognizing and balancing its responsibility to

3   be a good steward of the Church.   However, RCBSD was not able to achieve a settlement

4   consistent with the apparent expectations and demands of the Clergy II Claimants without

5   compromising its stewardship and ministry obligations to the Catholic community in San Diego

6   and Imperial Counties.   Moreover, an additional nine (9) cases were filed against RCBSD since

7   the beginning of 2007.   Under the Plan, all the Claims can be determined and paid on a fair and

8   equitable basis that ensures that all Claimants with similarly situated Claims are essentially

9   treated the same, further ensures that RCBSD can continue pastoral programs that address the

10   needs of victims and ensures that RCBSD can continue with the mission and ministry of the

11   Diocese and the Church.

12   **B.**      **The Purpose of this Disclosure Statement**

13          Pursuant to Bankruptcy Code § 1125, RCBSD has prepared and filed this Disclosure

14   Statement along with the Plan, for the Court's approval and submission to the holders of Claims.

15   However, before an acceptance or rejection of a plan may be solicited, the Court must find that

16   this Disclosure Statement contains "adequate information."

17          "Adequate Information" is defined in Bankruptcy Code § 1125(a)(1) to mean information

18   of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and

19   history of the debtor and the condition of the debtor's books and records, that would enable a

20   hypothetical reasonable investor typical of the holders of Claims or interests of the relevant class

21   to make an informed judgment about the plan. *In re Metrocraft Publishing Serv., Inc.*, 39 B.R.

22   567 (Bankr. N.D. Ga. 1984).

23   **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW**

24   **ABOUT:**

25          **(1) WHO CAN VOTE OR OBJECT,**

26          **(2) HOW YOUR CLAIM IS TREATED, (i.e., if your Claim is disputed and what**

27   **your Claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT**

28   **COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

(3) **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

(4) **WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

(5) **WHAT IS THE EFFECT OF CONFIRMATION, AND**

(6) **WHETHER THIS PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you. Be sure to read the Plan as well as this Disclosure Statement.

**1.        Definitions and Plan Supremacy**

Unless this Disclosure Statement expressly states that a term defined in the Plan will have a different meaning, all terms defined in the Plan will have the same meanings when used in this Disclosure Statement.   In addition, unless otherwise stated, terms used in this Disclosure Statement will have the same meanings as in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or the Local Rules of the Bankruptcy Court.   Terms defined in this Disclosure Statement which are also defined in the Plan or the other sources described above are solely for convenience and the Debtor does not intend to change the definitions of those terms from the Plan or from the otherwise applicable sources.   In the event of any inconsistency between the Plan and this Disclosure Statement, the Plan will control. The Exhibits attached to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement.

**2.        Limited Representations**

This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125 for the purpose of soliciting acceptances of the Plan from holders of certain Claims.   It is subject to approval by the Bankruptcy Court as containing information of a kind, and in sufficient detail, which is adequate to enable you to make an informed judgment whether to vote to accept or to reject the Plan.   This Disclosure Statement will be used to solicit acceptances of the Plan only

QUARLES & BRADY LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                                -9-

CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1   after the Bankruptcy Court enters an order approving this Disclosure Statement as containing

2   adequate information.

3       In determining whether the Plan should be confirmed, the Bankruptcy Court will consider

4   whether the Plan satisfies the requirements of the Bankruptcy Code, including whether it is

5   feasible, and whether it is in the best interests of the holders of Claims. The Bankruptcy Court

6   also will receive and consider a ballot report prepared by the Debtor concerning the votes for

7   acceptance or rejection of the Plan by parties entitled to vote. Only holders of Allowed Claims

8   that are impaired under the Plan will be allowed to vote to approve or reject the Plan.

9   **THIS DISCLOSURE STATEMENT IS NOT THE PLAN. THIS**
**DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, WHICH IS**
10  **ATTACHED HERETO AS EXHIBIT "1", SHOULD BE READ**
**COMPLETELY. FOR THE CONVENIENCE OF CREDITORS, THE**
11  **PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT**
**ALL SUMMARIES AND OTHER STATEMENTS REGARDING THE**
12  **PLAN ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF,**
**WHICH IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY.**

13

14      The Bankruptcy Court will hold a hearing on confirmation of the Plan. The date and time

15  of the hearing will be fixed by order of the Court and will be noticed to Creditors after this

16  Disclosure Statement is approved. The Confirmation Hearing may be adjourned from time to

17  time without further written notice.

18      Certain materials contained in this Disclosure Statement are taken directly from other,

19  readily accessible documents or are digests of other documents. While every effort has been

20  made to retain the meaning of such documents, you are urged to rely upon the contents of such

21  documents only after a thorough review of the documents themselves.

22  **NO REPRESENTATIONS OR ASSURANCES CONCERNING THE**
**DEBTOR, INCLUDING, WITHOUT LIMITATION, ITS OPERATIONS,**
23  **THE VALUE OF ITS ASSETS, OR THE FUTURE OPERATIONS OF THE**
**REORGANIZED DEBTOR ARE AUTHORIZED BY THE DEBTOR**
24  **OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

25  **THIS IS A SOLICITATION BY THE DEBTOR ONLY AND IT IS NOT A**
**SOLICITATION BY THE DEBTOR'S ATTORNEYS OR ANY OTHER**
26  **PROFESSIONALS EMPLOYED BY THE DEBTOR. THE**
**REPRESENTATIONS MADE HEREIN ARE THOSE OF THE DEBTOR**
27  **AND NOT OF THE DEBTOR'S ATTORNEYS OR ANY OTHER**
**PROFESSIONAL.**

28

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                    -10-                    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

**REASONABLE EFFORTS HAVE BEEN MADE TO ACCURATELY PREPARE ALL UNAUDITED FINANCIAL STATEMENTS WHICH MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT FROM THE INFORMATION AVAILABLE TO THE DEBTOR. HOWEVER, AS TO ALL SUCH FINANCIAL STATEMENTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED THEREIN IS WITHOUT ERROR.**

## II.

### CONFIRMATION REQUIREMENTS: VOTE REQUIRED FOR APPROVAL OF THE PLAN

**PERSONS OR ENTITIES CONCERNED WITH THE CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.** The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines in the Reorganization Case. The proponent CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

A.    **Who may Vote or Object**

1.    **Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

2.    **Who May Vote to Accept/Reject the Plan**

A Creditor or interest holder has a right to vote for or against the Plan if that Creditor or interest holder has a Claim which is both (1) Allowed or allowed for voting purposes and (2) classified in an impaired class.

(a)    What is an Allowed Claim/Interest

As noted above, a Creditor or interest holder must first have an Allowed Claim or interest to have the right to vote. Generally, any Proof of Claim or interest will be allowed, unless a party in interest brings a motion objecting to the Claim. When an objection to a Claim or interest is filed, the Creditor or interest holder holding the Claim or interest cannot vote unless the Court,

1    after notice and hearing, either overrules the objection or allows the Claim or interest for voting

2    purposes.

3    **THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE HAS NOT**

4    **YET BEEN SET BY THE COURT. THIS DISCLOSURE STATEMENT WILL BE**

5    **UPDATED WHEN THE BAR DATE IS SET BY THE COURT.  IN ALL EVENTS,**

6    **HOWEVER, THE BAR DATE IS ANTICIPATED TO BE NO MORE THAN SIX**

7    **MONTHS FROM THE TIME THE ORDER IS ENTERED BUT IT COULD BE LESS.** A

8    Creditor or interest holder may have an Allowed Claim or interest even if a proof of Claim or

9    interest was not timely filed. A Claim is deemed allowed if (1) it is scheduled on the Debtor's

10   schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no

11   party in interest has objected to the Claim.  An interest is deemed allowed if it is scheduled and

12   no party in interest has objected to the interest.  There are no interests in the Reorganization Case.

13                    (b)          What is an impaired Claim/Interest

14               As noted above, an Allowed Claim or interest only has the right to vote if it is in a Class

15   that is impaired under the Plan. A Class is impaired if the Plan alters the legal, equitable, or

16   contractual rights of the members of that Class. For example, a Class comprised of general

17   Unsecured Claims is impaired if the Plan fails to pay the members of that Class 100% of what

18   they are owed as estimated by the Court pursuant to the Bankruptcy Code.

19               Claims against the Debtor are classified in the following classes in accordance with

20   Bankruptcy Code § 1122(a) as follows:

21                    Class 1 – Priority Employee Unsecured Claims

22                    Class 2 – Prepetition Property Tax Secured Claims

23                    Class 3 - Union Bank Claims

24                    Class 4 – ALSAM Claims

25                    Class 5 - Allied Irish Claims

26                    Class 6 - Bank of America Claims

27                    Class 7 - General Unsecured Convenience Claims

28

1    <u>Class 8</u> – Parish and School Deposit and Loan Trust Claims

2    <u>Class 9</u> – Parish Unsecured Claims

3    <u>Class 10</u> – General Unsecured Claims

4    <u>Class 11</u> – Other Tort and Employee Claims

5    <u>Class 12</u> – Tort Claims

6    <u>Class 13</u> – Insurance and Benefit Claims

7    <u>Class 14</u> – Penalty Claims

8    For purposes of the Plan, Classes 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, and 14 are impaired and

9    holders of Claims in each of these Classes are therefore entitled to vote to accept or reject the

10   Plan. Classes 1, 6, and 13 are unimpaired and holders of Claims in each of these Classes,

11   therefore, do not have the right to vote to accept or reject the Plan. Parties who dispute RCBSD's

12   characterization of their Claim as being impaired or unimpaired may file an objection to the Plan

13   contending that RCBSD has incorrectly characterized the class. RCBSD reserves the right to

14   supplement this Disclosure Statement (if necessary) and to solicit any of those Classes which may

15   prove to be impaired or unimpaired, as the Reorganization Case develops further.

16   **3.        Who is Not Entitled to Vote**

17   The following four types of Claims are not entitled to vote:

18   (1) Claims that have been Disallowed; (2) Claims in unimpaired Classes; (3) Claims

19   entitled to priority pursuant to 11 U.S.C. §507(a)(1), (a)(2) and (a)(8); and (4) Claims in Classes

20   that do not receive or retain any value under the Plan. Claims in unimpaired Classes are not

21   entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to

22   priority pursuant to Code § 507(a)(1), (a)(2), and (a)(8) are not entitled to vote because such

23   Claims are not placed in Classes and they are required to receive certain treatment specified by

24   the Bankruptcy Code. Claims in Classes that do not receive or retain any value under the Plan do

25   not vote because such classes are deemed to have rejected the Plan. **EVEN IF YOUR CLAIM IS**

26   **OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT**

27   **TO CONFIRMATION OF THE PLAN.**

28

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                    -13-                    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

**4.**     **Who can Vote in More than One Class**

A Creditor whose Claim has been allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the Secured part of the Claim and another ballot for the Unsecured Claim.

**5.**     **Votes Necessary to Confirm the Plan**

If impaired Classes exist, the Court cannot confirm the Plan unless: (1) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on nonaccepting Classes, as discussed later in paragraph 7 of this Section.

**6.**     **Votes Necessary for a Class to Accept the Plan**

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted, voted in favor of the Plan.  A Class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the interest-holders of such Class which actually voted, voted to accept the Plan.  There are no interests in the Reorganization Case.

**7.**     **Treatment of Nonaccepting Classes: Absolute Priority Rule**

As noted above, even if all impaired Classes do not accept the proposed Plan, the Court may nevertheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Bankruptcy Code.  The process by which nonaccepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting classes of Claims if it meets all consensual requirements except the voting requirements of Bankruptcy Code § 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in Bankruptcy Code § 1129(b) and applicable case law.

(a)     Secured Claims:

There are three ways to satisfy the fair and equitable standard with respect to a dissenting class of Secured Claims.  The first way is to provide that class members retain their security

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                -14-                CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1   interests (whether the collateral is kept or is transferred by the debtor) to the extent of their

2   allowed Secured Claims and to give each Secured Creditor in the class deferred cash payments

3   that aggregate to at least the amount of the allowed Secured Claim and which have a present

4   value equal to the value of the collateral.   This method of satisfying the fair and equitable

5   standard may be complicated by the application of 11 U.S.C. § 1111(b)(2). The meaning of

6   "Allowed Secured Claim" as used in this paragraph will depend whether the Secured class makes

7   a § 1111(b)(2) election to be treated as fully Secured despite the fact that the collateral may be

8   worth less than the amount of the Claim.

9          The § 1111(b)(2) election converts the unsecured deficiency Claim into a Claim secured

10   by the collateral of the electing Creditor.   If a Creditor so elects, the Debtor must treat the

11   Creditor's entire Claim as a Secured Claim and the Plan must provide for the Creditor to receive,

12   on account of its Claim, payments, either present or deferred, of a principal face amount equal to

13   the amount of the Claim and of a present value equal to the value of the collateral.

14          A second alternative for complying with the fair and equitable standard with respect to a

15   Class of dissenting Secured Creditors is for the Plan to provide for the realization of the

16   "indubitable equivalent" of their Secured Claims. The third alternative for satisfying the fair and

17   equitable standard is to provide in the Plan for the sale of the collateral free and clear of liens,

18   with the liens to attach to the sale proceeds.

19                        (b)          Unsecured Claims:

20          There are two ways of satisfying the fair and equitable standard with respect to a

21   dissenting Class of Unsecured Claims. The first way is for the Plan to provide for distributions to

22   the dissenting class worth the full amount of their Allowed Claims. The Allowed Claims need not

23   be paid in full on the Effective Date of the Plan. If the Plan provides for deferred payments, an

24   appropriate discount factor must be used so that the present value of deferred payments equals the

25   full amount of the allowed Unsecured Claims of the dissenting class.

26          The second way to satisfy the fair and equitable test with respect to the dissenting class of

27   Unsecured Creditors is for the Plan to provide that all Claims that are junior to the dissenting

28   class do not receive or retain any property on account of their Claims or interests. Accordingly, if

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                    -15-                    CASE NO. 07-00939-LA11
                                                          DISCLOSURE STATEMENT DATED MARCH 27, 2007

1    a dissenting Unsecured Creditor class is to receive property worth only one-half of its Allowed

2    Claims, the Plan may still be fair and equitable if all junior classes are to receive or retain nothing

3    and if no senior class is to receive more than 100% of its Allowed Claim.

4    **B.    Voting Procedures**

5        **1.    Generally**

6        Only those Classes that are impaired under the Plan are entitled to vote to accept or reject

7    the Plan. RCBSD reserves the right to supplement this Disclosure Statement (if necessary) and to

8    solicit any of those Classes which may prove to be impaired or unimpaired, as the Reorganization

9    Case develops further.

10        Separate Ballots will be sent to the known holders of Claims whether or not such Claims

11    are disputed.    However, only the holders of Allowed Claims (or Claims that have been

12    temporarily Allowed or have been estimated by the Bankruptcy Court) which are impaired are

13    entitled to vote on the Plan. A Claim to which an objection has been filed is not an Allowed

14    Claim unless and until the Bankruptcy Court rules on the objection and any appeals are

15    determined. The holders of such Disputed Claims are not entitled to vote on the Plan unless they

16    request that the Bankruptcy Court, pursuant to Bankruptcy Rule 3018, temporarily allow the

17    Claims in appropriate amounts solely for the purpose of enabling the holders of such Disputed

18    Claims to vote on the Plan, and the Bankruptcy Court does so.

19        **2.    Incomplete Ballots**

20        Ballots which are signed, dated, and timely received, but on which a vote to accept or

21    reject the Plan has not been indicated, will not be counted as a vote either to accept or to reject the

22    Plan or as a vote cast with respect to the Plan.

23        **3.    Withdrawal of Ballots; Revocation**

24        Any Creditor holding an impaired Allowed Claim who has delivered a Ballot accepting or

25    rejecting the Plan or opting out of the Settlement Trust may withdraw such acceptance or

26    rejection or election by delivering a written notice of withdrawal to RCBSD at any time prior to

27    the voting deadline. A notice of withdrawal, to be valid, must: (i) contain the description of the

28    Claim to which it relates and the amount of such Claim; (ii) be signed by the voting Creditor, in

1   the same manner as the Ballot; and (iii) be received by RCBSD in a timely manner at the address

2   set forth below. Unless otherwise directed by the Bankruptcy Court, a purported notice of

3   withdrawal of Ballots or change in the Claimant's election to opt out of the Settlement Trust

4   which is not received in a timely manner will not be effective to withdraw a previously furnished

5   Ballot.

6       **4.        Submission of Ballots**

7       The form of Ballot for each of the Classes entitled to vote on the Plan will be sent to all

8   Creditors along with a copy of the Court-approved Disclosure Statement and a copy of the Plan.

9   Creditors should read the Ballot carefully.  If any Creditor has any questions concerning voting

10  procedures, such Creditor may contact:

11          QUARLES & BRADY LLP
            One South Church Avenue, Suite 1700
12          Tucson, AZ 85701
            (520)770-8700
13          Attention: Kasey C. Nye, Esq.

14          PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
            530 B Street, Suite 2100
15          San Diego, California 92101
            Telephone: 619-238-1900
16          Attention: Geraldine A. Valdez, Esq.

17      Ballot(s) or withdrawals/revocations or changes of election thereof must be returned to the

18  above counsel for RCBSD.  Ballots (and withdrawals/revocations and changes of elections of

19  Ballots) must be postmarked no later than ____ _____, 2007.  In addition, Ballots may be

20  faxed, Attention: Suzanne Utter, (520) 770-2228.  To be effective, transmission of the facsimile

21  must begin no later than 5:00 P.M. on _____, 2007.

22      In addition, the Bankruptcy Court will hold a hearing on confirmation of the Plan

23  commencing on ____ _____, 2007 at _____ a.m./p.m. in the Jacob Weinberger U. S.

24  Courthouse, 325 West F Street, San Diego, California 92101-6991. All objection(s), if any, to

25  confirmation of the Plan must be in writing; must state with specificity the grounds for any such

26  objections); and must be filed with the Bankruptcy Court and served upon counsel for RCBSD at

27  the following address on or before ____ _____, 2007:

28

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                    -17-                    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1  QUARLES & BRADY LLP
   One South Church Avenue Suite 1700
2  Tucson, Arizona 85701
   (520) 770-8700
3  Attention: Kasey C. Nye, Esq.

4  And

5  PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
   530 B Street, Suite 2100
6  San Diego, California 92101
   Telephone: 619-238-1900
7  Attention: Geraldine A. Valdez, Esq.

8                          **III.**

9              **DESCRIPTION OF THE PLAN**

10         The following description of the Plan is for informational purposes only.  Creditors should

11  not rely on this description for voting purposes, but should read the Plan in its entirety.  This

12  summary of the Plan does not purport to be complete.  THE PLAN IS CONTROLLING IN THE

13  EVENT OF ANY INCONSISTENCY BETWEEN THE CONTENTS OF THE PLAN AND

14  THIS DISCLOSURE STATEMENT.

15  **A.**     **General Overview of The Plan**

16         RCBSD seeks to achieve the goals articulated in Section I of this Disclosure Statement

17  through the Plan.  To that end the Plan provides for a mechanism whereby Tort Claimants can

18  have their Claims determined by a Special Arbitrator and receive compensation through a

19  Settlement Trust.  The Plan also provides a mechanism whereby a Tort Claimant can have his or

20  her Tort Claim determined by a federal court or a jury (if the right to a jury trial is available and

21  has not previously been waived) and receive compensation through a Litigation Trust if such Tort

22  Claimant affirmatively opts out of the Settlement Trust.

23         The Plan contemplates that, on the Effective Date, RCBSD will establish the Fund which

24  will be allocated by the Bankruptcy Court as part of the confirmation process between the

25  Settlement Trust and the Litigation Trust in the amounts or percentages as may be proposed by

26  the Debtor and determined by the Bankruptcy Court as part of the confirmation process.  It is

27

28

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                         -18-                    CASE NO. 07-00939-LA11
                                                    DISCLOSURE STATEMENT DATED MARCH 27, 2007

anticipated that the Committee will also have input into the allocation of the Fund between the Settlement Trust and the Litigation Trust.  The Fund will consist of all of the following:

- The sum of $95,000,000 to be paid by RCBSD[9] by payment of the Initial Payment of $30,000,000 and the balance paid as RCBSD Fund Installment Payments which consist of:

  o The sum of $23,750,000 to be paid to the Fund on the first Business Day of the first (1st) anniversary of the Effective Date; and

  o The sum of $41,250,000 to be paid to the Fund on the first Business Day of the second (2nd) anniversary of the Effective Date unless extended pursuant to the terms of the Plan whereby RCBSD can defer up to $15,000,000 of the last Fund Installment Payment for two (2) additional years provided that interest is paid on the deferred amount and other conditions contained in the Plan are satisfied.

- Payments, if any, from the Participating Third Parties

In addition to the Fund amounts, RCBSD will establish an Unknown Claims Reserve to be administered by the Trustee of the Settlement Trust[10] in an amount, to be funded over time and as necessary, of $3,000,000.   Any Unknown Tort Claims that are Allowed by the Special Arbitrator or by a Final Order if the Unknown Claims Representative opts out of the Settlement Trust, will be paid out of the Unknown Claims Reserve.   The other Allowed Claims against RCBSD will be paid in accordance with the terms of the Plan.  Allowed Claims will be paid from

---

[9] Catholic Mutual is the sole insurer for RCBSD with respect to Tort Claims.  RCBSD has been in negotiation with Catholic Mutual as to its share of the Fund.   While there is not yet a written agreement between RCBSD and Catholic Mutual, RCBSD believes that such an agreement will provide for Catholic Mutual to pay one-half of the Fund under terms and circumstances to be determined by a written agreement between RCBSD and Catholic Mutual and submitted to the Bankruptcy Court for approval.  If Catholic Mutual does not agree to pay one-half or if the agreement between RCBSD and Catholic Mutual is not approved, RCBSD will not be able to meet these funding provisions and will modify the Plan.

[10] If the Unknown Claims Representative opts out of the Settlement Trust, the Unknown Claims Reserve will be maintained by the Trustee of the Litigation Trust.

1    the reserves established by RCBSD for such payment, from the business operations of RCBSD,

2    from any borrowed funds and from sales of property owned by RCBSD.

3         The Special Arbitrator who will hear and determine the Tort Claims of Settling Tort

4    Claimants will be appointed by the Bankruptcy Court as part of the confirmation process.

5    RCBSD anticipates that the Committee and RCBSD will agree on the person to serve as a Special

6    Arbitrator.  Absent such agreement, RCBSD will propose the Special Arbitrator and the final

7    appointment will be made by the Bankruptcy Court as part of the confirmation process.  The

8    Special Arbitrator will determine whether to Allow or Disallow a Tort Claim.  If a Tort Claim is

9    Allowed, such Tort Claim will be placed in a Tier based upon criteria proposed by RCBSD and

10   finally determined by the Court.  There are four (4) Tiers into which allowed Tort Claims may be

11   placed which are described in the Plan.

12   **B.    What Creditors Will Receive Under the Proposed Plan**

13        As required by the Bankruptcy Code, the Plan classifies Claims in various Classes

14   according to their right to priority. The Plan states whether each Class of Claims is impaired or

15   unimpaired. The Plan provides the treatment each Class will receive.

16   **C.    Unclassified Claims**

17        Certain types of Claims are not placed into voting Classes; instead they are unclassified.

18   They are not considered impaired and do not vote on the Plan because they are automatically

19   entitled to specific treatment provided for them in the Bankruptcy Code. As such, RCBSD has not

20   placed the following Claims in a Class.

21        **1.          Administrative Claims**

22        An Administrative Claim is: (a) every cost or expense of administration of the

23   Reorganization Case which is allowable pursuant to Bankruptcy Code § 503, including any actual

24   and necessary postpetition expenses of preserving the Estate; (b) any actual and necessary

25   postpetition expenses of operating RCBSD; (c) all Professional Charges approved by the

26   Bankruptcy Court pursuant to interim and final allowances in accordance with Bankruptcy Code

27   §§ 330, 331, and 503(b); (d) every Property Tax Administrative Claim; and (e) all fees and

28

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                    -20-                    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1    charges assessed against the Estate under Chapter 123 of Title 28, United States Code. Allowed

2    Administrative Claims will be paid in full on the Effective Date or the Claim Payment Date.

3        The treatment under the Plan of Allowed Administrative Claims and the types of

4    Administrative Claims anticipated on the Effective Date are set forth in Exhibit "2" attached

5    hereto and incorporated by this reference.

6        **2.**        **Priority Unsecured Claims**

7        Priority Unsecured Claims include every Unsecured Claim or portion thereof which is not

8    an Administrative Claim, a Priority Tax Claim or a Priority Employee Unsecured Claim and

9    which is entitled to priority under any applicable provision of Bankruptcy Code § 507. The holder

10    of every Allowed Priority Unsecured Claim will be paid, in full satisfaction of such Claim, (a) a

11    single Cash payment in the Allowed amount of the Claim on the Effective Date (or the applicable

12    Claim Payment Date); or (b) as otherwise agreed in writing by the holder of the Allowed Claim or

13    ordered by the Bankruptcy Court. A chart describing the Debtor's anticipated Priority Unsecured

14    Claims, if any, and their treatment under the Plan is attached hereto as Exhibit "3" and

15    incorporated by this reference.

16        **3.**        **Priority Tax Claims**

17        Priority Tax Claims include every Unsecured Claim or portion thereof which is entitled to

18    priority pursuant to Bankruptcy Code § 507(a)(8). The holder of every Allowed Priority Tax

19    Claim, will be paid, in full satisfaction of such Claim pursuant to the provisions of Bankruptcy

20    Code § 1129(a)(9)(C): (a) in deferred Cash payments over a period of five (5) years from the

21    Petition Date, to be paid in equal quarterly installments of principal and interest; (b) the first

22    payment to be made on the first Business Day after the day which is ninety (90) days after the

23    later of the Effective Date or the Claim Payment Date; and each payment thereafter to be paid on

24    the first Business Day of each succeeding quarter until paid in full; provided, however, that, the

25    entire unpaid amount of the Allowed Priority Tax Claim, together with any interest accrued

26    thereon, will be paid in full on the date which is five (5) years after the Petition Date of such

27    Allowed Priority Tax Claim; or (c) as otherwise agreed in writing by the holder of the Allowed

28    Claim or ordered by the Bankruptcy Court. A chart describing the Debtor's anticipated Priority

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4        -21-        CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

Tax Claims, if any, and their treatment under the Plan is attached hereto as Exhibit "4" and incorporated by this reference.[11]

**D.    Treatment of Classes of Claims Which Are Not Impaired Under The Plan**

    **1.    Priority Employee Unsecured Claims – Class 1**

Classification: Class 1 Priority Employee Unsecured Claims include every Unsecured Claim of an employee of RCBSD for wages, vacation or sick leave pay which is otherwise entitled to priority pursuant to Bankruptcy Code § 507(a)(3)(A).

Treatment: Allowed Class 1 Employee Unsecured Claims are not impaired under the Plan. The legal, equitable and contractual rights of holders of Priority Employee Unsecured Claims in Class 1 will either: (a) not be altered by the Plan; or (b) at the option of the Debtor, be treated in any other manner that will result in such Allowed Priority Employee Unsecured Claims being deemed unimpaired under Bankruptcy Code § 1124. A chart describing the Debtor's anticipated Class 1 Priority Employee Unsecured Claim, if any, and their treatment under the Plan is attached hereto as Exhibit "5"  and incorporated by reference.

    **2.    Bank of America Claim - Class 6**

Classification:  The Class 6 Bank of America Claim is the Unsecured Claim of BofA against RCBSD arising from the Guaranty of RCBSD, dated May 14, 2003 in favor of Bank of America with respect to that certain swap agreement between CSE and BofA, including all interest, costs and other charges properly chargeable by BofA pursuant to the applicable documents evidencing the BofA Claim.

Treatment: Allowed Class 6 BofA Claim is not impaired under the Plan. The holder of the Allowed BofA Claim will retain its Claim, if any, against the Reorganized Debtor, and the Plan leaves unaltered the legal, equitable and contractual rights to which such Claim entitles BofA. At the present time there has been no default by CSE who is the party to the agreement

---

[11] The Exhibits describing the anticipated Claims in each Class are based upon the books and records of RCBSD and the Schedules filed in the Reorganization Case.  The listing of anticipated Claims is not an admission of the validity of such Claims and RCBSD deserves its right to object to any such Claims listed in any Class and in any Exhibit to this Disclosure Statement.

1    with BofA which is guaranteed by RCBSD.  RCBSD does not anticipate that any payments will

2    be required to be made to BofA on account of the BofA Claim.

3        **3.**        **Insurance and Benefit Claims – Class 13**

4        <u>Classification</u>:  Class 13 Insurance and Benefit Claims include any Unsecured Claim

5    against RCBSD for property damage, general liability or workers compensation for which

6    RCBSD is or may be liable, whether arising from tort (other than Other Tort and Employee

7    Claims, Tort Claims or Unknown Tort Claims), contract or workers compensation for which there

8    is insurance coverage, including but not limited to, any Claim for which RCBSD has a self-

9    insured retention and any Claim arising from or related to obligations, contributions or benefits

10   pursuant to any pension plans which are either administered by RCBSD or for which RCBSD

11   collects contributions and remits such contributions to the appropriate trustee of such pension

12   plans.

13       <u>Treatment</u>: Allowed Class 13 Insurance and Benefit Claims are <u>not impaired</u> under the

14   Plan. The holders of Allowed Insurance and Benefit Claims will retain their Claims, if any,

15   against the Reorganized Debtor and the Plan either:  (a) leaves unaltered the legal, equitable and

16   contractual rights to which such Claims entitle the holders thereof; or (b) at the option of the

17   Debtor, treats such Allowed Insurance and Benefit Claims in any other manner that will result in

18   such Allowed Insurance and Benefit Claims being deemed unimpaired under Bankruptcy Code §

19   1124.   All such Insurance and Benefit Claims will be determined in accordance with the

20   provisions of any benefit plans, policies and procedures of RCBSD and applicable law.  At this

21   time, RCBSD does not anticipate that there will be any Insurance and Benefit Claims.

22   **E.**    <u>**Treatment of Classes of Claims Which are Impaired Under the Plan**</u>

23       **1.**        **Classes of Secured Claims**

24       Secured Claims are Claims secured by liens on property of the Estate. The following chart

25   lists all Classes containing Debtor's secured pre-petition Claims and their treatment under the

26   Plan.  Under the Plan there are three Classes of Secured Creditors:

27       (a)        <u>Class 2: Prepetition Date Secured Tax Claims</u>

28       <u>Classification</u>: Class 2 Prepetition Secured Tax Claims include any Claim asserted by a

1  governmental unit holding a Claim for taxes which is secured by property of the Estate by

2  operation of applicable non-bankruptcy laws, including, but not limited to, every such Claim for

3  unpaid real property taxes, unpaid personal property taxes, or unpaid sales taxes or leasing taxes,

4  arising on or before the Petition Date, but only to the extent of the validity, perfection, and

5  enforceability of the claimed lien, security interest, or assignment, and the value of the interest of

6  the governmental unit holding such Claim against the Debtor and only to the extent that such

7  Secured Tax Claim does not relate to Parish Property. Any Claims for unpaid real property taxes,

8  unpaid personal property taxes, or unpaid sales taxes or leasing taxes pertaining to a Parish or

9  Parish Property will be paid by the Parish owning such Parish Property for which the tax was

10  assessed.

11  Treatment: Class 2 Prepetition Secured Tax Claims are impaired under the Plan. The

12  Allowed Class 2 Claims, including interest thereon from and after the Effective Date, will be paid

13  in two equal installments. The first installment thirty (30) days after the Effective Date or the

14  Claim Payment Date and the second, six (6) months after the Effective Date or the applicable

15  Claim Payment Date. The Debtor does not believe there are any Prepetition Date Secured Tax

16  Claims.

17  (b)        Class 3: Union Bank Claims

18  Classification: Class 3 is the Secured Claim of Union Bank pursuant to that certain Loan

19  Agreement between RCBSD and Union Bank dated January 30, 2003 as amended and restated in

20  that certain Loan Agreement dated as of December 29, 2006, and reflected in related documents

21  (collectively the "Union Bank Loan Documents"). The Union Bank claim consists of a $5mm

22  line of credit with a sub-line for letters of credit together with all interest, costs, attorneys fees and

23  other charges properly chargeable pursuant to the Union Bank Loan Documents. As of the

24  Petition Date the amount of letters of credit issued by Union Bank for the benefit of RCBSD was

25  approximately $4,323,000.00. Pursuant to the Union Bank Loan Documents, the Union Bank

26  Claim is secured by certain marketable securities worth approximately $5,250,411.13.

27  Treatment: The Class 3 Union Bank Claims are impaired under the Plan. Union Bank

28  will retain its collateral and will be paid 100% of its Allowed Claims pursuant to the Union Bank

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                    -24-                    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1  Loan Documents, except that the Union Bank Loan Documents will be modified so that: (1) all

2  amounts outstanding under the Union Bank Note will bear interest at a rate which is 00.10% per

3  annum in excess of Union Bank's Libor Rate as defined in the Union Bank documents evidencing

4  the Union Bank Claim; and, (2) the maturity date of the Union Bank Note will be extended to

5  ninety (90) days after the Effective Date at which time all amounts due and owing thereunder will

6  be fully due and payable.

7          (c)        Class 4: ALSAM Foundation

8      Classification: Class 4 is the Secured Claim of ALSAM Foundation, a Utah trust with The

9  Northern Trust Company as Trustee, pursuant to that certain Loan Agreement dated August 15,

10  2005 (the "ALSAM Loan Agreement"), and reflected in the related documents including among

11  other things, "Promissory Note Secured By Deed of Trust," dated August 15, 2005, in the original

12  principal amount of $50,000,000.00, (the "ALSAM Note"), and "Deed Of Trust With Absolute

13  Assignment Of Rents, Security Agreement, And Fixture Filing" (the "Deed of Trust" and

14  collectively the "ALSAM Loan Documents"). As of the Petition Date RCBSD owed ALSAM

15  approximately $36,000,000.00 and the collateral secured by the Deed of Trust was worth

16  approximately $63,629,469.00. The ASLAM Claim is for construction financing of Mater Dei

17  High School.  RCBSD has requested authorization to borrow the remaining availability in the

18  construction loan to complete Mater Dei High School.

19      Treatment:  The ALSAM Claims are impaired under the Plan.  The Plan provides that

20  ALSAM will retain its collateral and will be paid 100% of its Allowed Claims under the terms of

21  the ALSAM Loan Documents, except that the ALSAM Loan Documents will be modified so that

22  the maturity date of the ALSAM Note will be extended to sixty-three (63) months after the date

23  that the improvements being constructed, in part, with proceeds from the ALSAM loan, are

24  completed; and if the ALSAM Claim is not paid in full prior to the sixtieth (60th) month after the

25  completion of construction of the improvements, in addition to all principal owing under the

26  ALSAM Note which will be paid on the extended maturity date, the Reorganized Debtor will pay

27  an extension fee to ALSAM of $250,000.

28

QUARLES & BRADY LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4

-25-

CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

2. **Treatment of Unsecured Claims**

    (a)    Class 5: Allied Irish Claim

Classification: This Class consists of the Unsecured Claim of Allied Irish against RCBSD arising from the Guaranty Agreement between Allied Irish and RCBSD entered into as of May 1, 2003, whereby RCBSD guaranteed the payment obligations of CSE, to Allied Irish as provider of the Allied Irish Letter of Credit and the Guaranty by RCBSD of the obligations of Catholic Charities - Diocese of San Diego to Allied Irish under the terms of that certain Loan Agreement dated June 28, 1993, including all interest, costs and other charges properly chargeable by Allied Irish pursuant to the applicable documents evidencing the Allied Irish Claim. Because the Class 5 Allied Irish Claims are guaranty obligations they constitute contingent claims.

Treatment: Class 5 Allied Irish Claims are _impaired_ under the Plan. The Plan provides that the terms of the Allied Irish Guaranty will be modified as follows:

- As of the Effective Date, Section 15(m) of the Allied Irish Guaranty will be modified to read: "Unrestricted Cash and Readily Marketable Securities Balance. Have on each January 1 and July 1 Unrestricted Cash and Readily Marketable Securities in an amount not less than $5,000,000."

- Sections 16(b), (c) and (d) of the Allied Irish Guaranty will not apply to any sale of assets, incurring of debt or granting of security interests which may occur under the Plan to fund the Plan and meet the Debtor's obligations under the Plan.

- On or before ninety (90) days after the Effective Date and on the same day (or the first day thereafter that is a Business Day if the date falls on a Holiday) of each year thereafter for a period of three (3) years after the Effective Date, the Reorganized Debtor will pay a guaranty fee to Allied Irish in the amount of $5,000 each year.

    (b)    Class 7: General Unsecured Convenience Claims

Classification: This class includes any Unsecured Claim in an amount of $500 or less, inclusive of interest, if any, accrued after the Petition Date through the later of the Effective Date or the Claim Payment Date. Any other Unsecured Creditor may elect on its Ballot to reduce the amount of its Allowed Claim to $500 and participate only in Class 7.

QUARLES & BRADY LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4

-26-

CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1       Treatment:  Allowed Class 7 General Unsecured Convenience Claims are <u>impaired</u> under

2    the Plan.  Holders of allowed Class 7 Claims and holders of Allowed Claims that have elected to

3    participate in Class 7 will be paid in cash in full, up to $500 sixty (60) days after the Effective

4    Date.  Attached hereto as Exhibit "6" and incorporated by this reference is a chart showing the

5    payment anticipated to be made to the holders of Allowed Claims.

6           (c)    <u>Class 8: Parish And School Deposit And Loan Trust Claims</u>

7       Classification: Class 8 includes the Unsecured Claims of the Parish and School Deposit

8    and Loan Trust, which is the trust into which Parish and Related Entities funds are deposited to be

9    held and administered by RCBSD as trustee pursuant to, among other things, certain policies and

10   procedures established by RCBSD and the Parishes and Related Entities.  In addition, loans to

11   Parishes, RCBSD and Related Entities are made from the Parish and School Deposit and Loan

12   Trust. The Parish and School Deposit and Loan Trust Claims against the Debtor are for any loans

13   made by the Parish and School Deposit and Loan Trust to the Debtor, including all interest,

14   attorneys' fees and other costs and charges to which the Parish and School Deposit and Loan

15   Trust might be entitled pursuant to the terms of any such loans or policies.

16       Treatment:   Allowed Class 8 Parish and School Deposit and Loan Trust Claims are

17   <u>impaired</u> under the Plan.  The holders of the Class 8 Claims will not receive any distribution

18   under the Plan until all payments to be made by RCBSD to the Fund are paid in full.  The

19   treatment under the Plan of Parish and School Deposit and Loan Trust Claims is attached hereto

20   as Exhibit "7" and incorporated by this reference.

21          (d)    <u>Class 9: Parish and Related Entity Unsecured Claims</u>

22      Classification: Class 9 includes every Unsecured Claim against RCBSD now held by a

23   Parish or other Catholic entity to whom RCBSD provides managerial or custodial services and

24   who, among other things, is a beneficiary of and participant in the Parish and School Deposit and

25   Loan Trust, and all Claims of a Parish or Related Entity for indemnification or contribution

26   arising out of any Tort Claims or other Claims; together with all interest, attorneys' fees and other

27   costs and charges to which each Parish is entitled pursuant to the terms of any agreements

28   between RCBSD and a Parish or applicable law.

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4         -27-        CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1    <u>Treatment</u>:  Allowed Class 9 Parish Unsecured Claims are <u>impaired</u> under the Plan.  Each

2    Allowed Parish Unsecured Claim that is not otherwise contributed or becomes part of the

3    consideration for a Parish to participate as a Participating Third Party (if such Parish determines

4    to become a Participating Third Party), will be paid in full after all payments to be made by

5    RCBSD to the Fund are paid in full and the Allowed Class 8 Claims have been paid in full.  At

6    this time, RCBSD is not aware of any Class 9 Parish Unsecured Claims.  There may be Claims

7    asserted for indemnification or contribution from those Parishes who are Co-Defendants with

8    RCBSD in the state court litigation.  To the extent any Class 9 claims are asserted as set forth

9    above, RCBSD will modify the Plan to provide for a payment plan with respect to these Class 9

10    Claims.

(e)    Class 10: General Unsecured Claims

11    <u>Classification</u>:  Class 10 includes every Unsecured Claim against RCBSD (including, but

12    not limited to, every such Claim arising from the rejection of an Executory Contract and every

13    Claim which is the undersecured portion of any Secured Claim), which is not an Administrative

14    Claim, a Priority Unsecured Claim, a Priority Tax Claim, a General Unsecured Convenience

15    Claim, a Parish and School Deposit and Loan Trust Claim, a Parish Unsecured Claim, a Tort

16    Claim, an Unknown Tort Claim, an Other Tort and Employment Claim or a Penalty Claim, and

17    which is classified and treated as the Plan provides for Class 10 Claims.

18    <u>Treatment</u>:  Allowed Class 10 General Unsecured Claims are <u>Impaired</u> under the Plan.

19    Each holder of an Allowed Class 10 General Unsecured Claim will be paid in full in monthly

20    installments, including interest with the first installment to be paid thirty (30) days after the

21    Effective Date (or the Claim Payment Date) and succeeding monthly installments to be paid

22    monthly until paid in full. If not fully paid by the third (3rd) anniversary of the Effective Date,

23    each Allowed General Unsecured Claim will bear interest from and after the third anniversary of

24    the Effective Date at the rate of five percent (5%) per annum or such other rate as set by the

25    Bankruptcy Court in the Confirmation Order.  A chart describing the anticipated Class 10 General

26    Unsecured Claims, and their treatment under the Plan is attached hereto as Exhibit "8" and

27    incorporated by reference.

28

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                    -28-                    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1    (f)    Class 11: Other Tort And Employee Claims

2    Class 11 includes any and all Claims, demands, suits, causes of action, proceedings or any

3    other rights or asserted right to payment heretofore, now or hereafter asserted against the Debtor,

4    whether or not reduced to judgment, based upon or in any manner arising from acts or failure to

5    act by the Debtor which has allegedly resulted in injury asserted by an employee or other Person

6    pursuant to applicable state or federal law, but excluding Tort Claims, any Claims of employees

7    entitled to priority pursuant to Bankruptcy Code § 507 and any Insurance and Benefit Claims.

8    RCBSD estimates that there are no other Tort and Employee Claim at this time.    There are

9    potential Claims which are contingent and unliquidated and therefore not taken into account.

10    Treatment: Class 11 Claims are Impaired under the Plan. Each holder of a Class 11 Other

11    Tort and Employee Claim, as and when such Claim becomes an Allowed Claim, will be paid

12    solely from the proceeds of any insurance policies applicable to such Other Tort and Employee

13    Claim.  To the extent that such Claims may not be satisfied in full by the foregoing, then such

14    Other Tort and Employee Claims, to the extent not so satisfied, will be Disallowed.  A chart

15    describing the Debtor's anticipated Class 11 Other Tort and Employee Claims, and their treatment

16    under the Plan is attached hereto as Exhibit "9" and incorporated by reference.

17    (g)    Class 12: Tort Claims

18    Classification:    Class 12 includes all Claims, demands, suits, causes of action,

19    proceedings or any other rights or asserted rights to payment, including, but not limited to any

20    Claims, demands, suits, or causes of action: (i) for personal injuries, including emotional distress;

21    (ii) for damages, including punitive damages; (iii) for attorneys' fees and other expenses, fees or

22    costs; and (iv) for any equitable remedy, heretofore, now or hereafter asserted against the Debtor,

23    any Released Parties, any Participating Third Parties, any Settling Parties, the Settlement Trust or

24    the Litigation Trust, whether or not reduced to judgment, based upon or in any manner arising

25    from or related to:

26    • acts as defined in Calif. Civ. P. Civil § 340.1(e);

27    • acts of sexual abuse committed by any cleric, employee, volunteer or other person

28    associated with the Diocese, any Parish or any affiliated entity;

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
Tucson

QBTUC\202594.4    -29-    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

- the failure of RCBSD to properly supervise any cleric, any volunteer, or any other employee of or person associated with the Diocese, a Parish or any affiliated entity;

- the processing, adjustment, defense, settlement, payment, negotiation or handling of any claims, demands, suits, proceedings or causes of action based upon or relating in any way to the Claims made as a result of any alleged abuse or other Tort Claim asserted by a Tort Claimant; or

- the failure to warn, disclose or provide information concerning, the alleged sexual abuse and other misconduct of clergy, other employees or volunteers of or persons associated with the Diocese, the Parishes or any affiliated entities.

Subject to the limitations contained in the Plan and except for purposes of treatment and payment under the Plan, Tort Claims include Unknown Tort Claims when they are asserted.

Treatment:  On or before the Effective Date (but after entry of the Confirmation Order), the Reorganized Debtor will, in full release and discharge of all Claims in Class 12, cause the Settlement Trust and the Litigation Trust to be established and deliver to the Trustee of each respective Trust that portion of the Initial Payment provided for under the Plan as allocated as part of the confirmation process. All Tort Claimants will automatically be in the Settlement Trust unless a Tort Claimant affirmatively opts out of the Settlement Trust and elects to have his/her Tort Claim determined pursuant to the Litigation Protocol. All amounts distributed to the Trustee of the Settlement Trust and the Trustee of the Litigation Trust will be held and distributed by the Trustee in accordance with the Settlement Trust Agreement and the Litigation Trust Agreement, respectively, which will be filed no later than ten (10) days prior to the final hearing on this Disclosure Statement.

The Special Arbitrator will assume full responsibility for resolving the Tort Claims of all Settling Tort Claimants and the Trustee of the Litigation Trust will assume full responsibility for resolving all Tort Claims of Non-Settling Tort Claimants. The Trustee of the Settlement Trust and the Litigation Trust will: (i) establish the Trust Administrative Expense Reserve; (ii) make payments to the holders of Allowed Tort Claims pursuant to the terms of the Plan; (iii) invest and

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                    -30-                    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1  manage the funds distributed to the Litigation Trust and the Settlement Trust; and (iv) pay the

2  fees, costs and expenses of the Settlement Trust and the Litigation Trust, all as set forth more

3  fully in the Settlement Trust Agreement, the Litigation Trust Agreement and the Plan.

4      With respect to the Tort Claim of a Settling Tort Claimant:

5      • The Special Arbitrator is to determine whether the Tort Claimant has proven that

6  the Tort Claimant was abused, that the Debtor can be held liable for the abuse under

7  applicable California law and that the applicable statute of limitations under Cal. Code

8  Civ. P. § 340.1(a) has not run on or before the Confirmation Date. The Special Arbitrator

9  is to determine Allowance or Disallowance of such Tort Claim in accordance with the

10  criteria and procedure set forth in the Plan.

11      • If a Tort Claim of a Settling Tort Claimant is Allowed, the Special Arbitrator will

12  determine the amount of such Tort Claim by assigning such Tort Claim to a Tier in

13  accordance with the criteria and procedures set forth in the Plan. The Tort Claim of a

14  Settling Tort Claimant will not be placed into a Tier until and unless the Special

15  Arbitrator has determined that the Tort Claim should be Allowed. If RCBSD and a Tort

16  Claimant have entered into a Claim Allowance Agreement prior to the Effective Date, the

17  Tort Claimant will be compensated in accordance with the Claim Allowance Agreement

18  and no further determination of the Tort Claim will be made by the Special Arbitrator.

19      • A Settling Tort Claimant and any Tort Claimant whose Claim is Disallowed

20  pursuant to the claim determination procedures set forth in the Plan will receive no

21  distribution under the Plan and will have no further Claim against RCBSD, the

22  Reorganized Debtor, a Participating Third Party, a Settling Party, a Settling Insurer or a

23  Released Party.

24      <u>Unknown Claims:</u>

25      The Unknown Claims Representative will be appointed to represent the interests of the

26  Unknown Tort Claimants. The Unknown Claims Reserve will be held and administered by the

27  Trustee of the Settlement Trust or the Litigation Trust (depending upon whether the Unknown

28  Claims Representative opts out of the Settlement Trust) in accordance with the applicable terms

1   of such trusts.  An Unknown Claims Reserve in the amount of $3,000,000 will be funded by

2   RCBSD over time and as needed to pay the Allowed Unknown Tort Claims.

3   • Unless the Unknown Claims Representative opts out of the Settlement Trust, any

4   Unknown Tort Claims will be treated and determined in the same manner and applying

5   the same criteria as is used to determine Allowance or Disallowance of a Tort Claim.

6   • On motion of a party in interest, the Court may reduce the distributions to such

7   Unknown Tort Claimants if a significant risk exists that the Unknown Claims Reserve

8   will not be sufficient to make such distributions and satisfy the Unknown Tort Claims

9   while still maintaining appropriate reserves.  In the event that the distributions are

10   reduced, any party in interest may move the Court to further consider whether the

11   distributions to the Unknown Tort Claimants with Allowed Claims may be increased

12   based upon the then current circumstances; provided, however, that no Allowed Unknown

13   Tort Claim will be increased so that the distribution to such Unknown Tort Claimant with

14   an Allowed Tort Claim is greater than the distribution to a Settling Tort Claimant with an

15   Allowed Tort Claim in the same Tier, taking into account the minimum and maximum

16   distributions the holder of an Allowed Tort Claim in a particular Tier can receive.

17   • If the Unknown Claims Representative opts out of the Settlement Trust, the

18   Unknown Claims will be treated and determined in the same manner as the Tort Claims

19   of Non-settling Tort Claimant.  The Unknown Tort Claimants will retain the right to

20   adjudicate their Claims through litigation (including, if not previously waived, trial by

21   jury in the Bankruptcy Court or the District Court, if and to the extent such is available),

22   subject however, to the provisions of the Plan, and the Litigation Trust Agreement.

23   • The Unknown Tort Claimant will commence his/her action by filing a Proof of

24   Claim in the Bankruptcy Court. An objection to the Proof of Claim by the Trustee or the

25   Reorganized Debtor will constitute an answer and commencement of the action to

26   determine the Allowance or Disallowance of the Unknown Tort Claim.

27

28

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                    -32-                    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1    Distributions to Non-Settling Tort Claimants and Unknown Tort Claimants (if part of the

2    Litigation Trust):

3         All Non-Settling Tort Claimants will retain the right to adjudicate their Claims through

4    litigation (including, if not previously waived, trial by jury in the Bankruptcy Court or the District

5    Court, if and to the extent such is available), subject however, to the provisions of the Plan and

6    the Litigation Trust Agreement.  Upon entry of a Final Order in favor of a Non-Settling Tort

7    Claimant, and upon resolution by Final Order of all Unknown Tort Claims, (and subject to the

8    limitations described above) an Unknown Tort Claimant and a Non-Settling Tort Claimant will

9    receive, in full discharge and satisfaction of such Allowed Claim, the lesser of:

10        • the amount of the judgment pursuant to a Final Order; or

11        • to the extent that the amount allocated to the Litigation Trust from the Fund, after

12    deduction of the Trust Administrative Expense Reserve allocable to the Litigation Trust, is

13    not sufficient to pay all Allowed Tort Claims of Non-Settling Tort Claimants the amount

14    awarded by a Final Order, the Allowed Claims of Non-Settling Tort Claimants will be

15    paid Pro Rata from the proceeds of the Litigation Trust.

16        • to the extent that the Unknown Claims Reserve, after deduction of all costs,

17    expenses, fees and other charges which are to be paid or reserved by the Trustee, is not

18    sufficient to pay all Allowed Unknown Tort Claims, the Allowed Unknown Tort Claims

19    will be paid Pro Rata from the proceeds of the Unknown Claims Reserve, and any funds

20    remaining in the Unknown Claims Reserve be distributed to back to the Reorganized

21    Debtor.

22    Summary of Settlement Trust Treatment:

23        The following is a chart estimating the distributions to each Tier based on the proposed

24    amounts to be contributed to the Fund by RCBSD and based upon information obtained by

25    RCBSD about the current allegations made by Tort Claimant in the state court litigation.[12]

26

27        [12] RCBSD disputes all Tort Claims and believes that many of the Tort Claims will be
placed in different Tiers after evidence is presented and considered by the Special Arbitrator.

28

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                              -33-                    CASE NO. 07-00939-LA11
                                                          DISCLOSURE STATEMENT DATED MARCH 27, 2007

RCBSD believes this is a fair estimate because not all current Tort Claims will be: (i) Allowed, or (ii) Allowed in the Tier in which the allegations of the Tort Claimant would currently place such Tort Claimant. In addition, while the total Fund is to be $95,000,000 the estimates below only result in a payout of approximately $74,000,000 (assuming the average payment within a Tier to each settling Tort Claimant with an Allowed Tort Claim). Therefore, there are sufficient funds to account for additional Tort Claims which have not yet been filed, more Tort Claimants receiving a higher payout within a Tier than the average, reserves for Trust Administrative Expense Reserve and amounts to be allocated to the Litigation Trust.

| Description | Treatment |
|---|---|
| **Tier 1 Claimants:** Victims of sexual abuse involving penetration, including penetration with an object and/or sexual intercourse.<br><br>**Estimated Number of Claimants:** 83<br>**Estimated Total Amount: $57,104,000**[13] | • **Distribution Range:** $576,000.00-$800,000.00 |
| **Tier 2 Claimants:** Victims of sexual abuse involving touching of sexual and other intimate parts (unclothed) such as Masturbation; Touching under clothing.<br><br>**Estimated Number of Claimants:** 14<br>**Estimate Total Amount: $6,657,000** | • **Distribution Range:** $376,000.00-$575,000.00 |
| **Tier 3 Claimants:** Victims of sexual abuse involving touching of sexual and other intimate parts (clothed).<br><br>**Estimated Number of Claimants:** 30<br>**Estimated Total Amount: $8,265,500** | • **Distribution Range:** $176,000.00-$375,000.00 |

---

[13] In determining the estimated total amount to be paid in each Tier, RCBSD has assumed that each Tort Claimant will be awarded the average of the minimum and maximum and are allowance of 143 Tort Claims all in the Settlement Trust.

| | |
|---|---|
| **Tier 4:**<br>Victims of sexual abuse involving acts which do not involve touching, examples of which are:<br><br>• Perpetrator exposes self to Tort Claimant;<br>• Perpetrator inappropriately looks at Tort Claimant's intimate parts;<br>• Perpetrator takes inappropriate photographs or video of Tort Claimants or shows Tort Claimant inappropriate sexual material.<br><br>**Estimated Number of Claimants:** 16<br>**Estimated Total Amount: $1,480,000** | • **Distribution Range:**<br>$10,000.00-$175,000.00 |

<u>Treatment of Attorney's Fees of Tort Claimants including Unknown Tort Claimants:</u>

The fees and expenses of attorneys representing any of the Settling Tort Claimants, Non-Settling Tort Claimants or Unknown Tort Claimants who receive payment from the Settlement Trust, the Litigation Trust or the Unknown Claims Reserve, will be borne by such Claimants based on applicable state law and individual arrangements made between such Claimants and their attorneys.  In no event will RCBSD, the Reorganized Debtor or the Trustee of the Settlement Trust or the Litigation Trust have any liability for any fees and expenses of attorneys representing any of the Settling Tort Claimants, any of the Non-Settling Tort Claimants or any of the Unknown Tort Claimants and any such Claims, if any, will be Disallowed.

<u>Treatment of Punitive Damages:</u>

Claims for punitive or exemplary damages in connection with Tort Claims, whether asserted by Tort Claimants, Unknown Tort Claimants or any other Claimants, will treated as Penalty Claims and be Disallowed.

   (h) <u>Class 14: Penalty Claims</u>

Class 14 includes any Claims for any fine, penalty, forfeiture, multiple damages, punitive damages, or exemplary damages not meant to compensate the claimant for actual pecuniary loss.

1   Treatment:   Class 14 claims are impaired under the Plan.   No Penalty Claims will be

2   Allowed and there will be no distribution to the holders of any Penalty Claims.

3   ## IV.

4   ## MEANS OF IMPLEMENTATION OF THE PLAN

5   A.   **Procedure for Determining Torts Claims of Settling Tort Claimants and Unknown**
      **Tort Claimants**
6

7   The Allowance or Disallowance of the Tort Claims of Settling Tort Claimants and

8   Unknown Tort Claimants (unless the Unknown Claims Representative opts out of the Settlement

9   Trust) will be determined by the Special Arbitrator.   The Special Arbitrator will consider

10  information provided by the Tort Claimant, information requested by the Special Arbitrator,

11  which may include:   (i) records and documents which has been produced in the course of

12  litigation; (ii) questionnaires submitted by Tort Claimants in the California coordination

13  mediation proceeding before the Honorable Peter Lichtman or the Honorable Anthony Mohr in

14  JCCP No. 4297; (iii) information provided by the Committee; (iv) information provided by

15  RCBSD; (v) and information requested or developed by the Special Arbitrator.   The Special

16  Arbitrator may also require an independent medical examination performed by a healthcare

17  professional regarding among other things, the nature and extent of damages allegedly suffered as

18  a result of the alleged acts giving rise to the Tort Claim.

19  The Debtor, the Reorganized Debtor or the Committee (collectively along with the

20  Settling Tort Claimant or Unknown Claimant are referred to as the "Arbitration Parties") may

21  make a recommendation to the Special Arbitrator regarding Allowance of a Tort Claim and Tier

22  placement. If the Arbitration Parties (including the Settling Tort Claimant) agree to the

23  recommendation, the Tort Claim will be Allowed as recommended by the Arbitration Parties and

24  as agreed by the Settling Tort Claimant.   If any of the Arbitration Parties disagree or the Tort

25  Claimant does not accept the recommendation, the Special Arbitrator will determine the Tort

26  Claim in accordance with the Plan.

27  Any of the Arbitration Parties may request written or oral discovery, under oath, which

28  complies with the Federal Rules of Civil Procedure, so long as the discovery may reasonably lead

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                     -36-                     CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1 to evidence with respect to the issues before the Special Arbitrator in determining Allowance or
2 Disallowance of a Tort Claim, the Tier into which such Tort Claim should be placed and the
3 consideration of circumstances which would justify a higher or lower amount of Allowance
4 within a Tier.

5      The method of presentation of information and evidence to the Special Arbitrator
6 regarding Allowance or Disallowance of a Tort Claim, the Tier into which such Tort Claim
7 should be placed and the consideration of circumstances which would justify a higher or lower
8 amount of Allowance within a Tier is within the discretion of the Special Arbitrator. Nothing
9 contained in the Plan, however, precludes a presentation of evidence at a formal evidentiary
10 hearing set at the request of one of the Arbitration Parties, or sua sponte by the Special Arbitrator.
11 The Special Arbitrator will have the right to issue subpoenas compelling the attendance of
12 witnesses at the evidentiary hearing at the request of an Arbitration Party. If the Special
13 Arbitrator approves such request, the witness will be compelled to attend to the extent the witness
14 could be compelled to attend a hearing in the Bankruptcy Court in which the Reorganization Case
15 is pending. The Special Arbitrator may also request that the Arbitration Parties provide any
16 additional materials or names of possible witnesses that will aid the Special Arbitrator in
17 evaluating a Tort Claim (including an Unknown Tort Claim).

18      **1.**      **Criteria for Determining Validity of Tort Claims**

19      Initially, and prior to determining the Tier into which a Tort Claim will be placed, the
20 Special Arbitrator will determine whether the Tort Claim (including an Unknown Tort Claim if
21 the Unknown Claims Representative has not opted out of the Settlement Trust) should be
22 Allowed by considering evidence of RCBSD's responsibility for the acts which give rise to the
23 Tort Claim, and the dates that the alleged abuse occurred. Tort Claimants and Unknown Tort
24 Claimants must also have complied with Cal. Code. Civ. P. § 340.1(h). RCBSD will have the
25 right, but not the obligation to appear and be heard in any proceeding for the Allowance of
26 Disallowance of the Tort Claim of a Settling Tort Claimant or an Unknown Tort Claimant.

27
28

### 2.     Criteria for Determining Tiers for Allowed Tort Claims

Under the Plan the Special Arbitrator must place Allowed Tort Claims of Settling Tort Claimants in one of the four Tiers corresponding to the acts which constitute classifying a Tort Claim. If a Tort Claimant experienced abuse that that would fall into more than one Tier, then the Tort Claims will be placed in the highest ranked Tier. A Tort Claimant cannot have Tort Claims in more than one Tier.

After allowing the Tort Claim and placing the Tort Claim into a Tier, the Special Arbitrator is to determine the distribution amount within the Tier range based upon the following factors:

(i)     the age of the Tort Claimant when abused;

(ii)    the duration of the abuse;

(iii)   the frequency of the abuse;

(iv)    whether the Tort Claimant has previously received compensation from RCBSD or another party for the abuse;

(v)     the damages suffered by the Tort Claimant as a result of the abuse;

(vi)    any manifestations of the abuse;

(vii)   the presence or absence of drug or alcohol abuse;

(viii)  any criminal history of the Tort Claimant; and

(ix)    any history or pattern of behavior to establish that the Tort Claimant has been an abuser.

### 3.     Notice of Allowance

The Special Arbitrator will give notice to the Reorganized Debtor, the Tort Claimant (or Unknown Tort Claimant) and the Committee Professionals of the Allowance of any Tort Claim, the Tier in which the Special Arbitrator is Allowing the Tort Claim and the amount of the applicable Tier distribution as determined by the Special Arbitrator. The Reorganized Debtor, the Tort Claimant (or Unknown Tort Claimant) or the Committee may object to such Allowance, including the Tier placement and amount of distribution by written objection to the Special Arbitrator with twenty (20) days of receiving such notice. The Special Arbitrator will serve

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4                    -38-                    CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

1   notice on the Reorganized Debtor, the Tort Claimant (or the Unknown Tort Claimant) and the

2   Committee Professionals if the Special Arbitrator is changing the Tier placement or decision to

3   Allow the Tort Claim or the amount of the distribution. The decision of the Special Arbitrator is

4   final and nonappealable.

5   **B.**   **Litigation Protocol**

6        If a Litigation Trust is necessary, the procedures for resolving Claims of Non-Settling Tort

7   Claimants will be described in the Litigation Trust Agreement. If there are no Non-Settling Tort

8   Claimants by the Confirmation Hearing, no Litigation Trust will be formed and no Litigation

9   Protocol will be established. If there are non-settling Tort Claimants, there will first be attempt to

10   settle the Tort Claims of Non-Settling Tort Claimants. The Special Arbitrator, acting as a

11   mediator, will attempt to resolve the Tort Claims of Non-Settling Tort Claimants (or Unknown

12   Tort Claimants, if applicable). If such attempts are not successful within the time frames

13   provided in the Litigation Trust Agreement, individual Non-Settling Tort Claimants (or Unknown

14   Tort Claimants if applicable) will have the right to proceed to trial, including jury trial, if

15   available, in the Bankruptcy Court or in the District Court in accordance with applicable law or

16   may waive the right to a jury trial, provided, that such Non-Settling Tort Claimant has not already

17   waived his or her right to seek relief in the District Court or before a jury.

18        In accordance with Bankruptcy Code § 1123(b)(3), after the Effective Date, the Trustee of

19   the Litigation Trust and the Trustee of the Settlement Trust will succeed to all claims, defenses,

20   counterclaims, set offs, and recoupments belonging to the Debtor or its Estate, including the

21   Constitutional Challenge with respect to all Tort Claims and Unknown Tort Claims. RCBSD also

22   reserves the right to bring the Constitutional Challenge at anytime during the Reorganization

23   Case, including, but not limited to, during any proceeding to estimate the Tort Claims. There

24   will be no distributions on account of the Allowed Claims of the Non-Settling Tort Claimants

25   until the Claims of all Non-Settling Tort Claimants have been determined by a Final Order.

26

27

28

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4

-39-

CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007

**C.    Procedure for Determination of Claims Other Than Tort Claims**

    **1.**          **Objections to Claims**

The Debtor and the Reorganized Debtor may object to the allowance of any Claim besides Settling Tort Claimants, Non-Settling Tort Claims or Unknown Tort Claimants against the Debtor or seek estimation thereof on any grounds permitted by the Bankruptcy Code by filing the appropriate pleading in the Bankruptcy Court at any time prior to the first Business Day which is one hundred eighty (180) days after the Effective Date.

    **2.**          **Disputed Claims**

No payments or other distributions will be made to holders of Claims unless and until such Claims are Allowed Claims pursuant to a Final Order or final determination of the Special Arbitrator.

    **3.**          **Treatment of Contingent Claims**

Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Contingent Claim will be treated as a Disputed Claim that is not entitled to distributions under the Plan.

**D.    Funding on the Effective Date.**

All payments under the Plan which are due on the Effective Date from RCBSD will be funded from the Fund with respect to payment of Allowed Tort Claims. The Fund will be funded from available Cash, sales of Assets and financing which RCBSD may seek to obtain on an unsecured or secured basis. All payments under the Plan which are due to other Creditors with Allowed Claims will be funded from available Cash, reserves, ordinary business operations, property sales and financing (if obtained). The Unknown Claims Reserve will be funded as necessary when and if Unknown Claims are asserted.

**E.    Payments Effective Upon Tender**

Whenever the Plan requires payment to be made, such payment will be deemed made and effective upon tender thereof by the Debtor or the Reorganized Debtor to the Creditor to whom payment is due. Creditors must apply the funds in accordance with the Plan as of the date of the tender.

QUARLES & BRADY
LLP
ATTORNEYS AT LAW
TUCSON

QBTUC\202594.4

-40-

CASE NO. 07-00939-LA11
DISCLOSURE STATEMENT DATED MARCH 27, 2007