James I. Stang (CA Bar No. 94435)
E-mail: jstang@pszyjw.com
Hamid R. Rafatjoo (CA Bar No. 181564)
E-mail: hrafatjoo@pszyjw.com
PACHULSKI STANG ZIEHL YOUNG JONES
     & WEINTRAUB LLP
10100 Santa Monica Blvd.
11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760

[Proposed] Attorneys for Official Committee of Unsecured
Creditors

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC BISHOP OF SAN DIEGO, a California corporation sole,<br><br>                Debtor | Case No.: 07-00939-LA 11<br><br>Chapter 11<br><br>**OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTOR'S MOTION FOR ORDER (A) AUTHORIZING CONTINUED USE OF DEBTOR'S CASH MANAGEMENT SYSTEM; (B) AUTHORIZING MAINTENANCE OF DEBTOR'S EXISTING BANK ACCOUNTS AND CONTINUED USE OF ITS BUSINESS FORMS; (C) WAIVING COMPLIANCE WITH 11 U.S.C. § 345(B); AND (D) FOR OTHER RELIEF; DECLARATIONS OF MICHAEL H. ZIMMER AND HAMID R. RAFATJOO IN SUPPORT THEREOF**<br><br>Date:     April 11, 2007<br>Time:    2:00  p.m.<br>Place:   Dept. 2, Rm. 118<br>            325 West "F" Street<br>            San Diego, CA 92101 |

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**TO THE HONORABLE LOUISE DECARL ADLER, UNITED STATES BANKRUPTCY JUDGE, AND TO THE DEBTOR AND ALL PARTIES IN INTEREST:**

The Official Committee of Unsecured Creditors (the "Committee") hereby opposes the *Motion for Order (A) Authorizing Continued Use of Debtor's Cash Management System; (B) Authorizing Maintenance of Debtor's Existing Bank Accounts and Continued Use of Its Business Forms; (c) Waiving Compliance with 11 U.S.C. §345(b); and (D) for Other Relief* (the "Motion") [Docket No. 9], and in support of such opposition respectfully represents as follows:

## I.

### Introduction

Through the Motion, the Roman Catholic Bishop of San Diego (the "Diocese") seeks authority to maintain its cash management system and concludes that such relief is "routinely granted in business cases." (Mot. at 5). Yet, as forth in greater detail below, the Motion is woefully inadequate and this is not an ordinary business case for many reasons, including the following:

First, the Diocese is the fifth and largest Catholic diocese that has filed bankruptcy in the country. The bankruptcy filing was the result of decades of mismanagement and deceit which culminated into hundreds of lawsuits against the Diocese stemming from the sexual abuse of children by clergy. Similar conduct around the country by other dioceses gave rise to a national tragedy.

Second, the Diocese filed bankruptcy on the eve of a trial after years of litigation. The Diocese did not file bankruptcy to "justly, fairly, and equitably compensate the victims of sexual abuse." (Disc. Stmnt at 6) [Docket No. 151]. If the Diocese intended to justly, fairly and equitably compensate the survivors of sexual abuse, it would not have filed its plan and disclosure statement 9 days after the appointment of the Committee and without any consultation whatsoever with the Committee or plaintiffs' counsel. If the Diocese intended to justly, fairly and equitably compensate the survivors of sexual abuse, it would have disclosed a $65 million real estate transaction by a wholly controlled entity or the Diocese's sole membership interest in the corporation holding the real estate (finally disclosed in amended Schedules of Assets and Liabilities).

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Based on the foregoing, the Committee has grave concerns regarding the lack of information in the Motion and respectfully requests that the Court (a) require the Diocese to provide more detailed information regarding its cash management system; (b) establish reporting requirements for the Diocese and the Service Recipients[1]; (c) make a specific finding that the order does not constitute a determination that the Service Recipients are separate from the Diocese and or that their assets are not assets of the estate; and (d) make a specific finding that nothing in its order constitutes a validation of the Diocese's position that certain accounts and/or funds are restricted accounts and/or funds which cannot be used to pay the claims of creditors.

## II.

### The Diocese Has Failed to Adequately Describe the Cash Management System

**A.      The Information Regarding the Existing Accounts is Inadequate**

In the Motion, the Diocese makes reference to numerous agreements that evidence the cash management system.  The Diocese makes reference to the administrative services it provides to the Service Recipients and states that it receives compensation for such services.  Yet, the Diocese fails to provide a copy of the agreement or agreements pursuant to which it provides such services.  The Diocese also fails to provide a cost-benefit analysis of such administrative services so that the Court, the US Trustee, and the Committee can determine whether the fees collected by the Diocese warrant maintaining the cash management system in place.

Similarly, the Diocese fails to provide any information on how the Bishop's Business Account is funded.  For example:  Are there any restrictions on how much the Bishop spends?  Who else has access to the funds in this account?  Additionally, the Debtor's Schedules of Assets and Liabilities (the "Schedules") do not list this account.  Thus, there is no way to determine how much is in this account or was in this account as of the petition date.

Similarly, the Diocese fails to provide any information on the system of checks and balances that are in place to control tens of millions of dollars in cash that flows through the Diocese and is sitting in the various accounts.

---

[1] Unless otherwise indicated herein, all capitalized terms shall have the meaning provided for in the Motion.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**B.      The Diocese Should Not be Authorized to Provide On-Going Cash Management Services to the Service Recipients Listed in the Schedules As Account Debtors**

The Motion fails to state that part of the Diocese's "cash management" system is to first pay for the payroll, the pension, and health insurance of the Service Recipients and THEN collect the funds from the Service Recipients. The Diocese's response to Schedule B 16 lists $9,592,784.89 in accounts receivable. Over $3.3 million of this accounts receivable is from the Service Recipients for the services being provided by the Diocese. In addition, the $3,324.612.83 in accounts receivable from the Service Recipients does not include $510,175 in accounts receivable that have not been included in the sum because they are "Doubtful Accounts." Why is the Diocese fronting the money for these services and why does it continue to front the money to parishes that have not reimbursed the Diocese? There is simply no reason for this. The Court should order that the Diocese, at the very least, require that all Service Recipients pay their share of the accounts receivable and, from here on, prepay for the services being rendered by the Diocese before the Diocese will render such services.

In addition, the Diocese's Statement of Financial Affairs indicates that the Diocese has paid approximately $1.25 million in the last year to subsidize certain parishes. This subsidy should not be part of the cash management system especially since the newly self-proclaimed Organization of Parishes has retained the law firm of Foley & Lardner to assist the Service Recipients to minimize their exposure in this bankruptcy case.

**C.      The Service Recipients Should Disclose How Much is In Their Accounts**

Exhibit 2 to the Declaration of Richard Mirando in Support of First Day Motions (Docket No. 6) lists at least 770 accounts held by the Service Recipients using the Diocese's taxpayer identification number. Given the $3,324.612.83 in accounts receivable and $510,175 in "Doubtful Accounts" the Service Recipients should disclose the balance in each of these accounts so that a determination can be made as to whether the Diocese should continue to take the risk associated with its services and whether such Service Recipients are good-for-the-money. Given the history of this Diocese and some of the reasons set forth in the introductory section to this Opposition, every

1  precaution must be taken to ensure that the Diocese and the Service Recipients are not parking

2  millions of dollars in these undisclosed accounts to avoid paying their creditors.

3  **D.    The Court Should Order the Diocese to Correct Its Misstatements to the Parishioners**

4        Attached hereto as Exhibit A to the Declaration of Michael H. Zimmer is a letter from Pastor

5  Michael Gallagher to the parishioners of Our Lady of Grace (the "Gallagher Letter").  In the

6  Gallagher Letter, there are numerous misrepresentations regarding this Court's prior rulings.  For

7  example, the Pastor Gallagher states that "[t]he Court ordered that we establish a new tax

8  identification number for every parish account instead of using the diocesan tax identification

9  number; we have started that process."  The Gallagher Letter also states:  "[u]nderstand that that

10 [sic] the court ruled that all contributions to Annual Catholic Appeal are 'designated' funds; and are

11 **not** considered diocesan assets under the Chapter 11 terms. . . ."

12       The Committee believes that the Court has made no such rulings.  Thus, the Diocese should

13 direct all pastors and priests to forthwith inform the parishioners of these misstatements.

14 **E.    The Motion Fails to Disclose the Operations of the "Diocesan Bank"**

15       The Diocese Policy Handbook, which is available online at http://www.diocese-sdiego.org,

16 has in the Diocesan Administration section the "Policy on Parish and Other Funds On Deposit With

17 the Diocese" (the "Diocesan Deposit Policy"), which is attached hereto as Exhibit B to the

18 Declaration of Hamid R. Rafatjoo (the "Rafatjoo Declaration").  This Diocesan Deposit Policy

19 provides that: "Parishes are required to deposit with the diocese (i.e. in the "Diocesan Bank") all

20 parish funds, including those generated and/or held for the benefit of parish operations,

21 organizations, projects or programs over and above funds needed for normal daily business.  This

22 policy applies to parochial schools and Diocesan high schools."  The Diocesan Deposit Policy goes

23 on to state that the amount needed for daily business is $50,000 for most parishes.

24       Presumably, the Diocesan Bank is the same as the "Parish & School Deposit & Loan Trust"

25 referenced in the Statement of Financial Affairs in response to Question 14—Property Held for

26 Others.  The Diocese profits from the funds "on deposit" with the Diocese and renders some services

27 in connection with such funds "on deposit" with it.  The Court and the creditors are entitled to

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

disclosures regarding the operations of the Diocesan Bank. Yet, the Motion fails to make the slightest reference to the Diocesan Bank.

In addition, according to the Gallagher Letter, the parishes are setting up a new fund "for parish and school deposits that will be held in trust by and for the Organization of Parishes." What does this mean? Has a subsidiary to the Diocesan Bank been formed for deposits? Why does the Diocese think that it does not need to Court's approval to divert funds? Why does the Diocese think that certain accounts can be established outside the Court's, the US Trustee's, and the Committee's supervision of these new accounts?[2]

Moreover, based on the Diocesan Deposit Policy, none of the 770 parish accounts should have over $50,000 in them. However, even with the $50,000 cap, there is potentially $38.5 million of cash at the parish level. In light of the Diocese's position that the Service Recipients are separate and that "[n]o one at RCBSD has access to or control over any of the Service Recipients' accounts, any knowledge of location or depository for such accounts or the activity in those accounts", the account funds may be used at the expense of creditors. At this juncture of the case, the Court should not allow the Diocese to benefit from how it has "staged" the case for the Service Recipients to the detriment of the only real creditors—the survivors of childhood sexual abuse by clergy.

The Diocese should provide information regarding the accounts of the Service Recipients so that a determination can be made as to whether the accounts are indeed vehicles for violating the rule against paying prepetition claims or if the account funds will be dissipated. It is equally important for the Court and the parties to be informed of how much is on deposit at the parish level. The Court should not fall prey to the Diocese's statement that it has no "knowledge of location or depository of such accounts." The Policy for Diocesan Tax, which is a tax imposed by the Diocese on the parishes, provides that all parishes shall provide annual financial statements to the Diocese.[3] Conveniently, the Diocesan Handbook section with parish Administration has the form Parish Financial Report that is to be used. The last page of this form asks for a list of the bank accounts

---

[2] In addition, the parishes should not be allowed to open any new accounts or transfer funds without reimbursing the Diocese for the accounts receivable and that any account that may be opened remain within the custody and control of the Diocese—and, thus, the supervision of the Court, the US Trustee's office, and the Committee.

[3] A true and correct copy of the Diocesan Policy on Tax is attached to the Rafatjoo Declaration as Exhibit C.

(which are not with the Diocesan Bank) including the name, account number, and balance.[4]  So, the Diocese knows.  It has simply chosen not to share the information with the creditors.

**F.      The Court Should Not Waive the Requirement of 345(b) Until Further Information is Provided**

According to the Statement of Financial Affairs, millions of dollars are in deposits in the following funds:  (1) the Pooled Income Fund; (2) various endowment funds, (3) Gift Annuity Fund, (4) Charitable Remainder Unitrust, and (5) a fund for retired priests.  The Diocese needs to provide the Court, the US Trustee and the Committee with more detailed information regarding each of these funds.  In addition, the Diocese should disclose if any priests against whom credible allegations of sexual abuse have been made have an interest in the $2.376 million retirement fund.

### III.

### Conclusion

The Committee is flabbergasted at the lack of disclosure in the Motion.  The Committee believes that the Court should order the Diocese to provide the Committee with satisfactory information regarding the issues set forth in this Opposition.  The Chapter 11 process is about financial transparency.  This rule applies to the Diocese just as it applies to every other debtor-in-possession.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[4] Similarly, the statement by the Diocese that it "has no way of knowing whether that list [of 770 parish accounts] is complete" is inaccurate.  It just needs to review the financial statements of the parishes.  A true and correct copy of the form Parish Financial Report is attached to the Rafatjoo Declaration as Exhibit D.

1    **WHEREFORE,** the Creditors respectfully requests that the Court set a date certain by which

2    the Diocese will provide information to the Committee, order that the Diocese grant the Committee's

3    financial advisors with full access to such financial information, and grant the Committee such other

4    and further relief as the Court may deem just and proper under the facts and circumstances of this

5    case.

6

7    Dated:    March 30, 2007                    PACHULSKI STANG ZIEHL YOUNG JONES

8                                                    & WEINTRAUB LLP

9                                     By

10                                           James I. Stang (CA Bar No. 94435)
                                             Hamid R. Rafatjoo (CA Bar No. 181564)
11                                           [Proposed] Attorneys for Official
                                             Committee of Unsecured Creditors

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

7

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### DECLARATION OF MICHAEL H. ZIMMER

I, Michael H. Zimmer, hereby declare and state as follows:

1.    I am an attorney duly admitted to practice by the State of California. I am a partner at the firm of Zalkin & Zimmer, LLP. My firm is counsel to 45 of the 154 plaintiffs who had filed suit against the Roman Catholic Diocese of San Diego. I have personal knowledge of the facts set forth herein and, if called upon as a witness, I could and would competently testify as to all of the matters stated herein.

2.    On March 22, 2007, I received a phone call from one of my clients who had in her possession a letter dated March 17, 2007 from Pastor Michael Gallagher (the "Gallagher Letter").

3.    After she read to me the contents of the letter, I asked her to provide me a copy of the letter.

4.    Attached hereto as Exhibit A is a copy of the Gallagher Letter that was provided to me by my client.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the _3 0_ day of March, 2007, at San Diego, California.

Michael H. Zimmer

–8–

DOCS_LA:164969.1

## DECLARATION OF HAMID R. RAFATJOO

I, Hamid R. Rafatjoo, hereby declare and state as follows:

1.      I am an attorney duly admitted to practice by the State of California.  I am a partner at the firm of Pachulski Stang Ziehl Young Jones & Weintraub LLP, proposed counsel to the Official Committee of Unsecured Creditors appointed on March 19, 2007 in the bankruptcy case of the Roman Catholic Diocese of San Diego (the "Diocese").  I have personal knowledge of the facts set forth herein and, if called upon as a witness, I could and would competently testify as to all of the matters stated herein.

2.      I obtained access to the Diocese Policy Handbook by logging into the Diocese's website at www.diocese-sdiego.org.  I entered the page relating to Administration and thereafter clicked on tab entitled "Policy Handbook."  The tab relating to Policy Handbook leads to a webpage entitled Diocesan Handbook Index.  As I scrolled down the page under the general heading of Administration and subheading of Diocesan, I clicked on a link entitled "Policy on Diocesan Tax."  A true and correct copy of the contents of the Policy on Diocesan Tax is attached hereto as Exhibit B.  I, thereafter, clicked on a link entitled "Parish Deposits with the Diocese."  A true and correct copy of the contents of the Parish Deposits with the Diocese is attached hereto as Exhibit C.

3.      As I scrolled down the page under the general heading of Administration and subheading of Parish, I clicked on a link entitled "Parish Financial Report."  A true and correct copy of the contents of the Parish Financial Report is attached hereto as Exhibit D.

4.      I logged into the Los Angeles Times website at www.latimes.com.  I typed the words mental reservation into the search engine and found an article dated March 26, 2007 called Lawyers Grapple with Catholic doctrine.  A copy of the article is attached hereto as Exhibit E.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the ___30th___ day of March, 2007, at Mission Viejo, California.

Hamid R. Rafatjoo

## PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )
COUNTY OF LOS ANGELES        )

I, Sherry Ploussard, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Blvd., 11th Floor, Los Angeles, California 90067-4100.

On March 30, 2007, I caused to be served the **OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTOR'S MOTION FOR ORDER (A) AUTHORIZING CONTINUED USE OF DEBTOR'S CASH MANAGEMENT SYSTEM; (B) AUTHORIZING MAINTENANCE OF DEBTOR'S EXISTING BANK ACCOUNTS AND CONTINUED USE OF ITS BUSINESS FORMS; (C) WAIVING COMPLIANCE WITH 11 U.S.C. § 345(B); AND (D) FOR OTHER RELIEF; DECLARATIONS OF MICHAEL H. ZIMMER AND HAMID R. RAFATJOO IN SUPPORT THEREOF** in this action by placing a true and correct copy of said document(s) in sealed envelopes addressed as follows:

*[See Attached Service List]*

☒ (BY MAIL) I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ (BY NOTICE OF ELECTRONIC FILING) I caused to be served the above-described document by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

☐ (BY FAX) I caused to be transmitted the above-described document by facsimile machine to the fax number(s) as shown. The transmission was reported as complete and without error. (Service by Facsimile Transmission to those parties on the attached List with fax numbers indicated.)

☐ (BY PERSONAL SERVICE) By causing to be delivered by hand to the offices of the addressee(s).

☐ (BY OVERNIGHT DELIVERY) By sending by                    to the addressee(s) as indicated on the attached list.

I declare that I am employed in the office of a member of the bar of this Court at whose direction was made.

Executed on March 30, 2007, at Los Angeles, California.

*Sherry Ploussard*
Sherry Ploussard

Office of the US Trustee
Steven J. Katzman
Tiffany L. Carroll
Office of the United States Trustee
402 West Broadway, Suite 600
San Diego, CA 92101


**REQUEST FOR SPECIAL NOTICE**


Irwin M. Zalkin, Esq.
Zalkin & Zimmer LLP
12555 High Bluff Drive, #260
San Diego, CA 92130

Thomas J. Salerno, Esq.
Squire, Sanders & Dempsey l.l.p.
Two Renaissance Square
40 North Central Avenue
Suite 2700
Phoenix, Arizona 85004-4498

Counsel to 8 Abuse claimants
Andrea Leavitt, Esq.
Law Office of Andrea Leavitt
402 W. Broadway, Fourth Floor
San Diego, CA 92101


Robert L. Mezzetti, II
Mezzetti Law Firm, Inc.
31 East Julian Street
San Jose, CA 95112


John C. Manly, Esq.
Manly, McGuire & Stewart
4220 Von Karman Avenue, Suite 200
Newport Beach, CA 92660


David L. Nye, Esq.
Timothy C. Hale, Esq.
33 West Mission Street, Suite 201
Santa Barbara, CA 93101

Gerald P. Kennedy
Geraldine A. Valdez
Procopio, Cory, Hargreaves , et al.
530 B Street, Suite 2100
San Diego, CA 92101

Counsel for Union Bank of California
Sara L. Chenetz, Esq.
DLA Piper US LLP
1999 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-6023

Counsel for Creditor Allied Irish Bank
Margaret M. Mann, Esq.
Heller Ehrman LLP
4350 La Jolla Village Drive, 7th Floor
San Diego, CA 92122-1246

Counsel to The Aslam Foundation
Debra A. Riley, Esq.
Allen Matkins Leck Gamble
        Mallory & Natsis LLP
501 West Broadway, 15th Floor
San Diego, CA 92101-3541

Jean H. Hurricane
SCHIFF HARDIN LLP
One Market Plaza
Spear Street Tower, 32nd Floor
San Francisco, CA 94105


M. Jean Starcevich
770 Lincoln Avenue
San Jose, CA 95126


Susan E. Seager
Davis Wright Tremaine LLP
865 South Figueroa Street
Suite 2400
Los Angeles, CA 90017

Venus Soltan, Esq.
Rebecca L. Rhoades, Esq.
Soltan & Associates
4220 Von Karman, Suite 200
Newport Beach, CA 92660

Susan G. Boswell
Quarles & Brady LLP
One South Church Avenue
Suite 1700
Tucson, AZ 85701-1621


Raymond P. Boucher, Esq.
Kiesel Boucher Larson LLP
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910


Counsel for Creditor Allied Irish Bank
Steven C. Koppel, Esq.
Heller Ehrman LLP
Times Square Tower
7 Times Square
New York, NY 10036

Counsel -Roman Catholic Bishop-Orange
James A. Hayes, Jr., P.C.
Cummins & White, LLP
2424 S.E. Bristol Street, Suite 300
Newport Beach, CA 92660-0757

J. Mark Fisher
Jonathan Freidland
Patricia J. Fokuo
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL 60606


Robert M. Tobin
1485 Park Avenue, Suite 200
San Jose, CA 95126


Law Offices of Farnell & Norman
R. Richard Farnell, Esq.
Ronald E. Norman, Esq.
4675 Macarthur Court, 12th Floor
Newport Beach, CA 92660-1849


James W. Hodges, Esq.
4475 Mission Boulevard, Suite 216
San Diego, CA 92109-3966

# EXHIBIT A

March 17, 2007

My Dear OLG Parishioners:

Many of you have asked why I haven't said anything in public about the decision by our diocese to seek Chapter 11 bankruptcy protection. The truth is I know very little, and the Bishop asked all pastors to be prudent in our public remarks.

Since the diocese's announcement, we've heard and read in the media some factual actions associated with filing Chapter 11 as well as quite a bit of speculation. It is not my place to comment on speculation; however, after consulting with Our Lady of Grace Parish Finance Committee, which is comprised of lay people like you, there are some new developments to share.

In an effort to protect the rights of our parish:

- Recently, the pastors in the diocese formed an Organization of Parishes and employed a legal counselor.

- The court ordered that we establish a new tax identification number for every parish account instead of using the diocesan tax identification number; we have started this process.

- Know that the money from the weekly collection will continue to be deposited into our parish account, and used for our operations.

- Understand that that the court ruled that all contributions to Annual Catholic Appeal are "designated" funds, and are **not** considered diocesan assets under the Chapter 11 terms. In addition, by order of the court, parish money in trust with the diocese is temporarily frozen. However, funds that have been "designated" by donors for construction projects in process should be available for that purpose soon.

- A new fund is being established for parish and school deposits that will be held in trust by and for the Organization of Parishes.

- As always, I will continue to seek the advice and support of the Parish Finance Committee about financial matters pertaining to our parish, and keep you informed.

Further information regarding the diocese's attempt to resolve these abuse claims is available on the diocesan Website: www.diocese-sdiego.org.

Please pray for all the victims of sexual abuse, the perpetrators of these crimes, and especially Bishop Brom that with God's help we may weather this difficult time.

Yours in Christ,

Michael Gallagher
Pastor

# EXHIBIT B

ADMINISTRATION
Diocesan-8
8/1/2006

Diocese of San Diego

POLICY FOR DIOCESAN TAX
Annual Catholic Appeal Portion

1.   All parishes are subject to annual diocesan tax through their Annual Catholic Appeal assessment.

2.   In the same proportion that its annual plate and envelope receipt, less approved deductions, bears to the total plate and envelope receipt of the diocese, less approved deductions, each parish is expected to bear its fair share of the approved and expected total net proceeds from the Annual Catholic Appeal.

In application:

a.   The parish plate and envelope receipt for the previous fiscal year, less approved deductions, is divided by the total plate and envelope receipt from all parishes in the diocese, less approved deductions.

b.   This percentage is multiplied by whatever amount is necessary to calculate in order to net the approved diocesan goal.

c.   Adjustments are made where this formula does not yield a fair-share assessment.

3.   Approved deductions are:

a.   Parish contributions from ordinary sources to its Catholic school or the Catholic school(s) attended by its children;

b.   Interest paid on indebtedness to the diocese;

c.   Donations to other parishes and other charitable religious organizations.

4.   Parishes exceeding their fair-share assessment for the Annual Catholic Appeal receive a rebate of the excess; parishes falling short of their fair-share assessment are billed for the shortfall.

5.   Parishes may appeal their fair-share assessment to an Appeals Board within ten (10) days of receipt.  Grounds for appeal would include calculation errors and unreported extraordinary circumstances.

Note: The Appeals Board can recommend either an assessment reduction or a grant. A grant does not lower the assessment, but provides a limited amount of relief to a parish if it fails to meet its assessment. Parishes receiving grants do not receive rebates unless the collection exceeds the original assessed amount.

Grants are given on the condition that the parishes which receive such awards conduct the Annual Appeal according to diocesan expectancies. This requires active parish planning, participation, and follow through, using diocesan materials and resources, including the billing program.

6.   After appropriate adjustments are made through the appeals process, all parish fair-share assessments are updated and finalized.

Parish Income-Based and Priests' Pension Plan Portion

1.    All parishes are subject to annual diocesan tax through payment of an approved percentage of their annual income, although, for good reason, parishes may apply for subsidy assistance toward this portion of their tax within ten days following receipt of their assessment.

> Note: No parish receives a subsidy for that portion of their tax which is in payment of the priests' pension plan.

> Note: Religious order priests in parishes entrusted to religious communities and religious order priests completely staffing diocesan parishes, after payment to the diocese of their priests' pension plan assessment, may request payment by the diocese to their religious community toward their retirement plan to a maximum amount of their assessment, subject to diocesan approval.

> Other religious order priests assigned to diocesan parishes may request a contribution annually determined by the diocese to the retirement plan of their community.

2.    This part of the diocesan tax is a percentage of ordinary parish income less approved deductions, which percentage is based upon an approved diocesan budget.

> Note: At times it is necessary to deduct expenses from receipts (e.g. for fund-raisers) in order to arrive at net ordinary income.

3.    The following are excluded from ordinary income:

   a.    Gifts designated by donors in writing for a specific purpose other than ordinary parish operations;

   b.    Interest received on money deposited with the diocese;

   c.    Annual Catholic Appeal rebates.

4.    The following may be deducted from ordinary income to arrive at taxable net income:

   a.    Parish contributions, from bingo or other ordinary sources, to the operation or capital expenses of its Catholic school or the Catholic school(s) attended by its children;

   b.    Interest paid on indebtedness to the diocese.

   c.    Donations to other parishes and other charitable religious organizations.

5.    Ordinarily, diocesan tax on parish income, excluding the pension plan portion, will not be allowed to increase more than 15% in a given year.

6.    The diocesan tax for each parish will be adjusted during the current year after all the annual parish financial statements from all parishes are received for the previous year.

# EXHIBIT C

ADMINISTRATION
Diocesan-11
11/1/06

Diocese of San Diego

POLICY ON PARISH AND OTHER FUNDS ON DEPOSIT WITH THE DIOCESE

Parishes are required to deposit with the diocese (i.e. in the "Diocesan Bank") all parish funds, including those generated and/or held for the benefit of parish operations, organizations, projects or programs over and above funds needed for normal daily business.  This policy also applies to parochial schools and Diocesan high schools.

Implementation

1.    "Funds needed for normal daily business" is defined as the normal operating expenses for a two-month period, which for most parishes is approximately $50,000.

2.    Funds deposited by a parish can be withdrawn at any time.  However, any non-emergency withdrawal requests will be processed each Thursday.  Withdrawals may be requested on an emergency basis within 24 hours but these requests are expected to be rare.  Requests should be in writing, or if by phone, followed up with a letter.  Usually parishes have more than one account, so it is important to specify the account number.

3.    The diocese may not, and will not, automatically deduct anything from parish or school funds on deposit without their consent, even though they may owe the diocese for assessments, insurance bills, or other obligations.

4.    Each six months, interest rates will generally be determined by taking eighty percent (80%) of the average of the prior six-month 91 Day T-Bill Auction Rate as reported by the Federal Reserve Bank, with a floor of 1.00%.

5.    The diocese will not reduce, or eliminate, interest payments to a parish by reason of obligations owed by the parish to the diocese.

6.    Parishes which have non-interest bearing debt normally will not earn interest on their funds on deposit.

# EXHIBIT D

ADMINISTRATION
Parish-2
5/1/00

## PARISH FINANCIAL REPORT
### JULY 1, _____ TO JUNE 30, _____

Parish Name _____

Parish Number _____

Opening Balance - Cash in Bank, July 1, _____          Total (A) _____

## PARISH RECEIPTS
### Ordinary Receipts

| | |
|---|---|
| Collections | _____ |
| Marriages, Baptisms and Funerals | _____ |
| Bequests and Donations | _____ |
| Interest and Dividends | _____ |
| Parish Events | _____ |
| Religious Articles | _____ |
| Rental Income | _____ |
| Other Ordinary | _____ |

Total (B) _____

### Extraordinary Parish Receipts

| | |
|---|---|
| Restricted Gifts for Extraordinary Purposes* | _____ |
| Property and Securities | _____ |
| Withdrawal of Funds on Deposit* | _____ |
| Loans from Diocese* | _____ |
| Interest on Funds on Deposit* | _____ |
| Annual Catholic Appeal Rebates | _____ |
| Religious Education Receipts | _____ |
| Other Extraordinary Receipts* | _____ |
| Parish Assistance Program | _____ |
| Clearing Account | _____ |
| Special Collections | _____ |

Total (C) _____

Grand Total  (B & C) _____

* Must agree with Reconciliation of Funds on page 3.

## PARISH DISBURSEMENTS
### Ordinary Parish Disbursements

Salary - Clergy _____

Salary - Supply _____

Fringe Benefits - Clergy _____

Salary - Lay and Religious _____

Fringe Benefits - Lay and Religious _____

Postage _____

Telephone _____

Supplies - Office _____

Supplies - Ministry and Program _____

Meetings Attended _____

Meetings Sponsored _____

Professional Services _____

Dues and Subscriptions _____

Taxes and Licenses _____

Groceries and Household _____

Furniture and Equipment _____

Miscellaneous _____

Utilities _____

Repairs and Maintenance _____

Diocesan Tax _____

Insurance - Property and Automobile _____

Interest _____

Parish Events _____

Religious Articles _____

Rent _____

Rental Related Expense _____

Total (D) _____

### Extraordinary Parish Disbursements

Religious Education Subsidy _____

Donations and Charity _____

Major Repairs _____

Major Furniture and Fixtures _____

New Property and Construction _____

Funds on Deposit* _____

Parish Debt* _____

School Subsidy _____

School Reimbursement _____

Parish Assistance Program _____

Clearing Account _____

Special Collections _____

Total (E) _____

Grand Total (D & E) _____

Ending Balance - Cash in Bank, June 30, _____

Note:  Opening balance plus grand total receipts less grand total disbursements must equal ending balance.

RECONCILIATION  ON DEPOSIT & LOAN FUNDS
(with the Diocese of San Diego)

Funds On Deposit-7/1/___  _____     Parish Debt-7/1/___  _____

Deposits during year  _____     Additions to debt  _____

Interest paid by Diocese  _____     Interest added  _____

Withdrawals during year _____     Payments during year  _____

Balance - 6/30/___  _____     Balance - 6/30/___  _____


Parish School (from School Report)     Religious Education Program

Total Receipts  _____     Total Receipts  _____

Total Expenses  _____     Total Expenses  _____

Balance  _____     Balance  _____

Amount Transferred  _____     Amount Transferred  _____

from Parish     from Parish


Gifts Restricted in Writing by Donors:

| Intended Use | Amount | Actual Use |
|---|---|---|
| _____ | $ _____ | _____ |
| _____ | _____ | _____ |
| _____ | $_____ | _____ |


Other Extraordinary Receipts:

| Description | Amount |
|---|---|
| _____ | $_____ |
| _____ | _____ |
| _____ | $_____ |


Are all parish moneys and receipts in the name of parish and in parish bank account?  _____YES  _____NO

ACCOUNTS HELD FOR BENEFIT OF PARISH, SCHOOL & RELATED ENTITIES

(Not With The Diocese, But In Banks, Savings & Loans Or Other Financial Institutions)

Name of Institution/
Branch Address                    Acct #            Acct Title        Fed ID#        Balance at 6/30/96

_____

_____

_____

_____

_____

List all authorized signatures for transactions on above accounts:

_____          _____

_____          _____

_____          _____

CHAIR OF PARISH FINANCE COUNCIL

(Council Required by Canon 537)

Name _____

Address_____

Business Phone _____        Home Phone _____

We declare that the foregoing PARISH FINANCIAL REPORT is complete and accurate to the best of our knowledge.

_____        _____

Pastor                                                Chairperson, Parish Finance Council

Date:_____