UNITED STATES BANKRUPCTY COURT

SOUTHERN DISTRICT OF CALIFORNIA

In re:

THE ROMAN CATHOLIC BISHOP )  Case No. 07-00939-LA 11
Of SAN DIEGO, a California  )
Corporation sole,     )  Chapter 11
          )
    Debtor    )  FIRST REPORT OF EXPERT
          )  R. TODD NEILSON, CPA
          )  PURSUANT TO
          )  APPOINTMENT DATED
          )  APRIL 30, 2007
_____ )

/ / /

/ / /

**Table of Contents**

# I. APPOINTMENT 12
A. Cooperation and Accessibility ............................................................ 14
B. Audit Process ....................................................................................... 15

# II. EXECUTIVE SUMMARY 16
A. Organizational Structure ..................................................................... 16
B. "Accounts" at the Diocese ................................................................... 19
C. Cash Management System ................................................................... 21
D. Debtor's Declarations With Regard to the First Day Motions ............. 23
E. Specific Responses to the Order of the Court ...................................... 25
F. PSDL Trust and the Diocesan Financial Statements ........................... 29
G. Relaiance on the Diocesan Office Financial Statements to Meet Debt Guarantee 31
H. Accounting Treatment for Land Held in Trust for Parishes ................. 34
I. Diocese Construction Management ....................................................... 34
J. Diocese Divisions ................................................................................. 35
K. Audit Results of Parish and School Accounting ................................... 35
L. Accounting for the Parishes and Schools .............................................. 36
M. Collection of Donations and Designation of Restricted Funds ............ 39
N. Parishes and the Diocesan Bank/PSDL Trust ...................................... 42
O. Post Petition PSDL Activity ................................................................ 44
P. Loans to Parishes .................................................................................. 45
Q. School Accounting ............................................................................... 47
R. Results of Parish/School Visits and Analysis ...................................... 49
S. Bank Accounts. ..................................................................................... 50
T. Questionable Transactions .................................................................... 53
U. Annual Catholic Appeal ("ACA") and Designated Special Collections ............... 61

# III. THE ROMAN CATHOLIC BISHOP OF SAN DIEGO/ SAN DIEGO DIOCESE 61
A. Organizational Structure ..................................................................... 61
B. Divisions of the Diocese ...................................................................... 63
C. Sources of Diocese Revenue ................................................................ 63
D. Accounts at the Diocese ....................................................................... 64
E. Pastoral Center ..................................................................................... 74
F. Cash Management Systems Administration .......................................... 75
G. Pre-Petition Cash Management ............................................................ 76
H. Post Petition Cash Management ........................................................... 80
I. Debtor's Declarations With Regard to the First Day Motions ............. 83
J. Holy Cross Cemetery ............................................................................ 85

K.   Marian Catholic High School and Mater Dei Catholic High School.................. 87
L.   Vincent Memorial Catholic High School ........................................................ 89
M.  Newman Centers ............................................................................................ 91
N.  Cathedral Catholic High School ("CCHS") ................................................... 91

## IV. DIOCESAN TRUST RELATIONSHIP AND THE PSDL TRUST _____93

A.  Diocesan Bank - Pre-Petition........................................................................ 93
B.  PSDL Trust - Post Petition............................................................................ 96
C.  Debtor's Authority to Maintain the PSDL Trust ........................................... 97
D.  Financial Statements of "The Diocesan Office Funds of the Roman Catholic Diocese of San Diego" ................................................................................. 101
E.  Reliance on the Diocesan Office Financial Statements to Meet Debt Guarantee 105
F.  Gift Annuities Administered for Parishes for the Benefit of Others ................. 108
G.  Accounting Treatment for Land Held in Trust for Parishes .............................. 108
H.  Diocese Construction Management ................................................................ 109

## V. RESTRICTION(S) OR LIMITATIONS ON FUNDS IN THE ACCOUNTS _____110

A.  Other Observations Concerning Restricted Assets ........................................... 116

## VI. AUDIT RESULTS OF PARISH AND SCHOOL ACCOUNTING _____117

A.  Accounting for the Parishes and Schools........................................................ 119
B.  Collection of Donations and Designation of Restricted Funds.......................... 123
C.  Parishes and the PSDL.................................................................................. 126
D.  Loans to Parishes ......................................................................................... 129
E.  Parish to Parish Loans.................................................................................. 130
F.  Post Petition PSDL Trust Activity................................................................ 132
G.  School Accounting....................................................................................... 133
H.  Results of Parish/ School Visits and Analysis ................................................ 136
I.   Bank Reconciliations and Cash Control ........................................................ 138
J.   Parish and School Cash Management............................................................. 139
K.  Questionable Transactions............................................................................ 158
L.  Annual Catholic Appeal and Designated Special Collections........................... 167
    1. Designated Donations - Special Collections................................................. 169
    2. (#1) Annual Lenton Collection and (#5) Collection for National Needs....... 170
    3. (#4) Mission Sunday (Propagation of Faith) and (#7) Missionary Cooperative Plan ....................................................................................................... 171
    4. (#3) Missions of the Holy Father (Peter's Pence) and (#6) Retirement Fund for Religious ................................................................................................. 171

     5.  (#2) Church 5in the Holy Land ....................................................................... 172

M.  Parish Finance Council ............................................................................... 172

N.  Diocesan Financial Review of Parishes ........................................................ 172

# Exhibit Listing

**Exhibit**

**Number**                                      **Description**

1.           Articles of Incorporation, 29 March, 1937 of The Roman Catholic Bishop of San Diego, a corporation sole.

2.           Amendment to Articles of Incorporation, 6 January, 1967 of The Roman Catholic Bishop of San Diego, a corporation sole.

3.           Amendment of Articles of Incorporation, 27 February, 1976 of The Roman Catholic Bishop of San Diego, a corporation sole.

4.           Amendment of Articles of Incorporation, 23 January, 2006 of The Roman Catholic Bishop of San Diego, a corporation sole.

5.           Richard Mirando Declaration re: First Day Motions.

6.           Christopher Lindscott Declaration re: First Day Motions

7.           Karen Jassoy Declaration re: First Day Motions

8.           Ernst & Young letter, May 29, 2007 with Management Representation Letters.

9.           Financial Statements of The Diocesan Office Funds of The Roman Catholic Diocese of San Diego, Years ended June 30, 2006 and 2005.

10.         Financial Statements of The Diocesan Office Funds of The Roman Catholic Diocese of San Diego, Years ended June 30, 2005 and 2004.

11.         Financial Statements of The Diocesan Office Funds of The Roman Catholic Diocese of San Diego, Years ended June 30, 2004 and 2003.

12.         Financial Statements of The Diocesan Office Funds of The Roman Catholic Diocese of San Diego, Years ended June 30, 2003 and 2002.

13. Analysis of Guarantee Debt Covenants - Unrestricted Cash and Readily Marketable Securities of Not Less than $10,000,000.

14. Analysis of Guarantee Debt Covenants - Unrestricted and Temporarily Restricted Cash and Marketable Securities to Debt (.75/1)

15. Policy for Developing a New Parish, 11/8/00.

16. Form 7 - Statement of Financial Affairs, Line 14 - Property Held for Others, February 27, 2007.

17. Building and Renovation Guidelines 5/1/2000.

18. Schedule of All Parishes – 2007 Catholic Directory – San Diego Diocese.

19. Schedule of All Elementary Schools – 2007 Catholic Directory – San Diego Diocese.

20. Summary of Selected Operating Revenue and Expenses – For the Forty-Eight Parishes Selected for Visit – For the Year Ended June 30, 2006.

21. PSDL Trust – Summary of Activity – March 1, 2007 through Early July 2007.

22. Memorandum from Monsignor Steven Callahan to Pastors, Administrators, and Principals dated May 24, 2007.

23. Schedule of Tuition for Schools Visited.

24. Schedule K of Debtor's Schedules – Schools and Parishes Visited.

25. Schedule K Corrections – For Accounts of 74 Parishes and Schools Visited.

26. Accounts Opened Post Petition, Discovered During Visit – Not Listed on Schedule K of Debtor's Schedules.

27. Change to Tax Identification Number for Parishes and Schools Visited.

28. Accounts Not Reported on Schedule K and Not Specific as to Diocese, Parish, or School.

29. List of Institutions Within Geographical Boundaries of The Roman Catholic Bishop of San Diego, a corporation sole.

30. Financial Statements, Catholic Secondary Education-Diocese of San Diego, Incorporated, Year ended June 30, 2006.

| 31. | Summary of the Cash Accounts of the Diocese Through May 2007. |
| 32. | Blank |
| 33. | Funds on Deposit with the Diocese. |
| 34. | Loans from the PDSL Trust to Parishes and Schools. |
| 35. | All Parish and School Bank Accounts Currently Known. |
| 36. | Guidelines for Parish Financial Procedures and Controls dated October 19, 2000. |
| 37. | Map of Holy Cross Cemetery with Crypts and Niches. |
| 38. | Financial Statements (Unaudited), Holy Cross Cemetery and Mausoleum, Years ended June 30, 2001 and 2000. |
| 39. | Financial Statements (Unaudited), Holy Cross Cemetery and Mausoleum, Years ended June 30, 2000 and 1999. |
| 40. | Financial Statements (Unaudited), Holy Cross Cemetery and Mausoleum, as of 4/30/07. |
| 41. | Sample Holy Cross Purchase Agreement Form. |
| 42. | Sample Holy Cross Purchase Agreement. |
| 43. | Map of Mater Dei High School. |
| 44. | Preliminary Financial Statements, Marian Catholic High School, School Year 2005-2006. |
| 45. | Financial Statements, Marian Catholic High School, Years ended June 30, 2003 and 2002. |
| 46. | Financial Statement, Marian Catholic High School, April 30, 2007. |
| 47. | Debtor's Monthly Operating Report for May 31, 2007, Schedule of Restricted Assets and Assets Subject to Security Interests. |
| 48. | Financial Statements, Catholic Secondary Education-Diocese of San Diego, Incorporated, Period ended March 31, 2007 and Year ended June 30, 2006. |
| 49. | Financial Statements, University of San Diego High School General Fund, Years ended June 30, 2005 and 2004. |

50.   Schedule B Personal Property, Line 19 - Equitable or Future Interests, Life Estates, etc.

51.   Blank

52.   Financial Statements of The Diocesan Administrative Offices and the Diocesan Bank, November 30, 2006.

53.   Policy on Loans to Parishes, 11/1/06 and 3/30/98.

54.   Write-off History, Email from Karen Jassoy, 07/05/07.

55.   Comparative Statement of Financial Position - PSDL Trust - Diocesan Bank.

56.   Monthly Operating Report for May 2007, PSDL Trust.

57.   Article on Canon Law 1276 Authored by William J. King, J.C.D.

58.   Policy on Parish and Other Funds on Deposit with the Diocese, 11/1/06.

59.   Financial Summary, 2004-2005, From the Website of San Diego Diocese.

60.   Guaranty Agreement between The Roman Catholic Bishop of San Diego, a corporation sole and Allied Irish Banks, P.L.C., New York Branch.

61.   Summary of Documentation of Annuities.

62.   Annuity Agreement with The Roman Catholic Bishop of San Diego – Example.

63.   Pooled Income Fund, Exhibit A – Example.

64.   US Bank Trustee Management Agency Agreement.

65.   The First American Corporation - Selected pages from Annual Report re: Trust Deposits.

66.   Schedule K, Submitted Pursuant To Order To Show Cause Re: Contempt

67.   Bishop Brom's Testimony at 341 Hearing.

68.   Karen Jassoy Email 07/05/07.

69.   Email from Karen Jassoy, 06/27/07, re: Funds on Deposit in Diocesan Bank.

70.   Father Steven Francis Callahan Section 273 (B) Transcript, page 70.

71.   Blank

72.   Standard Form of Agreement Between Owner and Design/Builder, AIA Document A191.

73. Standard Form of Agreement Between Owner and Contractor, AIA Document A101-1997.

74. Standard Form of Agreement Between Owner and Construction Manager, AIA Document A121/CMc and AGC Document 565.

75. Application and Certification for Payment Documents.

76. Order of Parishes On Appointment of Expert, April 30, 2007.

77. Schedule B - Personal Property - Schedule of Restricted Assets and Assets Subject to Security Interest, February 27, 2007.

78. FAS 116

79. FAS 117

80. FAS 124

81. FAS 136

82. Email from Susan G. Boswell, re: Restricted/Trust Funds, 07/03/07.

83. Analysis of Support for Restricted Assets.

84. Schedule B - Personal Property - Schedule of Restricted Assets and Assets Subject ot Security Interest, February 27, 2007, With May 31, 2007 Monthly Operating Report Comparison.

85. Vincent Memorial Catholic High School-Main, Profit & Loss, July 2006 through June 2007.

86. Vincent Memorial Catholic High School-Main, Profit & Loss, July 2005 through June 2006.

87. Vincent Memorial Catholic High School-Main, Profit & Loss, July 2004 through June 2005.

88. Vincent Memorial Catholic High School-Main, Profit & Loss, July 2003 through June 2004.

89. Vincent Memorial Catholic High School-Main, Profit & Loss, July 2002 through June 2003.

90. Individuals Interviewed.

91.     Documents and Information Reviewed by Expert.

92.     Summary of Selection Criteria for Parishes and Schools – For the Forty-Eight Parishes and Twenty-Six Schools Visited.

93.     Diocesan Bank – Summary of Activity – June 30, 2004 through June 30, 2005.

94.     Diocesan Bank – Summary of Activity – June 30, 2005 through June 30, 2006.

95.     Diocesan Bank – Summary of Activity – June 30, 2006 through February 28, 2007.

96.     Document Request for Parishes and Schools.

97.     Changes to Tax Identification Number for Parishes and Schools Not Visited.

98.     Accounts Held by Parishes and Schools Not Visited – Listed on Schedule K of Debtor's Schedules.

99.     Letter dated September 8, 2006 to Father Robert Irwin from Finance Office – Office for Parish Administration

# Appendices Listing

Appendix A:  Handbook – Diocese of San Diego

Appendix B:  Parish and School Audit Reports

Appendix C:  Catholic Directory – Diocese of San Diego 2007

Appendix D:  The Official Catholic Directory Glossary

Appendix E:  Activity Report for All Accounts in the Diocesan Bank, January 1, 2006 through February 28, 2006

# I.

## APPOINTMENT

On April 11, 2007, the Honorable Louise DeCarl Adler conducted a hearing on an Order to Show Cause Re Contempt or Other Sanctions (the "OSC"). The Court ordered, *inter alia*, that an Expert accounting professional shall be appointed pursuant to Federal Rule of Evidence 706 (a). The Court decided, after consideration of suggestions from the Roman Catholic Bishop of San Diego ("RCBSD" or "Debtor"), the Official Committee of Unsecured Creditors, the Organization of Parish for the Roman Catholic Diocese of San Diego ("OPSD"), and the United States Trustee, to appoint an Expert "to examine the financial structure of the RCBSD, its cash flow, including uses and sources of income, and such other issues pertinent to the Cash Management Motion of RCBSD, all to be more fully defined by the Court in a separate order in this case."

On April 30, 2007, R. Todd Neilson was appointed as Expert witness ("Expert") pursuant to Federal Rule of Evidence 706 (a). In accordance with the Order, the Expert was to "perform the following investigation and analysis and make appropriate findings regarding the Cash Management System of the Debtor, including:

    (1)    The identity of each Account, including the account number, name and address of all Account depositories' branches, the name and address of Account holder as reflected in the Account depositories' records, the tax identification number associated with the Account if different from the Debtor's tax identification number, the owner of such tax identification number and the date the Account was opened.

(2)        All documents pursuant to which the Account was established.

(3)        The identity of each Account that, after the commencement of the Debtors chapter 11 case, was closed or changed in any way, including but not limited to changes in tax identification numbers, Account signatories or any agreement affecting the Account. To the extent of any such changes or closures, the identity of the person requesting the closure or changes and the authority of such person to make or seek such closure or change.

(4)        Any alleged restriction(s) or limitations with respect to the funds in the Accounts.

(5)        An analysis of the Account holder's compliance with any alleged restrictions or limitations with respect to the funds deposited in or withdrawn from the Accounts. The Expert's analysis may be derived from his performance of such random tests and/or samplings as he deems appropriate and necessary.

(6)        An analysis of whether the Cash Management System described in the Debtor's FIRST DAY MOTION #1 (d.e. #9) operates in a manner consistent with the Debtor's representations in said Motion. The Expert's analysis and opinion may be derived from his performance of such random tests and/or samplings as he deems appropriate and necessary.

(7)        The restrictions, if any, on use of funds raised in the Annual Catholic Appeal.

(8)     The Debtor's state and federal tax returns, if any, for the last five (5)

years."

The Order also directed the Expert to "include a list of all individuals interviewed by the Expert, all documents reviewed by the Expert, all documents requested by the Expert but not produced and the identity of the person failing" to produce the documents and the reasons provided for such failure. [1]

The Order further directed all persons "identified in the OSC shall cooperate fully with the Expert."

The Order allowed the Expert, in accordance with Local Rules of Bankruptcy Procedure and guidelines of the Office of the United States Trustee, to "employ professionals (including Professional firms in which the Expert is a principal, shareholder, member or partner) to assist in the performance of the Expert's duties." Pursuant to that Order, on May 25, 2007, the Court ordered the appointment of LECG to act as financial advisors to the Expert in furtherance of his duties. The Expert wishes to express his sincere appreciation for the invaluable support of the Directors and employees of LECG. Without their extremely valuable assistance this report would never have been compiled within the tight time parameters as imposed by the Court. Within this report, the collective efforts of both the Expert and the financial professionals at LECG are singularly referred to as the Expert.


Cooperation and Accessibility

The Order appointing the Expert expressly directed all persons "identified in the OSC" to "cooperate fully with the Expert." The Expert wishes to thank Bishop Brom and all other

Diocesan personnel as well as all Parish Priests and the lay personnel associated with their respective Parishes for their invaluable assistance and cooperation in the preparation of this report. All of the above individuals, including the professionals employed by the Diocese, have been wholly supportive throughout this entire process. During the many similar matters in which the Expert has been engaged, he cannot recall an assignment where he has had more complete and positive cooperation.

As more fully outlined in the report, the Expert has met with Bishop Brom and other supporting personnel at the Diocese. Within a few days after his appointment, the Expert also met with a representative group of Parish Priests to receive their input into the process of reviewing the financial operations of their respective Parishes. During the course of preparing this report, the Expert met with various personnel from the Diocesan offices as well as a substantial number of Parish Priests and their accounting staffs. In conjunction with these meetings and interviews, the Expert reviewed thousands of documents in preparation for this report and both the Diocesan staff, as well as almost all of the Parish staff, responded quickly and professionally to the voluminous requests for records and supporting information. A listing of the individuals the Expert interviewed is attached as Exhibit 90. A schedule of the records reviewed by the Examiner in the preparation of the report is attached as Exhibit 91.

Audit Process

The Expert did not audit, review or compile the financial information contained within this report in accordance with generally accepted auditing standards nor does the Expert express

---

[1] See Pages 15 – 20 for a detailed response to each of the points raised in the Court's Order. Also, see Section II Executive Summary – Results of Parish/School Visits & Analysis – Bank Accounts.

any opinion or any form of assurance on the accuracy or completeness of the data provided by the Diocese[2], schools, or parishes which have been made available to the Expert.

This report is intended solely for the purposes as outlined in the Order appointing the Expert and should not be used for any purpose other than those described herein.

II.

Executive Summary

**The following Executive Summary provides a condensed abridgment of the material contained within the entire Expert Report. It is intended to provide the Court with a cogent recap of the major issues and opinions rendered by the Expert. The Court is invited to review the more detailed portions of the Expert Report following the Executive Summary.**

Organizational Structure

On February 27, 2007, The Roman Catholic Bishop of San Diego "RCBSD" ("Debtor") commenced a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Petition Date"). The RCBSD is a civil entity which, as a sole corporation organized under the laws of California, conducts the business of the Roman Catholic Diocese of San Diego ("Diocese"). The Diocese was incorporated March 29, 1937[3] (Exhibit 1) and is now the canonical entity which operates in the San Diego and Imperial counties of Southern California under the canonical authority of Bishop Robert H. Brom. The purpose of the Diocese is declared in the Articles of Incorporation and amendments thereto, which were filed January 4, 1967 (Exhibit 2), February 24, 1976 (Exhibit 3) and December 19, 2005 (Exhibit 4).

---

[2] For purposes of this report the Expert refers to both the "Diocese", the "Roman Catholic Bishop of San Diego", ("RCBSD"), and the Debtor interchangeably. The use of any of these terms is not to be construed as a legal statement by the Expert. The Expert is primarily referring to the entities in an accounting context and is not opining as to the legal definition of any term.

The Diocese has ministered to the spiritual needs of the Roman Catholics in the Southern California area since the founding of the Mission San Diego de Alcala on July 16, 1779.  Since that date, the Diocese has evolved to encompass 98[4]  Parishes and 16[5] missions which address the spiritual and ecclesiastical needs of the approximately 980,000 Roman Catholics presently residing in the San Diego/Imperial County areas.

The Diocese also offers educational opportunities through 43 elementary schools and three high schools in San Diego and Imperial counties. The high schools are Marian Catholic High School[6] ("Marian") in Chula Vista, (Mater Dei Catholic High School in Chula Vista will replace Marian in the upcoming school year) ("Mater Dei"), Vincent Memorial High School ("Vincent") in El Centro, and Cathedral Catholic High School ("CCHS") in San Diego[7].

The Diocese employs 246[8] people in a variety of areas, including but not limited to, finance, accounting, schools, civil affairs, human relations, personnel and other areas[9]. The Diocese also owns and operates Holy Cross Catholic Cemetery and Mausoleum ("Holy Cross").

[3] Previous to the incorporation in 1937, the San Diego Diocese was part of the Los Angeles Diocese.
[4] The 2007 Catholic Directory (See Appendix C) contains conflicting information regarding the number of parishes and missions in the San Diego Diocese.  According to the introductory material, there are 98 parishes and 16 missions.  However, the parish and mission section of the Directory reflects 99 parishes and one mission.  The reason for this discrepancy is rooted in the designation given to the Immaculate Heart of Mary, Niland. The Immaculate Heart of Mary is not an independent parish but, in actuality, a small mission associated with the St. Patrick, Calipatria Parish. Hence, with this change there are 98 parishes.
[5] The reference to 16 missions being located in the Diocesan area is somewhat confusing to the Expert.  A review of the 2007 Catholic Directory reflects 13 missions as being associated with various Parishes in the Parish Directory. With the addition of the Immaculate Heart of Mary, Niland, referenced above and the St. Maximilian Kolbe Mission, which is listed separately, the total number of missions is actually 15 – not 16.  However, for purposes of this report, the Expert will accept the number of missions as 16.
[6] RCBSD is in the process of constructing a new high school, Mater Dei, which will replace Marian.  The proposed enrollment in Mater Dei will approximate 2,000, substantially larger than the present enrollment of 700 in Marian High.
[7] RCBSD owns two of the high schools – St. Vincent and Marian.  The other high school, Catholic Cathedral, is owned by Catholic Secondary Education – Diocese of San Diego Incorporated ("CSE") of which RCBSD is the sole member.
[8] Per Debtor's Disclosure Statement dated March 27, 2007.
[9] The Administrative Office includes a number of support functions such as accounting, legal, information technology, architectural oversight, and human resources.  Bishop Brom's office is located at the Pastoral Center and, in addition to the religious programs offered at or through the Pastoral Center, the primary function of the Pastoral Center is to assist Bishop Brom in his responsibilities as Ordinary of the Diocese.

In addition to the services as outlined above, RCBSD provides a variety of administrative, management and custodial services for the parishes, schools and other Catholic entities within the territory of the Diocese. These services include, but are not limited to, payroll services, investment advisory and management services, construction management services and insurance services. Those services are primarily provided by personnel located at the Diocesan general offices located on Paducah Drive in San Diego. The Diocesan revenues come primarily from donations by Catholic laity faithful from the following sources:

1.  Parishes are assessed the Diocesan Tax (sometimes called the Parish Assessment or Chancery Tax), which is defined as 13% of their annual income[10]. The revenue from the Diocesan tax totaled $6,783,611 in fiscal 2006, $6,452,541 in fiscal 2005 and $6,253,966 in fiscal 2004.
2.  The Annual Catholic Appeal which generates $2.5 million a year.[11]
3.  The Diocese retains earnings in excess of interest paid on deposits in the Diocesan Bank or PSDL Trust[12]. These excess earnings, accumulated over a number of years, constitute net assets of the Diocesan Bank and totaled $12,539,713 as of November 30, 2006.[13]
4.  Investment income from marketable securities.
5.  The Diocese earns revenue from fees for administrative, insurance and religious programs, rental income, direct bequests, donations and interest or investment income.

---

[10] Annual Income is also referred to as "Ordinary Receipts" upon the annual reports as filed by the individual parishes with the Diocese.

[11] The cash from the Annual Catholic Appeal is temporarily retained at the Diocesan level but ultimately flows through to the chosen charities.

[12] The PSDL Trust is an acronym for Parish, School Diocese Loan Trust Account which supplanted the previously designated Diocesan Bank account. The Expert believes this account and name was primarily a post-petition designation. Throughout this report the Expert will use the term Diocesan Bank to describe the account pre-petition and will use the term PSDL Trust to describe elements of this account on a post-petition basis.

The Diocese pays 3.5% interest on funds located in the PSDL Trust and periodically loans funds to parishes and schools from the PSDL, charging 4.5% for those loans, thereby earning the 1% differential. There is also a variable differential associated with investing remaining funds in the PSDL Trust. The Expert believes the PSDL Trust operates in a manner very similar to a bank, of course without the regulatory requirements, and hence, previous to the petition date, it was referred to as the Diocesan Bank.

## "Accounts" at the Diocese

In prior hearings before the Court the Debtor has referenced in excess of 700 separate bank accounts being maintained at the parish level. In addition, the Court previously referenced a possible further accumulation of 500 "accounts" purportedly being maintained at the Diocese level, prompting the Court to describe the accounting system at the Diocese as "Byzantine". The Expert understands the Court's frustration. The source of this frustration is probably based upon two factors. First, the term "account" can have a number of different but distinct meanings depending upon the circumstances in which the term is used. The Expert believes the Court naturally assumed the term "account" meant a bank account or savings account located at a financial institution which is not necessarily the same meaning perhaps ascribed to "account" by the Debtor. Secondly, for reasons described further within this report, there truly are a massive number of bank accounts collectively maintained at the Parish level. The Expert believes the number of bank accounts at the Parish level will ultimately exceed 900 upon completion of his analysis. The thought of analyzing 900 bank accounts is a daunting but manageable process. However, the potential existence of 500 separate undefined "accounts" maintained at the Diocese combined with 900 accounts at the parish level, clearly moves us into the realm of Byzantine.

In actuality, the number of bank accounts at the Diocese level does not even begin to approximate 500 separate bank accounts. When using the term account as being an account maintained at a financial institution, the Debtor had 35 bank or brokerage accounts at the date of

---

[13] The date of the most recent financial statement prepared post-petition by the Debtor. (Exhibit 52)

petition and added three additional accounts post-petition, bringing the present number of accounts to 38[14].

The 500 "accounts" discussed by the Court probably relate to the individual claims the parishes and schools assert upon funds located in the PSDL Trust, which involves only one banking account. As will be further explained in the report, the PSDL trust accepts funds from parishes and schools as deposits thereby creating a "depositor account"[15] with the PSDL Trust. Many parishes and schools have multiple depositor accounts in the PSDL Trust (as of the Petition Date the number was 201 different accounts and as of July 7, 2007 the number had increased to 218). With the monies deposited by the parishes and schools, the PSDL Trust provides loans to parishes and schools from available funds thereby creating a "loan account."[16] As of the Petition Date, loans to parishes or schools was 33 and as of July 7, 2007 had increased to 36. Therefore, as of July 7, 2007, the total of depositor and loan "accounts" was not 500 accounts, as originally referenced, but 254 (218 plus 36), "depositor or loan accounts" maintained in one single bank account – the PSDL Trust.

There was also discussion before the Court as to the number of checking accounts maintained at the parish level. That number was estimated to be approximately 700. Each parish or school maintains from one to twenty two individual checking accounts at banks with which the parish or school receives donations, fees, tuitions, etc, and pays operating or construction expenses or transfers excess funds to the PSDL Trust. The Expert's investigation concerning the

---

[14] In actuality, the Administrative Office has personal control over only 12 bank accounts and 8 brokerage or marketable securities accounts. The remaining accounts were controlled directly by Divisions within the Diocese, such as high schools and the Holy Cross Cemetery.

[15] Assuming the PSDL Trust is a stand alone entity, the depositor accounts are liabilities or beneficiary interest of the PSDL Trust.

[16] Assuming the PSDL Trust is a stand alone entity, the loans to parishes and schools are assets of the PSDL Trust.

total number of parish accounts is still continuing but his current estimate of outstanding checking accounts at both the school and parish level is between 900 and 1000 accounts[17].

Cash Management System

The Pastoral Center, sometimes called the Administrative Office, maintains a cash management system ("CMS"), which is used to administer monies[18] for its operations; monies in the PSDL Trust; and monies in servicing activities. It is intended to provided "an efficient and secure means of managing and disbursing cash for RCBSD's operations"[19] incorporating all of the 38 banking accounts previously referenced. It contained a number of components, all of which are described in greater detail throughout the Expert Report. In its simplest terms, the CMS system provided the structure whereby the Administrative Office received and disbursed all cash flowing into the Administrative Office.

On a pre-petition basis the Administrative Office directed nearly[20] all cash flowing into the Administrative Center, directly or indirectly, into the Pastoral Center Main Checking Account at Union Bank of California, also called the Diocesan Bank. In essence, all water flowed into this communal pond.

The Pastoral Center Main Checking Account was the repository of all funds from the Diocesan revenue stream including the Diocesan or Chancery tax, the Annual Catholic Appeal, interest and investment income and administrative fees. In addition to the Diocesan funds referenced above, the parishes and schools also deposited money in the Pastoral Center Main

---

[17] See Pages 15 – 19 for further clarification of ongoing investigation into Parish accounts.
[18] The Expert utilizes the terms monies and funds somewhat interchangeably. Any reference to the phrase funds primarily relates to cash and should not be confused with the accounting theories underlying fund accounting.
[19] Per the Debtor's First Day Motion No. 1: Debtor's Motion for Order: (A) Authorizing Continued Use of Debtor's Cash Management System

Checking Account. There were two primary purposes which would cause the parishes or schools to forward funds to the Pastoral Center Main Checking Account. The first purpose was to place parish or school monies in the Diocesan Bank, later to be called the PSDL Trust. ("Funds on Deposit") The parish or schools also received interest on these Funds on Deposit, somewhat similar to a bank, hence the name – Diocesan Bank. The second purpose was to reimburse the Diocese for servicing activities including payroll, employee benefits and insurance which were the responsibility of the individual parishes or schools but were administered by the Diocese ("Servicing Activities").

Post-petition the general cash flows of the CMS have remained approximately the same with comparable receipts and disbursements by activities[21]. However, the Debtor opened two[22] new bank accounts at the Administrative Office in the post-petition period. The first account is the PSDL Trust Checking Account. This account is designed to accommodate the receipts and disbursements related solely to the PSDL Trust, which avoids commingling PSDL Trust monies with non-PSDL Trust monies, as was the practice during the pre-petition period. The second new account is referred to as the Pastoral Services – Main Checking Account, which is now utilized the house the funds solely belonging to the Diocese. The prior Pastoral Center Main Checking Account which, on a pre-petition basis, was the central repository of all funds flowing into the Administrative Office was renamed the Pastoral Services – Main Checking II Account and is designed to house the monies related to the Service Activities, which avoids commingling the Service Activities monies with non-service activities monies.

---

[20] Relatively minor deposits were made directly into the lay or Priest Health checking accounts from Service Recipients rather than going through the Main Diocesan Bank account and then being deposited into this account.

Debtor's Declarations With Regard to the First Day Motions

It is the opinion of the Expert that the representations made by Mr. Mirando (See Exhibit 5), Mr. Linscott, (See Exhibit 6) and Mrs. Jassoy (See Exhibit 7) within their declarations as attached to the FIRST DAY MOTION NO. 1 DEBTOR'S MOTION FOR ORDER: (A) AUTHORIZING CONTINUED USE OF DEBTOR'S CASH MANAGEMENT SYSTEM, are by and large correct, with the following clarifications:

Linscott Declaration:

Paragraph #12 - "RCBSD has traditionally subsidized parishes. Contrary to the allegations in the Unsecured Committee's Objection, this is not part of the Debtor's cash management system. Parish subsidies are active conscious gifts made pursuant to RCBSD's mission as a faith-based non-profit organization."

The Expert disagrees with the portion of Linscott's declaration wherein he asserts that the subsidies were not part of the Debtor's cash management system. The Expert believes all subsidizations, "gifts" or any transfers involving the PSDL Trust or Diocesan Bank were, by definition, a portion of the Debtor's Cash Management System.

Paragraph #15 - The PSDL Trust is not a component of the Debtor's operational cash management.

The Expert disagrees with the statement contained in the Linscott declaration, Paragraph #15, concerning the PSDL Trust not being a component of the Debtor's

---

[21] There was a period after the Petition Date when transfers from the PSDL Trust were frozen and then later released.
[22] The Debtor also opened a separate checking account for the new high school – Mater Dei.

operational cash management.  The Expert believes the PSDL Trust to be an integral element of the Debtor's Cash Management System.

Mirando Declaration:

Paragraph #10 – "The Service Recipients carry on their own activities and functions and maintain and control their own bank accounts into which deposits are made and expenses paid. No one at RCBSD has access to or control over any of the Service Recipients' accounts, any knowledge of location or depository for such accounts or the activity in those accounts."

It is the opinion of the Expert that this portion of the declaration is not fully inclusive of the operational and audit capabilities present within the Diocese.  It is true that no one at the Diocese is a signatory or actively controls disbursements or receipts into the parish or school local checking accounts and accordingly, at any given time, the Diocese may be unaware of parish and school local checking account information.  However, annual reports provided by the parish to the Diocese contain bank account information.  Also, although the audits of the parishes by the Diocese are only conducted every five (5) years, the audit reports provide a limited amount of banking information.  In addition, in accordance with the Handbook – Diocese of San Diego – 2007 ("Handbook"), see Appendix A, the Diocese can obtain information as to the location and activity within any of the parish and school local checking accounts should they choose to do so.

Jassoy Declaration:

The Expert has no comments or clarifications concerning Mrs. Jassoy's declaration.

Specific Responses to the Order of the Court

The Expert was directed to perform an "investigation and analysis and make appropriate findings regarding the Cash Management System of the Debtor." In an attempt to provide particularity as to the investigation and analysis performed by the Expert and in response to the specific assignments listed within the Order, the Expert presents below a recap of the individual tasks delineated within the order and provides references to relevant sections of the report or Exhibits and Appendices which relate to that task. The Expert also submits general responses he feels will further clarify the investigation he has conducted.

- "The identity of each Account, including the account number, name and address of all Account depositories' branches, the name and address of Account holder as reflected in the Account depositories' record, the tax identification number associated with the Account if different from the Debtor's tax identification number, the owner of such tax identification number and the date the Account was opened;

  a. The Expert was able to provide a significant portion of this information to the Court as included in the referenced Exhibits and Appendices referenced below. However, due to the lack of response from many of the financial institutions who were served with subpoenas requesting account information, the Expert has not fully concluded this portion of the report. The Expert intends to file a supplemental report to the Court when he has received all of the responses. The Expert may seek further direction of the Court should his attempts to obtain the subpoenaed material be unsuccessful.

b. See Exhibits – 24, 25, 26, 27, 28, 31, 35, 97& 98

c. The information is also included in Appendices B.1 – B.74 which includes the audit results and documentation for the 48 parishes and 26 schools audited by the Expert. Additional information, provided to the Expert, is included in the 250 binders of supporting documentation received during the course of the audit.

- All documents pursuant to which the Account was established;

   a. All documents to the extent available and provided to the Expert relating to the establishment of the accounts concerning the 48 parishes and 26 schools audited by the Expert are included in the 250 binders of supporting documentation received by the Expert during the course of the audits.

   b. As detailed above, the information which the Expert has sought within the aforementioned subpoenas includes specifics concerning the establishment of the account.  Unfortunately, the Expert has not fully concluded his account analysis and will file a supplemental report upon receipt of all of the subpoenaed material.

- The identity of each Account that, after the commencement of the Debtors chapter 11 case, was closed or changed in anyway, including but not limited to changes in tax identification numbers, Account signatories or any agreement affecting the Account.  To the extent of any such changes or closures, the identity of the person requesting the closure or changes and the authority of such person to make or seek such closure or change;

a. The Expert has previously referenced the opening of three new bank accounts by the Administrative Office.

b. See Exhibits 25, 26, & 98

c. As previously stated, the Expert has not fully concluded his account analysis and will not be able to do so until he receives all of the subpoenaed material.

d. The information is also included in Appendices B.1 – B.74, which includes the audit results and documentation for the 48 parishes and 26 schools audited by the Expert. Additional information, provided to the Expert, is included in the 250 binders of supporting documentation received during the course of the audit.

- Any alleged restriction(s) or limitation with respect to the funds in the Accounts;

    a. See Exhibits 21, 55, 77, 84, 93, 94, & 95

    b. See Report Pages

    c. The information is also included in Appendices B.1 – B.74, which includes the audit results and documentation for the 48 parishes and 26 schools audited by the Expert. Additional information, provided to the Expert, is included in the 250 binders of supporting documentation received during the course of the audit.

- An analysis of the Account holder's compliance with any alleged restrictions or limitations with respect to the funds deposited in or withdrawn from the

Accounts. The Expert's analysis may be derived from his performance of such random tests and/or samplings as he deems appropriate and necessary;

    a.  See Exhibits 21, 77, 84, 93, 94, & 95.

    b.  The information is also included in Appendices B.1 – B.74, which includes the audit results and documentation for the 48 parishes and 26 schools audited by the Expert. Additional information, provided to the Expert, is included in the 250 binders of supporting documentation received during the course of the audit.

- An analysis of whether the Cash Management System described in the Debtor's FIRST DAY MOTION #1 (D.E. #9) operates in a manner consistent with the Debtor's representations in said Motion. The Expert's analysis and opinion may be derived from his performance of such random tests and/or samplings as he deems appropriate and necessary;

    a.  See Section Entitled <u>Debtor's Declarations With Regard to the First Day Motions</u>

    b.  The cash management system is discussed liberally throughout the Expert report.

- The restrictions, if any, on use of funds raised in the Annual Catholic Appeal;

    a.  The issue of restrictions is discussed in detail within Section III entitled The Roman Catholic Bishop of San Diego/San Diego Diocese

    b.  See Section VI – Annual Catholic Appeal and Designated Special Collections

    c.  See Exhibits 9, 10, 11, 12, 77 & 84

- The Debtor's state and federal tax returns, if any, for the last five (5) years

  a. The Expert has been advised by the Debtor that no tax returns are required and none have been filed within the past five-year period.

- The Order also directed the Expert to "include a list of all individuals interviewed by the Expert, all documents reviewed by the Expert, all documents requested by the Expert but not produced and the identity of the person failing" to produce the documents and the reasons provided for such failure.

  a. See Exhibits 90 & 91

  b. The Expert has been unable to fully complete the account analysis section of the report for the reasons described above. The Expert is disappointed with the response of certain financial institutions and will work diligently to obtain an adequate response from each financial institution. If the Expert is unsuccessful, he will provide, within a supplemental report, the identity of each person or entity failing to produce the documents as requested by subpoena.

PSDL Trust and the Diocesan Financial Statements

The financial statements of the Debtor, on a pre-petition basis, were referred to as the Diocesan Office Funds of the Roman Catholic Diocese of San Diego, ("The Diocesan Office Funds Financial Statements") and were audited by Ernst & Young LLP for the years 2002 through 2006. In the course of their audit, Ernst & Young LLP obtained representations concerning the financial information from the management ("management representation letter")

of the Diocese (Exhibit 8).  Management representation letters are obtained by an auditor in the normal course of their audit engagement for the purpose of obtaining written representations from the client attesting that the information in the financial statement is correct.  The Debtor's management representation letters were signed by Bishop Robert H. Brom, Hal Gardner, Director of Finance (since deceased) and Karen Jassoy, Controller.

In a number of filings with the Court, the Debtor has consistently asserted that the funds maintained in the PSDL Trust (or Diocesan Bank) are received and maintained solely in behalf of the individual parish or school and do not constitute the property of the Debtor's estate. However, the Debtor's management representation letters for the year ended June 30, 2204 through 2006.:

"Ownership and Pledging of Assets"

"The Diocesan Office *has satisfactory title to all assets* (italics added) appearing in the statement of financial position.  No security agreements have been executed under the provisions of the Uniform Commercial Code, and there are not liens or encumbrances on assets, nor has any asset been pledged".  (Exhibit 8, page 2)

The Diocesan Office Funds Financial Statements contains all of the funds held by the Diocese, including the Diocesan Bank, makes no disclosure of a trust relationship and gives no indication that any asset in the Diocesan Bank belongs to anyone other than the Diocese.  Any assertion by the Diocese that they are holding the Diocesan Bank funds in behalf of the individual parishes and schools in a trust capacity is in direct conflict with the representations

made by the Debtor's officers in the management representation letters[23].   It should be further noted that the Debtor's Bankruptcy petition did not list the assets of the PSDL Trust and accordingly, were filed in direct contradiction to the assertions with the management representation letters attested to by the Debtor.

The Diocesan Office Funds Financial Statements, as audited by Ernst & Young, were provided to a number of financial or other institutions in connections with financing or other arrangements. In light of the potential third parties reliance thereon, it would also be a critical misrepresentation to report that assets belonging to others are included in the Diocesan Office Funds Financial Statements as the Debtor's assets. Some of the entities which received the Diocesan Financial Statements are as follows:

1.    Union Bank of California,
2.    Bank of America,
3.    Allied Irish Bank,
4.    California Department of Insurance for Gift Annuities,
5.    California Department of Insurance – Self Insurance Plans for Workers' Comp,
6.    Insurance carriers CMG and CMU, and
7.    The Department of Motor Vehicles.


Reliance on the Diocesan Office Financial Statements to Meet Debt Guarantee

Footnote 10 of the Diocesan Office Funds Financial Statement for the years ended June 30, 2002 through 2006 (Exhibits 9 through 12) describe a guarantee between the Debtor and a bank that provides a letter of credit securing $28.4 million of variable rate demand revenue bonds issued for the benefit of CSE to finance, in part, the construction of the Cathedral Catholic High School.  Certain loan covenants of the guarantor are discussed in Footnote 10 to the

---

[23] The Expert has included a copy of a footnote (Exhibit 65, starting with the last sentence on page 36) from the annual report of The First American Corporation's public annual report that is filed with the Securities and Exchange Commission as an example of how such trust relationships are disclosed in financial statements under generally accepted accounting principles.  The First American Corporation holds billions of dollars of assets in

financial statements. Both the management of the Debtor, as well as the auditor, declare the Debtor in compliance with the covenants of the aforementioned guaranty.

Noting that the debt was funded in May of 2003, two of the guarantee covenants described in Footnote 10 could not be met in subsequent years without including all of the assets of the Diocesan Bank, which were supposedly held in trust by the Diocese in behalf of the parishes and schools and other claimants.

The first covenant is the requirement to maintain a minimum of $10 million in unrestricted cash and readily marketable securities[24] which was only possible in the years ended June 30, 2004[25] and 2006 with the inclusion of all of the marketable securities in the Diocesan Bank. The calculations in Exhibit 13 demonstrate this fact. There is not a sufficient level of unrestricted cash in the Administrative Office General Fund in fiscal year 2006 to comply with this covenant without including the funds supposedly being held in trust in the Diocesan Bank. Even adding to the Administrative Office Restricted Fund the amounts in the Bishop's Burse Fund does not satisfy the financial covenant. Only by adding the marketable securities in the Diocesan Bank can the covenant be met.

---

behalf of others in escrow accounts or as a trustee. As the footnote states, "…trust deposits are not considered assets of the Company and, therefore, are not included in the accompanying consolidated balance sheets."
[24] The Guarantee Agreement (Exhibit 60, page 2) defines unrestricted cash and readily marketable securities as, "…all cash, cash equivalents, and Readily Marketable Securities held by the Guarantor and treated under GAAP in a manner consistently applied, as historically applied by the Guarantor as unrestricted and available for use for the payment of principal or premium, if any, and interest on Debt or for the payment of operating expenses (underline added) of the Guarantor."
[25] When the Diocesan Office Financial Statements were first issued for the year ended June 30, 2004, the Property fund was shown as a separate fund. In 2005 the Property fund was merged with the Diocesan Bank and a change was made which moved the Accounts Receivable, CSE from the Administrative Office General fund to the Diocesan Bank. Hence, the changed 2005 presentation of the 2004 financial information would qualify on this loan covenant where the 2004 presentation would not.

The second covenant mentioned in Footnote 10 is the requirement to maintain a ratio of assets of unrestricted cash and temporarily restricted cash and marketable securities[26] to debt of not less than .75:1. That ratio, as detailed in Exhibit 14, cannot be met without including the assets of the Diocesan Bank which are supposedly being held in trust in behalf of the Parishes and Schools. The Administrative Office unrestricted cash and temporary cash and marketable securities are shown in Exhibit 14. The ratio to the then outstanding debt balance is calculated and demonstrates the failure of this loan covenant based solely upon these Administrative Office General Fund assets in each of the three years. Even with the addition of the Bishop's Burse Fund there still exists a failure to meet the loan covenant in three of the years. With the addition of the Interfund account balances, assuming them to be cash (which they probably are not for purposes of the covenant definition), there is a failure to meet the loan covenant in three of the years. Only after adding the Diocesan Bank assets does the Debtor meet the required loan covenant.

The definitions in the loan covenants refer to cash, cash equivalents, and Readily Marketable Securities held by the Guarantor, the RCBSD, that are available for the payment of "operating expenses of the Guarantor." Including the Diocesan Bank cash, cash equivalents and Readily Marketable Securities in the loan covenant implies that the assets of the Diocesan Bank are available to pay the operating expenses of the Debtor.

Ernst & Young LLP advised the Expert they are not in possession of a workpaper which provides their computations of compliance with the loan covenants. However, when the Expert

---

[26] The Guarantee Agreement (Exhibit 60, page 2) defines unrestricted cash and temporarily restricted cash and marketable securities as, "…all cash, cash equivalents, and Readily Marketable Securities held by the Guarantor and treated under GAAP in a manner consistently applied, as historically applied by the Guarantor as unrestricted or temporarily restricted by the Governing Body of the Guarantor…available for use for the payment of principal or premium, if any, and interest on Debt or for the payment of operating expenses (underline added) of the Guarantor."

spoke with Kristin Janix, manager at Ernst & Young LLP, who was assigned to the audit of The Diocese Funds Financial Statements, she agreed that in order to comply with the loan covenants, it would be necessary to include all of the assets of the Diocesan bank.

Accounting Treatment for Land Held in Trust for Parishes

It is the policy of the Diocese to provide a parish, upon establishment, a sufficient amount of developable land from the Diocese on which to build their parish (Exhibits 15 and 70).  With a few exceptions, parishes which are in the start up phase, The Diocesan Financial Office Funds Financial Statements for the years ended June 30, 2002 through 2006 (Exhibits 9 – 12, Pages 2 & 3) do not include the cost or other basis for land held for the benefit of parishes.

The financial statements of the parishes the Expert analyzed do not include the cost or other basis for land used by the parish in their financial statements.  At the parish level, when construction costs are incurred they are expensed and therefore no capital asset is created, including land gifted to the parish from the Diocese.  Hence, the land held in the name of The Roman Catholic Bishop of San Diego, which the debtor asserts it holds for the benefit of the parishes (Exhibit 16, pages 1 to 19) is not carried on the books of the Diocese or the parishes

Diocese Construction Management

The Diocese provides construction supervision and management to the parishes for all projects over $100,000.  Joel King, AIA, serves as Director of Construction Services ("CS") within the Pastoral Center.  Parishes that wish to build facilities submit their proposals to the Building and Renovation Committee (the "BRC").  A copy of the bylaws of the committee and other policies concerning parish project construction are contained in Exhibit 17.

Mr. King provided the Expert with three samples of Construction Contracts (Exhibits 72, 73, & 74). It should be noted that all three of the sample contracts provided by Mr. King have the Roman Catholic Bishop of San Diego, a corporation sole (or variation thereof), as the owner of the project even though the projects were for construction of parish facilities. The Expert has seen certain contract documents (Exhibit 75) where the individual parish is named as the owner. Mr. King indicates that some parishes wish to be named as the owner, while others have no preference or specifically do not want to be listed as owner on the contract.

Diocese Divisions

The Diocese has several different operating units or divisions. The major characteristic of each Diocesan division is their autonomy of accounting operations from the Pastoral Center. These divisions presently maintain their own accounting systems separate from the Administrative Office but it should be noted that the Debtor's Monthly Operating Report for March 31, 2007 was the first time, other than the Debtor's bankruptcy schedules, that the Debtor prepared a consolidated financial statement containing what it considers to be its divisions i.e. Holy Cross Cemetery, Vincent Memorial, Marian and Mater Dei High Schools, the Newman Centers and the Apostleship of the Sea. Prior to that time, the divisions all had separate accounting statements which were not consolidated into the Debtor

Audit Results of Parish and School Accounting

The Order required the Expert to provide the Court with information concerning the existence, as well as the operational and informational data regarding bank accounts, as well as any restrictions which may be imposed with respect to those funds. In order to do so, the Expert

was required to conduct an audit[27] (or accounting analysis) of various Diocese and parish accounting records. The audit was also required to determine whether the CMS operates in a manner consistent with declarations as provided by responsible officials in the Diocese.

Due to appropriate and understandable time constraints, the Expert was not able to visit all 98 parishes and 43 elementary schools. However, the Expert reviewed all available data related to all 98 parishes from the list below and based upon that data selected 48 parishes to audit.

Exhibit 18 is a schedule of all the parishes in the San Diego Diocese with a notation of the 48 parishes the Expert chose to audit. Exhibit 19 is a full schedule of the 43 schools in the San Diego Diocese and the 26 schools which were reviewed by the Expert.

Accounting for the Parishes & Schools

Approximately $165 million flows through the annual collective coffers of the Diocese, parishes and schools of the RCBSD[28]. One would naturally assume that such a large financial enterprise would establish a standard system of accounting and reporting, which would allow for meaningful financial measurement standards to be imposed throughout the entire organization. If such a system were in place, any entity, such as the Diocese, should be able to access financial information concerning each of the parishes or schools within the Diocese in order to monitor their financial performance or adherence to established procedures. However, the Diocese has no such system and, absent a personal visit, cannot independently access the full level of parish

---

[27] The Expert utilizes the terms "audits, visits and reviews" throughout this report to describe the accounting analysis which he conducted. However, the term "audit" as well "review", as defined herein, is not to be construed as complying with the standards of an audit or review as defined by the AICPA.

[28] Excluding the funds flowing from the high schools and other separate divisions associated with the Diocese.

or school accounting information.  As a result, they are often woefully unaware of the specific financial operations of the individual parishes.

In practice, each parish and school is responsible for their individual method of accounting and bookkeeping leading to a lack of standardized accounting.  This absence of a prevailing accounting system leads to an incredible array of accounting programs and methods to record their financial transactions. As a result, the accounting programs within the parishes range from a handwritten system of ledgers[29] to advanced parish accounting software packages.

Regardless of the method used, the Expert found that the parishes and schools were reasonably well organized and sufficient detail was generally available to allow the Expert to analyze the receipts and disbursements of each parish or school.  This availability is probably due, in part, to the fact that each parish and school is required to send an annual report to the Diocese.  This requirement is detailed in the Diocesan Handbook, which is included as Appendix A.  The accounting system of the Parish must be adequately standardized to provide accounting data in sufficient detail to allow the parish or school to prepare the annual reports to the Diocese.[30]

The Expert has reviewed all of the annual reports for the fiscal years ended 2003 through and including 2006 as provided by the Diocese and the 48 parishes and 26 schools which were audited by the Expert[31].  The financial data in the annual reports to the Diocese is primarily a receipt and disbursement based analysis.  It also contains information concerning restricted (or extraordinary) donations, as well as a supposed list of the bank accounts maintained by the

---

[29] It should be noted that the handwritten system was meticulously maintained.
[30] Some of the parishes use specialized software for parish accounting which allows the report to be printed from their software system.
[31] To the extent provided, copies of each of the annual reports for the 48 parishes and 26 schools are included in the binders maintained by the Expert containing the supporting accounting information obtained during the audit.

parish. As in most parish related accounting issues, there is a wide disparity between the accuracy and inaccuracy of the information.

In conjunction with the duties of the pastor, the guidelines, as outlined in the General Handbook, regarding parish cash state, "Accounts with financial institutions may be established *only with the permission of the pastor*. All accounts *must be* in the name of the parish. The pastor *must be* a signer on all such parish bank accounts. Anytime a change of signature(s) on an account is required, *the pastor must* sign the new signature card(s)....Separate accounts for parish organizations (altar society, etc.) are permissible. However, such accounts must contain reference to the name of the parish to which they pertain (e.g. St. Vincent Altar Society) and the pastor must be an authorized signatory on such accounts. Subsequent changes in authorized signatures must likewise be made only with the pastor's approval and signature on the new signature card(s)." (Emphasis added)

The Expert found that the pastors in the individual parishes audited by the Expert almost always complied with the aforementioned procedures especially relating to the principal bank accounts within the parish. However, a number of the smaller special purpose accounts at the parish level did not comply with these guidelines.

As outlined above, the pastor has ultimate responsibility for the administration of the parish. He may delegate certain responsibilities but according to the Handbook he retains supervisory control. The first general responsibility outlined in the handbook is "All parish receipts and disbursements shall be entered in the parish financial records according to the parish chart of accounts." During the audits conducted by the Expert, it was determined that a good faith effort was made to accurately record all receipts and disbursements in accordance with the aforementioned policy. When deviations from the parish chart of accounts occurred, it was

generally due to the inexperience of the person making the entry, as many lay personnel, who lack conventional accounting skills, are designated that task. However, those entries which were discovered to have been recorded incorrectly did not have a material effect upon the financial reports.

Collection of Donations and Designation of Restricted Funds

Within the 48 parish audits conducted by the Expert, he found the collection of ordinary and restricted/designated donations for parishes to be administered in a comparable manner. The collections are gathered and separated by type, i.e., ordinary or extraordinary. Ordinary receipts are those designated for the general operation of the parish. Extraordinary donations are those which fall outside the general operational nature and may include building funds, special purpose donations such as hurricane or other disaster relief, Diocesan special collections, and ACA rebates[32]. The manner of designation or segregation is normally determined by the color, notation or other distinguishing factor on the donation envelope. Based on that designation, or occasionally through verbal directions to the pastor, the donation is categorized as either ordinary receipts or designated as restricted receipts for specific causes[33]. In some cases the general collection process may be modified to create a designation. For example, the pastor might have a second collection on the first Sunday of a month and designate those collections for the building fund or some other cause.

---

[32] Diocesan special collections include such pass through collections which go directly on to the Diocese, such as Peter's Pence and the Annual Lenten Appeal. The Annual Catholic Appeal (ACA) rebates represent the return of funds advanced to the Diocese as contributory amounts which are estimated by the Diocese in the first part of the year and a parish may ultimately have advanced more than required under the final assessment.
[33] It should be noted that the Diocesan tax of 13% is not charged against those collections designated as extraordinary. Thus, in certain instances, it is beneficial for a parish to designate certain collections as extraordinary as it reduces the Diocesan tax due from the parish.

Occasionally, the parish will receive a larger than normal donation that may or may not necessarily be designated for a specific purpose. Often the donor will direct the pastor to use the funds in areas where he feels the parish may have the greatest need. In those instances, it is not uncommon for the pastor to designate these donations as an extraordinary contribution and allocate it to a specific purpose, such as a new construction campaign. This procedure, which is used regularly in the parishes, is not in accordance with the handbook as when handling unspecified purpose receipts, such as those mentioned above, the handbook states, "funds that are not restricted by the donor and are internally designated by the parish are to be classified as ordinary receipts."

Most, but not all, large contributions the Expert reviewed included a letter designating the purpose and intended use of such contribution. The Expert has retained copies of all such letters in the binders of supporting documentation for each individual audit.

Following receipt and counting by three or more parishioners, the funds can then be deposited into one or more accounts established at the parish. Most parishes have separate accounts for general donations, building funds, or other designated gift accounts. The number of bank accounts maintained by the parishes range from one general account to as many as twenty-two separate accounts at the Our Lady at Mount Carmel, San Ysidro.

The above practice generally comports with the procedures outlined in the Handbook under the section "Administration – Parish" (see Appendix A). This section contains detailed cash counting and accounting procedures. The pastor and parish personnel generally try to follow these guidelines based on the specific circumstances at each parish. The handling of cash is one of the primary areas addressed whenever the parishes are audited by the Diocese and accordingly, parishes endeavor to comply with all of these requirements.

In summary, with the exception of those contributions whose purpose have been supported by a specific letter detailing the intentions of the donating party, the Expert has relied upon the procedural descriptions, as provided by the pastor and the lay personnel assigned to each parish, as to which contributions have been designated for general operations or extraordinary or specifically designated contributions. The Expert believes most parishes made a good faith attempt to comply with the procedures as outlined in the Handbook. However, as stated before, there is a significant variation between both the accounting capabilities of parish personnel and the diligence to which the individual pastor observes the Handbook guidelines concerning the designation of restricted funds. The Expert was not present during the collection procedures and the envelopes containing past contributions have been discarded. Therefore, there is not sufficient independent accounting documentation available to allow the Expert to provide a conclusory opinion as to the adequacy of the procedures employed. Consequently, the Expert is unable to opine as to whether the preponderance of those funds were accurately designated as restricted. If the procedure is followed, which in most cases it appears to have been, the procedures as outlined are probably sufficient to allow a pastor to designate funds as restricted as to purpose. Nevertheless, the Expert witnessed a number of occasions during the course of the audits wherein those procedures were not adhered to or, in some cases, completely disregarded.

In regard to disbursements at the parish level, the Expert believes with a few exceptions, the pastors and parishes make a good faith attempt to comport with the guidelines enumerated in the Handbook.

A significant amount of the funds actually spent for normal operating expenses are paid directly to the Diocese. Generally, most clergy salary and benefits, religious and lay salaries and

benefits, diocesan tax, clergy pension tax and insurance for property and auto are directly transferred to the Diocese from the parish accounts by automatic transfer twice a month[34]. Prior to the bankruptcy these funds were paid to the Diocese with checks written from the parish accounts. According to Diocesan policy, as detailed in the Handbook, all personnel are to be paid from the Diocesan payroll system. Based on Exhibit 20, which demonstrates the operating expense analysis for the 48 parishes visited by the Expert, these operational expense transfers to the Diocese account for approximately 71.15% of the total general operating expenses.

Parishes and the Diocesan Bank/PSDL Trust

There is a clear obligation on the part of the parishes to deposit excess funds into the Diocesan Bank/PSDL Trust and a goodly number of the parishes are attempting to comply with the guidelines as best as they can understand those procedures. However, there is an understandable, but clearly apparent, ambivalence on the part of the parishes to comply with that requirement. A number of the parishes have collected substantial donations from their parishioners over the past few years to replace or renovate their parishes. Those designated monies collectively represented in excess of $35,000,000 for the fiscal year ended June 30, 2006. When faced with the looming specter of bankruptcy and the possibility that those donations may be swept into the vortex of the Diocesan litigation, many of the parishes have become defensibly protective of those monies. As will be further detailed within the report, a number of parishes choose to employ various means to protect the funds they believe to be the exclusive property of the parish. Those means range from a complete disregard of the requirement to deposit excess

_____

[34] It should be noted that those withdrawals cannot occur without the express approval of the respective parishes as the Diocese is not a signatory on any of the parish accounts and accordingly cannot unilaterally make such withdrawals.

parish funds into the Diocesan Bank/PSDL Trust to occasional inappropriate and discreditable methods.

The Parish Administration section of the Handbook provides the following clear direction as to the procedure for transfer of surplus funds from the parish to the Diocese. "Surplus funds *must* (italics added) be on deposit with the diocese in accordance with diocesan policy. Surplus funds are amounts above what is needed for normal operations for a two month period, which is estimated to be $50,000." The Expert has found a veritable plethora of interpretations at the parish and school level of the surplus funds requirement which range from good faith adherence to absolute disregard. The designation of surplus funds as being those funds in excess of $50,000 and an additional two months operating expenses was the most common interpretation of the surplus funds procedure the Expert received from the parishes during the course of his review. Thus, if a parish were to adopt that interpretation and had monthly operating expenses of $60,000, surplus funds would be those funds greater than $170,000, or two times $60,000 plus $50,000. A goodly number of the parishes the Expert reviewed tried to comply, at least to some degree, with their interpretation of this policy. There were also a significant number of parishes, such as Our Lady of Mt. Carmel, San Ysidro Parish, who demonstrated a willful disregard of this procedure. The audits of the parishes and schools confirmed the wide variation afforded this procedure. For example, strict adherence to this policy would indicate that each of the 74 parishes and schools audited by Expert visited should have each had approximately $50,000. In practice, only nine (9) of the seventy-four (74) parishes and schools the Expert visited had less than $100,000 on hand at the petition date and three (3) had more than $1.1 million. Another eighteen (18) had between $400,000 and $1,100,000, and seventeen more had between $250,000 and $400,000. If this policy were implemented to limit each of the 74 parishes and schools the

Expert reviewed to a total of $50,000, the amount remaining at the parish level would be approximately $3.70 million ($50,000 X 74). Nevertheless, the total cash on hand at the petition date, as reported on Schedule K, for the same 74 parishes and schools is $25.46 million, which results in excess or surplus funds of approximately $21.76 million being held in the multiple accounts of the 74 parishes and schools audited. Even if the base amount was raised to $100,000, the surplus monies at the parishes and schools would still be in excess of $18 million.

Post Petition PSDL Activity

The Expert was provided a schedule of activity relating to the PSDL for all parishes and parochial schools from the petition date through early July 2007. This information is summarized in Exhibit 21. The following summarizes the activity in the PSDL Trust for this period:

| | |
|---|---|
| Deposits & Credits to Funds on Deposit | $ 4,521,870 |
| Payments on Debt | 1,415,237 |
| Total Receipts | $ 5,937,107 |
| | |
| Withdrawals & Debits from Funds on Deposit | $ 3,475,733 |
| Draws on the PSDL Debt | 3,425,018 |
| Total Withdrawals | $ 6,900,751 |

From the 74 parishes and schools the Expert selected for audit he reviewed the fifteen parishes or schools with the highest levels of available cash on hand at the petition date based on Schedule K. The fifteen all had more than $500,000 in their parish or school accounts according to Schedule K. As a combined group these 15 parishes and schools had $11,965,094 on hand at the petition date according to Schedule K. Six of the fifteen had principal activity in the PSDL

44

Trust from February 28, 2007 through early July 2007. As a group, these fifteen parishes and schools had no withdrawals of Funds on Deposit or draws on debt from the PSDL Trust during this time frame. During this same period, as a combined group, the six parishes and schools either deposited into the PSDL Trust or made debt payments to the PSDL Trust totaling $902,126.

It appears the parishes and schools continued to ignore the Diocesan policy regarding the deposit of excess funds into the PSDL Trust. This disregard for the policy is even more troubling given a memorandum sent to the pastors, administrators and principals on May 24, 2007 by Monsignor Steven Callahan. This memorandum has been included as Exhibit 22. The document declares, "At a hearing in the bankruptcy court on May 10, 2007, both the Diocese of San Diego and the Organization of Parishes agreed to comply with the diocesan policy that surplus funds be deposited in the Parish and School Deposit and Loan (PSDL) Trust (formerly known as the diocesan bank)…*Therefore, you are directed to deposit surplus funds no later than May 31, 2007"* (emphasis added). The memo closes with the statement, "Your cooperation is essential so that the diocese and parishes are in compliance with the commitment to the Court." It is apparent, according to the most recent information available to the Expert, most parishes continued to ignore the diocesan policy, the direction of this memo and their commitment to the court.

Loans to Parishes

There is a separate diocesan policy dated November 1, 2006 that addresses loans from the Diocese to individual parishes which are primarily used for construction of new projects, but may also include purchases of assets, maintenance projects and even the purchase of Rectories.

The Expert found one instance where a parish borrowed funds from other parishes. The parish that borrowed the funds was St. Brigid Parish. The Expert visited St. Brigid on May 31, 2007. At the time of the bankruptcy petition, St. Brigid had a new rectory construction project underway which was scheduled for completion in July 2007.

According to parish personnel, due to the bankruptcy, they were unable to access the funds in these three accounts in the PSDL Trust. The construction was ongoing for the new rectory and the parish did not have sufficient funds on hand to pay for construction costs. St. Brigid had only one parish bank account with a balance of $69,179 as listed on the Schedule K.

Because of the financial constraints referenced above, St. Brigid borrowed funds from three parishes in March 2007. The parish borrowed $50,000 each from St. Therese of Carmel, St. Gregory and Guardian Angel. The parish also borrowed $20,000 from a retired priest associated with the parish during March 2007. As of the date of the Expert's visit to the facility, the loans had not been repaid. Subsequent to the Expert's audit, the parish was able to access its monies in the PSDL Trust. The parish subsequently withdrew $38,722.70 from the "Funds on Deposit" account in the PSDL Trust and $47,000 from the "New Rectory" account in the PSDL Trust.

The Expert spoke with parish personnel on July 11, 2007, and was informed the three loans from the parishes remain unpaid. The $20,000 loan from the retired priest has been repaid.

The requirements and implementation procedures imposed by the Diocese are generally designed to protect the financial well-being of the individual parishes and to assure some form of repayment to the Diocese.

In order for a loan to be given the parish must have obtained the following:

1) The approval of the parish finance council,

2) All the required approvals of the Building and Renovation Committee and the Bishop have been obtained,
3) One-third of the approved cost of the project must be on deposit with the Diocese; evidence that the loan will not jeopardize the pastoral and financial responsibilities of the parish and
4) An agreed upon plan for repayment.

As of the date of petition, there are 30 separate loans from the PSDL Trust to the parishes and schools totaling $21,929,960[35]. Of the 30 outstanding loans at the petition date, eight were interest free loans. Generally, the parishes have been very diligent in paying off outstanding loans.

School Accounting

The pastor of the sponsoring parish has the primary responsibility for the financial administration of the school. As stated in the Handbook, "The pastor shall have the responsibility for the financial administration of the school in consultation with the Parish Finance Council. This responsibility may be delegated to the school principal." According to the Handbook, the pastor of the sponsoring parish is also a member of the executive board of the school. In addition, the pastor must be a signatory on all school bank accounts and has approval responsibility for fundraising and activities that involve publicity. The parish also assumes responsibility for the building and maintenance of the school and equipment following construction.

The same accounting and internal control procedures which apply to the parishes, as outlined above, also apply to the schools. Schools have reporting requirements similar to the

---

[35] These 30 loans include two relatively small loans to Cathedral Catholic High School and Vincent Memorial High School.

parish which include an annual report in a standard format issued by the diocese or in a form substantially equivalent to the parish form.

The major source of revenues for the school is tuition and student fees. The tuition rate is usually set by the principal with input and approval of the pastor and Parish Finance Council with due consideration for the local economic conditions. A summary of the tuition charged by the schools the Expert audited is included as Exhibit 23. The Expert did not specifically request this information from the schools, but most provided it as an act of courtesy. Accordingly, Exhibit 23 contains information for only 19 of the 26 schools the Expert audited. The schools receive a limited amount of restricted gifts and those gifts generally relate to tuition assistance or equipment needs of the school. For the fiscal year 2006, 38[36] of the schools analyzed had total restricted gifts of just under $900,000. By way of comparison, the total tuition and fees for the 38 schools was $44.61 million.

The parish may have the responsibility to supplement tuition and fees with parish funds if required by the approved budget. Many of the parishes the Expert visited provide at least some subsidy to the school. As reported by 38 of the 43 schools in fiscal year 2006, the parishes provided total subsidies of $1.22 million. However, many of the schools have established reputations and accordingly generate sufficient tuition and fees to cover all expenses and often generate excess operating funds. In fact, the aforementioned 38 schools generated excess operating revenues of approx. $2.86 million. During fiscal year 2006, those schools increased their Funds on Deposit by a net amount of approximately $760,000.

Schools are entitled and required to participate in the PSDL Trust in the same manner as the parishes. The Diocesan policy is clear that surplus funds of the schools must also be on

deposit in the PSDL Trust. It is common for the schools to deposit tuition funds in the PSDL Trust because substantial amounts are collected at the beginning of the school year and at mid-year.  These funds are then sent to the PSDL Trust and drawn as required by the school to meet ordinary operating expenses.  The schools generally designate these Funds on Deposit in the PSDL Trust as restricted or designated as they represent prepaid tuition and fees for the students.  The schools also may have excess operating funds or excess funds from fundraising efforts which are used to fund designated accounts for new construction or endowments for tuition assistance.  However, the Experts noticed a similar inconsistency of compliance with the policy requiring excess funds to be deposited with the PSDL Trust which ranged from good faith compliance to utter disregard.

Teacher salaries and benefits represent the preponderance of expenses and operational costs for the schools.  For example, in 2006, these payroll expenses represented almost 98% of the total tuition collected by the 38 schools analyzed[37].   The payment of teacher payroll and benefits are administered through the diocese in the same manner as the payroll for the parishes.


Results of Parish/School Visits and Analysis

The Expert reviewed the financial operations of a total of 48 parishes and 26 schools.  Detailed reports for each parish and school which document the audit results are located in 74 separate Appendices designated as Appendices B.1 through B.74.  The information below is intended to highlight some findings of the Expert as a result of those audits:

---

[36] As previously stated, the Expert audited only 26 schools but reviewed the Annual Reports for the 38 schools mentioned.