Bank Accounts

As outlined on Exhibit 24, the 74 parishes and schools the Expert chose to audit had reported a total of 511 bank accounts as listed on Schedule K.   This exhibit contains the information as outlined in Schedule K.

Exhibit 25 utilizes the previous Exhibit 24 and denotes corrections which are required in the original Schedule K for updates, new accounts, closed accounts and other changes which were uncovered during the course of the Expert's audit.  These changes have been highlighted in order to be easily identified.  (The Expert has used the date of February 28, 2007 for all of this information to establish consistency)  It is evident from the attached corrections that Schedule K, which was provided in response to a request for further clarifications as to outstanding cash balances in the parishes from the Court, had a significant number of errors. Based on the Expert's audit analysis 9 accounts were found that should have been included on Schedule K but were omitted as well as 51 accounts that listed the incorrect tax identification number ("TIN"). This exhibit also includes a list of those bank accounts identified by the banks pursuant to the subpoena process not listed on Schedule K or given to the Expert as a result of his requests during the audit process.  This list is constantly increasing as banks are continuing to respond to the subpoenas requesting additional information.  Based on the most recent information available this list identifies 19 additional bank accounts.

Exhibit 26 lists 21 accounts, discovered during the Expert's audits of the 74 parishes and schools, which were opened post-petition.  Almost all of these new accounts used new tax identification numbers applied for and received by the parishes and/or schools.

---

[37] There are additional income streams which flow into a school, such as parish subsidies, fees, and special fundraisers and other fund raising efforts.  Even taking those supplemental fund sources into consideration, teacher salaries and benefits consume 75% of all revenue sources, including tuition.

Exhibit 27 is a summary of the 74 parishes and schools audited by the Expert and information regarding application for and use of new tax identification numbers. As shown on Exhibit 27, 58 parishes and schools applied for and received new tax identification numbers. Of these, 22 used their newly acquired TIN numbers to open new accounts or change existing accounts. Exhibit 27 also demonstrates that of the 74 parishes and schools audited by the Expert, 16 did not apply for or utilize a new tax identification number.

Finally, Exhibit 28 is included providing information regarding 20 bank accounts identified by the banks pursuant to the, as yet uncompleted, subpoena process which could not be identified as belonging to the Diocese or a specific parish or school. The analysis of the Expert in this area is still ongoing as banks are continuing to respond to the subpoenas and are providing additional account information.

In summary, in the Debtor's Bankruptcy Schedules and on the First Day Motion No.1 – Debtor's Motion for Order: (A) Authorizing Continued Use of Debtor's Cash Management System, Richard Mirando, Director, Office of Finance, estimated the number of parish and school bank accounts to approximate 766. Pursuant to the Court's *Order on Order to Show Cause Re: Contempt*, entered on April 17, 2007, the Court ordered the Debtor to provide subsequent schedules concerning the actual number of bank accounts currently held in the name of the "various parishes of RCBSD and reported under the taxpayer identification number of RCBSD (the "Alleged Parish Accounts")." The Debtor provided a subsequent schedule, referred to as Schedule K, which was submitted to the Court listing the Alleged Parish Accounts. The number of accounts listed upon Schedule K was 862, approximately 100 more accounts than originally estimated in the Debtor's bankruptcy schedules. As of the date of this report, the Expert estimates the total number of Alleged Parish Accounts to be at least 940. (See Exhibit

35) Thus, the Expert has located 78 additional accounts not listed upon Schedule K. As detailed above, the 78 new accounts were uncovered from the following sources:

- Through the audits of the 48 parishes and 26 schools, the Expert uncovered the following information:
  - 21 new accounts opened in the post petition period.
  - 9 accounts which had been in existence in the pre petition period but had not been included in Schedule K.
- The Court has issued subpoenas to a number of financial institutions requesting bank account information of entities affiliated with the RCBSD. As previously stated, the Expert has not concluded his analysis of all of the account information received in response to the subpoenas and is continuing to encourage financial institutions to satisfactorily respond to those requests. Nevertheless, the subpoenas have provided the following information concerning accounts not listed on Schedule K:
  - 19 new accounts for those entities previously audited by the Expert.
  - 9 new accounts which the Expert has determined belong to those parishes and schools which were not audited by the Expert.
  - 20 new accounts which the Expert cannot identify with any of the parishes or schools as he has not received sufficient information which would allow him to do so[38].

---

[38] It is possible that some of these accounts are not actually Alleged Parish Accounts.

<u>Questionable Transactions</u>

As more fully detailed within the attached appendices, most of the audits conducted by the Expert yielded occasional lapses in judgment and intermittent deficiencies in accounting expertise. Nonetheless, the preponderance of pastors and the lay personnel assisting them demonstrated a good faith attempt to comply with the general parameters of the Handbook. However, a few parishes engaged in openly questionable activities which the Expert feels should be brought to the attention of the Court as detailed below:

- Our Lady of Guadalupe Parish, Calexico
  - (See Appendix B.2)

On February 21, 2007, just days prior to the bankruptcy petition, but clearly after the parish was made aware of a possible bankruptcy filing, Our Lady of Guadalupe Parish set in motion a series of transactions which deliberately concealed $49,685.47 from the Bankruptcy Court. The February 21, 2007, transactions include the following:

- $4,000 was withdrawn (possibly in the form of cash; the bank statement simply shows it as a withdrawal) from a Sun Community Federal Credit Union ("SCFCU") account #4993950. This account is not included in the parish general ledger, nor was the account listed on Schedule K since it was closed February 21, 2007, following the four transactions described herein. The general ledger does not reflect that this $4,000 was deposited or transferred to another parish bank account. Following this withdrawal the balance in this SCFCU account was $27,636.32.

- $12,726.00 was transferred from the general checking of the parish into the SCFCU account #4993950. This amount represents the exact amount of an ACA rebate which was deposited into the general checking the same day.

- $9,323.15 was transferred from the Union Bank designated gifts account #3710005477 into the SCFCU account #4993950.

- As a result of the three items above the balance in the SCFCU account #4993950 was $49,685.47. This amount was then withdrawn in the form of a cashiers check. This check was then held by the parish for approximately 30 days, during which time bankruptcy filing took place.

These monies held in the form of a cashiers check by the parish are not disclosed on Schedule K.

On or about March 20, 2007, Our Lady of Guadalupe Parish changed the tax identification number for only one of its bank accounts. Previously, the monies deposited into this account originated from the rental of the Parish Hall and all expenses required to operate the hall were paid from this account. During the audit, the Expert uncovered a $49,685.47 deposit and a $40,000 withdrawal the same day. Back-up documentation was requested concerning the purpose of the two transactions. Despite repeated calls, two weeks lapsed prior to the receipt of requested documents. Following a review of the documents, the Expert determined the $49,685.47 deposit was received from funds raised during a festival held in early

2007.  The parish finance council and fundraising committee decided that the funds raised would be used to make repairs to the church and offices.  A $40,000.00 withdrawal was in the form of a cashiers check drawn in the name of Our Lady of Guadalupe.

Upon further review, the Expert was still unable to ascertain the ultimate destination of the $40,000 cashiers check.  On June 29, 2007, the Expert ascertained through a conversation with Lenna Ivie, the parish office manager, and Rev. Fernandez the $40,000 check had been re-deposited into the parish hall bank accounts on June 22, 2007.  However, during the period from March 20, 2007 until June 22, 2007, the check had been held in the church safe and was only re-deposited when uncovered during the course of the Expert's audit[39].

It is the Expert's opinion that the withdrawal of $40,000 through the issuance of a cashiers check was a purposeful attempt on the part of Rev. Fernandez, who has the ultimate responsibility for the parish funds, to evade the direction of the Court to report all cash available.  With a $40,000 cashier's check safely secured in the safe, during that period, the parish need not list the $40,000 as cash being maintained by the parish, thereby escaping the control of the Court[40].

---

[39] The Expert has subsequently received documentation reflecting the re-deposit of the $40,000 into the same account from which it was withdrawn.

[40] A detailed report on this transaction, including supporting documentation provided by the parish, is included in Appendix B.2.

- St. Mary of El Centro Parish[41]

    In the course of the Expert's audit of the financial records of St. Mary of El Centro Parish he discovered the following transactions:

    In late December 2006, prior to the Debtor's filing date of February 2007, the parish received a $300,000 donation supposedly for the building fund. The money was deposited into the building fund account at Union Bank of California. On March 7, 2007, eight days following the Debtor's bankruptcy filing on February 27, 2007, in two separate transactions, $290,000 was withdrawn from this account to purchase six (6) cashiers checks; five (5) cashiers' checks each for $50,000 and one (1) check in the amount of $40,000. As of the date of the Expert's audit, it was determined that the aforementioned 6 cashier's checks were being held in the parish safe and according to parish personnel the money is intended to be used for new carpet and remodeling. It was also asserted by parish personnel, that the Parish Finance Council made the decision to handle these funds in this manner.

    It is the Experts view that the parceling of the $300,000 donation into 6 separate cashier checks totaling $290,000 was a purposeful attempt on the part of the parish and the Parish Finance Council to circumvent the intent and direction of the Court requesting transparency in the recognition of financial cash balances by all of the parishes. It is especially unfortunate that just eight (8) days after the Debtor's

---

[41] See Appendix B.15

bankruptcy the pastor and the Parish Finance Council would engage in such deliberately misleading behavior.

The Expert has received subsequent confirmation from the Diocese that the entire sum of $290,000 has been re-deposited into the parish accounts and later, the funds were transferred to the PSDL Trust.

- Our Lady of Mt. Carmel San Ysidro Parish ("San Ysidro Parish")[42]

    The financial condition of the San Ysidro Parish and financial concessions provided by the Diocese are somewhat contradictory and are therefore perplexing to the Expert.

    The parish has consistently maintained that they are one of the poorest parishes in the Diocese, yet the parish held $1.2 million in the local banking accounts of the parish at the petition date, which sum is only exceeded by one other parish in the entire Diocese. The parish also holds the largest number of private bank accounts (22) which far exceeds the normal range of parish bank accounts. In fact, there are a few parishes who maintain only one general account. In addition, Our Lady of Mt. Carmel, the San Ysidro Parish asserts that nineteen (19) of the accounts hold restricted funds while only three (3) hold unrestricted funds.

---

[42] See Appendix B.58

The Expert believes that the parish inappropriately designates the preponderance of funds flowing into the parish as restricted. For example, the parish owns rental property which is rented for $1,800 a month. All of the rental proceeds are designated as restricted yet almost all of the expenses associated with the rental property, including property taxes are included as normal operating expenses and are paid from the ordinary donations of the parish. In addition, the parish holds weekly Sunday breakfasts and all proceeds from the Sunday breakfasts are designated as restricted, yet almost all of the expenses associated with the breakfasts are categorized as ordinary expenses and paid from ordinary donations. It is a common practice for many parishes to hold specialized events for specific fund raising activities and designate those funds as restricted. However, the holding of a weekly breakfast event wherein all of the funds are designated as restricted is unprecedented in the Diocese.

The Diocesan Bank loaned money for the construction of a school which is associated with the parish. As of June 30, 2004, the outstanding debt to the parish was $436,326.52 on this interest free loan[43]. The debt, under normal Diocesan procedure, is the responsibility of the parish. Therefore, an agreement for repayment was made between the parish and the Diocese which provided for an annual payment of $12,000. Three payments of $12,000 were made in 2005, 2006, and 2007 for a total reduction of $36,000. In addition, the parish requested payments of $5,000 a month from the school to reduce the parish obligation to the Diocesan Bank. In furtherance

of that agreement, the school paid $50,000 directly to the Diocesan Bank in 2002/2003 to reduce the debt. In addition, during October 2003, the school paid the Diocesan Bank another $48,000 which was applied to the debt. Finally, during June 2006, the school changed their previous procedure and paid $40,000 directly to the parish for ultimate transmittal to the Diocesan Bank to further reduce the debt. Instead of sending the funds to reduce the debt, the parish retained the funds. In addition, during the year ended June 30, 2006, while the parish was holding close to $1 million in their parish bank accounts, the Diocese granted the parish rebates of $96,000 thereby further reducing the loan. Also, from the period 2004 through 2007, interest free loans have been made by the parish to two parish employees in the total amount of $13,520 of which $10,491 still remain outstanding. The Expert finds this to be troubling and certainly not indicative of an impoverished parish unable to pay their obligations to the Debtor.

Perhaps the most disconcerting aspect of the Expert's audit concerns the JCCG Foundation. On February 20, 2007, one week prior to the bankruptcy filing the parish received and deposited into the foundation bank account $100,290 from the Most Reverend Gilbert E. Chavez,[44] Auxiliary Bishop of San Diego until his retirement on May 31, 2007 and previous pastor of the parish. An additional $15,000 was transferred to the JCCG Foundation bank account from another San Ysidro Parish account which had recently received $40,000 from Bishop Chavez. The funds for the

---

[43] Since the parish has an outstanding interest free loan, it is not entitled to interest on funds deposited in the PSDL Trust, which may explain the retention of $1.2 million in parish bank accounts.

JCCG Foundation were placed in a restricted bank account at the parish on February 20, 2007. Subsequent to the bankruptcy filing, from March 2, 2007 through March 8, 2007, seven (7) checks, each for $8,572 and another check for $9,959 (for a total of $69,963) were written from the restricted account. According to the personnel at the parish, the checks were written directly to Raul Gonzalez, a deacon at the San Ysidro Parish, who supposedly transferred the funds to an individual named Mauro Tovar, who had expertise in importing and exporting goods from Columbia. Again according to personnel at the parish, Mr. Tovar was to facilitate the transfer of funds to the sister parish in Columbia in order to allow them to purchase 67 computers and several printers, which was the former home of Reverend Castillo, the present Pastor of the San Ysidro parish. An additional $23,000 was also disbursed from the JCCG Foundation account later in March and early April 2007, but the Expert has not received any supporting documentation for those transfers.

The Expert appreciates the kindhearted intentions of the parishioners of the San Ysidro parish towards their sister parish in Columbia. Notwithstanding such generosity, the Expert believes that the transparency inherent in the bankruptcy system does not allow for such transfers to occur while the parish still maintains a significant obligation to the Diocese. The Expert also believes the San Ysidro parish manifestly violated the standards established in the Handbook regarding such transfers.

---

[44] According to our analysis, since August 2006, Reverend Chavez has donated a total of approximately $490,000 of

Annual Catholic Appeal ("ACA") and Designated Special Collections

Since 1991, the goal of the Roman Catholic Bishop of San Diego has been successful in raising an annual sum of $2.5 million[45].  Among other things, the ACA[46] proceeds, at the direction of the Diocese, are to be used to benefit schools, religious education, care of priests, and other Catholic charities.

Each year, each parish is assessed an allocable amount by the Diocese for the ACA.  This amount is based on a calculation of each individual parish's total plate and envelope collections for the previous fiscal year as compared proportionally to the total plate and envelope collection from all parishes in the Diocese, less approved deductions.

III.

**The Roman Catholic Bishop of San Diego/San Diego Diocese**

**The following material represents the entirety of the Expert Report in an all-inclusive format.  The material included hereafter provides greater detail and more substantive exhibits than outlined in the previously titled Executive Summary.  Accordingly, the Court may note some level of repetition due to the inclusion of similar material in the Executive Summary.**

Organizational Structure

The Roman Catholic Bishop of San Diego, a corporation sole, ("Debtor" or "Diocese") covers a geographical area including the San Diego and Imperial counties of California.  The

---

his own monies to the parish.

[45] In addition, the Diocese includes in the ACA assessment to each parish an additional 10% administrative charge. This charge is to cover the costs incurred by the Diocese to administer the program.

[46] See further description of the ACA procedures in Section  VI  - Audit Results of Parish and School Accounting – Annual Catholic Appeal and Designated Special Collections

Diocese was incorporated March 29, 1937 (Exhibit 1) and filed its petition for bankruptcy on February 27, 2007 ("Petition Date").

The purpose of the Diocese is declared in the Articles of Incorporation and amendments thereto, which were filed January 4, 1967 (Exhibit 2), February 24, 1976 (Exhibit 3) and December 19, 2005 (Exhibit 4).

From the "Catholic Directory Diocese of San Diego – 2007" (Appendix C) and the "Diocese of San Diego" included in the *Official Catholic Directory 2005* the Expert has prepared Exhibit 29[47], which lists all the religious institutions, which may or may not be associated with the RCBSD, within the geographical boundaries of the Diocese. The Expert has indicated the ownership of each institution based upon the information obtained from the Debtor[48] and if the institution's asset and liabilities are a part of the bankruptcy.

The Debtor has chosen not to include the preponderance of the institutions which are listed on Exhibit 29, including the parishes, schools, and other institutions in their bankruptcy schedules as they have asserted lack of ownership. Exhibit 29 is included for informational purposes only as the Expert has not received sufficient information which would allow him to draw any meaningful conclusions, one way or the other, regarding the ultimate ownership of these referenced entities.

---

[47] A more detailed description of the Diocese is contained in the Handbook

[48] Alexandria Kelly, the head of the Office of Civil Affairs ("OCA") in the RCBSD, has indicated that most of the institutions on the list are not part of their clients and she is not fully informed as to the exact ownership of each

## Divisions of the Diocese

The Diocese has several different operating units or divisions. The major characteristic of each Diocesan division is their autonomy of accounting operations from the Pastoral Center. The major divisions of the Diocese are:

- Pastoral Center or Administrative Office[49]
- Holy Cross Cemetery and Mausoleum ("Holy Cross")
- Marian Catholic High School ("Marian") and Mater Dei Catholic High School ("Mater Dei")
- Vincent Memorial Catholic High School ("Vincent")
- Newman Centers:
    - San Diego State University
    - University of California, San Diego
- Catholic Secondary Education-Diocese of San Diego, Incorporated ("CSE") is a California non-profit public benefit corporation, of which the Diocese is the sole member (Exhibit 9, page 8). Cathedral Catholic High School ("CCHS") is a Diocesan Catholic high school whose facilities are owned by CSE and staffed and administered by the Roman Catholic Bishop of San Diego (Exhibit 30, page 5).

Each of the Divisions listed above will be more fully described in subsequent sections of the report.

## Sources of Diocesan Revenue

The Diocese receives revenues from the following sources:

1. Parishes are assessed the Diocesan Tax (sometimes call the Parish Assessment or Chancery Tax), which is defined as 13% of their annual income[50]. The revenue from the

---

institution. Her understanding is that many, if not most, of the institutions are legally formed as non-profit corporations or in another legal form and the remainder may be unincorporated associations.

[49] The Administrative Office includes a number of support functions such as accounting, legal, information technology, architectural oversight, and human resources. Bishop Brom's office is located at the Pastoral Center and, in addition to the religious programs offered at or through the Pastoral Center, the primary function of the Pastoral Center is to assist Bishop Brom in his responsibilities as Ordinary of the Diocese.

Diocesan tax totaled $6,783,611 in fiscal 2006, $6,452,541 in fiscal 2005 and $6,253,966 in fiscal 2004.

2. The Annual Catholic Appeal which generates $2.5 million a year.[51]

3. The Diocese retains earnings in excess of interest paid on deposits in the Diocesan Bank or PSDL Trust[52]. These excess earnings, accumulated over a number of years, constitute net assets[53] of the Diocesan Bank and totaled $12,439,713 as of November 30, 2006.[54] For financial reporting purposes, the Debtor allowed these earnings to accumulate in Diocesan Bank until the date of the petition, after which they were transferred, for financial reporting purposes, into the Debtor's assets and liabilities.

4. Investment income from marketable securities.

5. The Diocese earns revenue from administrative insurance and religious program fees, rental income, direct bequests, donations and interest or investment income.

Accounts at the Diocese

In prior hearings the Debtor has referenced in excess of 700 separate bank accounts being maintained at the parish level and an additional 500 "accounts" purportedly maintained at the Diocese level, prompting the Court to describe the accounting system at the Diocese as "Byzantine". The Expert understands the Court's frustration. The source of this frustration is

---

[50] Annual Income is also referred to as "Ordinary Receipts" upon the annual reports as filed by the individual parishes with the Diocese.

[51] The cash from the Annual Catholic Appeal is temporarily held at the Diocesan level but ultimately flows through to the chosen charities.

[52] The Diocese pays 3.5% interest on funds located in the PSDL Trust and periodically loans funds to parishes and schools from the PSDL, charging 4.5% for those loans, thereby earning the 1% differential. There is also a variable differential associated with investing remaining funds in the PSDL Trust. The Expert believes the PSDL Trust operates in a manner very similar to a bank, of course without the regulatory requirements, and hence the previous name of the Diocesan Bank.

[53] In a not-for-profit entity, the term "net assets" represents the amount determined by deducting total assets from total liabilities. In a normal for-profit entity, the synonymous term is "equity".

probably based upon two factors. First, the term "account" can have a number of different but distinct meanings depending upon the circumstances in which the term is used. The Expert believes the Court assumed the term "account" meant a bank account or savings account located at a financial institution which is not necessarily the same meaning ascribed to "account" by the Debtor. Secondly, for reasons described further within this Report, there truly are a massive number of bank accounts maintained at the parish or school level. The Expert believes the number of bank accounts at the parish level will exceed 900 upon completion of his analysis. The thought of analyzing 900 bank accounts is a daunting but nevertheless a manageable process. However, when any party verbally layers the potential existence of 500 separate undefined accounts supposedly maintained at the Diocese, upon the 900 accounts at the parish level, we clearly move into the realm of Byzantine.

In actuality, the number of bank accounts at the Diocese level does not even begin to approximate 500 separate bank accounts. When using the term account as being an account maintained at a financial institution, the Debtor had 35 bank or brokerage accounts at the date of petition and added three additional accounts post-petition bringing the present number of accounts to 38. (In actuality, the Administrative Office has personal control over 12 bank accounts and 8 brokerage or marketable securities accounts. The remaining accounts were controlled directly by other divisions of the Diocese.)

The following table is a summary of the 38 major financial institution's accounts the Expert has identified in the review of the Diocese records and financial statements and other "accounts" referenced in the Debtors records:

---

[54] The date of the most recent financial statement prepared post-petition by the Debtor. (Exhibit 52)

| Account Type [55] | Exhibit Numbers | Number of Accounts [56] | Account Holder/Creditor |
|---|---|---|---|
| Pastoral Center bank checking | 31 | 10 | Diocese |
| Diocese Divisions bank checking | 31 | 17 | Diocesan Divisions |
| Diocese broker securities | 31 | 6 | Diocese |
| PSDL Trust broker securities | 31 | 2 | PSDL Trust |
| PSDL Trust [57] bank checking | 31 | 1* | PSDL Trust |
| Servicing bank checking | 31 | 1* | Diocese |
| Mater Dei Checking | 31 | <u>1</u>* | Diocesan Divisions |
| Total Accounts | | <u>38</u> | |

*Accounts opened post-petition

<u>Accounts Maintained at Parishes</u>

| | | | |
|---|---|---|---|
| Parish/School bank checking [58] | 35 | 900 - 1000 | Parishes/Schools |

<u>Depositor Accounts – Asserted Ownership in PSDL Trust Accounts</u>

| | | | |
|---|---|---|---|
| Funds on Deposit [59] at PSDL Trust | 21 | 218 | Parishes/Schools |
| Funds on Deposit at Diocese | 33 | 15 | Diocese Divisions |

Loans from PSDL Trust to Parish

| | | | |
|---|---|---|---|
| Or Schools | 34 | 33[60] | Parishes/Schools |

---

[55] At the Diocesan level, all of the above accounts utilized the RCBSD taxpayer identification number ("TIN") (95-1644613) in opening bank accounts at any third party financial institutions.

[56] This is the number of accounts existing at the date of petition as well as additional accounts added subsequent to the petition filing.

[57] Previously call the Diocesan Bank. The bank account was opened in March of 2007.

[58] These accounts are found in Schedule K to the Debtor's SOFA plus all of the additional accounts uncovered by the Expert. These exclude Marina, Mater Dei and Vincent High Schools that are included in the Diocesan divisions.

[59] The Expert later refers to this as the Depositor Accounts.

The 38 bank/brokerage accounts are detailed as follows[61]:

- 10 Bank Accounts maintained at the Pastoral Center as follows:

  - 1) The Pastoral Center Main Checking Account

    - The primary checking account into which the preponderance of pre-petition monies flow from almost all sources.

    - Post-petition monies related to the PSDL Trust and servicing activities flow through two new accounts.

  - 2) Payroll Account

    - This account is used to provide payroll services to the Diocese, parishes, schools, divisions of the Diocese and CCHS.

  - 3) ACA Lock-Box Account

    - The funds from the Annual Catholic Appeal ("ACA") are deposited into this account.

      - Prior to the bankruptcy petition, funds from the ACA were deposited directly into this account and were subsequently transferred to the Pastoral Center Main Checking Account.

      - Following the bankruptcy petition, funds from the ACA are still deposited directly into this account but are not transferred to the Pastoral Center Main Checking Account. The funds are held in the ACA lockbox until such time as the funds can be directly transmitted to the Catholic Charities.

---

[60] Does not include the three separate loans to high schools.

- o 4) Lay Health Checking Account
  - ▪ This account, as well as the Priest Health Checking Account below, is controlled by the third party administrator of the health plan. The Diocese, parishes and schools transmit checks directly into these accounts and the administrator pays the applicable premiums to the health insurance companies.
- o 5) Priest Health Checking Account
  - ▪ This account, as well as the Lay Health Checking Account, is controlled by the third party administrator of the health plan. The RCBSD and parishes transmit checks directly into these accounts and the administrator pays the applicable premiums to the health insurance companies.
- o 6) Merchant Card Account
  - ▪ This account is used to convert credit card donations and other revenue, i.e., conference registrations, tribunal payments, and Southern Cross subscriptions, to cash after which the money is transferred to the Pastoral Center Main Checking Account.
- o 7) Medical Reimbursement Account
  - ▪ The Diocese funds this account through payroll withholding from the Diocese, and Service Recipients as provided under the Diocese Medical Reimbursement Plan. Employees then seek reimbursement

---

[61] See Exhibit 31.

from this account for qualified medical expenses not reimbursed by the insurance plan.

- o 8) St. Francis Center Checking Account
    - ▪ The account is physically located at the St. Francis Center which is located near UCSD Campus. It is also the location of the Bishop's Residence and the Priest Training Center. The balances and amounts in this account have been relatively minor. The Debtor has indicated that this account will be consolidated with the Pastoral Center Main Checking Account in the future.
- o 9) Inter-Parish Adult Education Checking Account
    - ▪ This account is used to receive funds and pay expenses related to certain adult education programs. There has been no activity in this account since April 2006. The Debtor has indicated that this account will be consolidated with the Pastoral Center Main Checking Account in the future.
- o 10) Padre Hidalgo Center Ethnic Education Affairs Office Checking Account
    - ▪ This account has been used to receive funds and pay expenses related to a small program within the Diocese. The Debtor has indicated that this account will be consolidated with the Pastoral Center Main Checking Account in the future.
- • 17 Divisional Bank Accounts
    - o Holy Cross Cemetery – 1 Account
    - o Marian High School – 5 Accounts

- o Vincent High School – 6 Accounts

- o Newman Center – 4 Accounts[62]

- o Apostleship of the Sea Seafarers Center – 1 Account

- 6 Marketable Securities Accounts

  - o Union Bank – 4 Accounts

    - Boston Partners Investment Manager – UBOC is the custodian of this account. The investments are made in equities.

    - Nicholas Applegate Investment Manager – UBOC is the custodian of this account. The investments are in equities.

    - PIMCO – UBOC is the custodian of this account. The investments are made in bonds.

    - UBOC Security Fund – UBOC is the custodian of this account. Investments are in Treasury bills. This account has been used as collateral for the revolving line of credit of $5 million of the Administrative. Office. The line of credit supports standby letters of credits.

  - o Merrill Lynch – 2 Accounts

    - Merrill Lynch – Donation account – This brokerage account is used to convert stock gifts to cash. A minimum balance of $50,000 is required to obtain a reduction of the brokerage fees. Balances in the account have grown post-petition due to donations of stock which have been sold but proceeds have not yet been paid to the intended parish or the

Diocese. The Debtor intends to transfer money from this account to the Pastoral Center Main Checking Account prior to disbursement to the intended recipient as it did during the pre-petition period.

- Merrill Lynch – Securities are held at Merrill Lynch who is also the investment manager. The investment manager invests in bonds.
- UBOC – 2 accounts – PSDL Trust Securities
  - UBOC – Christian Brothers – UBOC is the custodian of this account. It is an international equity fund.
  - UBOC – UBOC is the custodian of this account. It is a growth equity fund.

Following the petition date, the Debtor opened the following three new accounts bringing the total number of accounts to 38 (See Table Above and Exhibit 31).

- PSDL Trust Checking Account – 1 Account
  - This new account, opened in March 2007, is to be used expressly for the monies deposited in the PSDL Trust by the parishes and schools. Prior to the creation of this account, all monies, including those in which the parishes and schools assert ownership interest, were deposited and commingled with all monies in the Pastoral Center Main Checking Account.
- Pastoral Center Main Checking Account  – 1 Account – Now called the Pastoral Services – Main Checking II.
  - This bank account was previously the Pastoral Center Main Checking Account and was used to receive all the monies flowing through the Administrative Office.

---

[62] The Debtor's Bankruptcy Schedules only listed two accounts (however they referenced three additional accounts

The Administrative Office is converting the account to only receive and disburse monies related to the Service Activities for Service Recipients on a post-petition basis. This account is connected for banking purposes to the payroll account which as a zero balance account draws on the Pastoral Center Main Checking Account to cover payroll checks when they are presented for payment. Since most of the payroll paid by the Administrative Office is for the payroll obligations of the Service Recipients the Debtor finds it convenient to retain the banking relationship between the two accounts and move the Debtor's activities to the new checking account described below.

- o The Debtor has not completed all of the work necessary to complete this transition. As of the May 31, 2007 Debtor's monthly operating report, over $9 million of Debtor pre petition funds remained in this account.

- New Pastoral Center Main Checking Account – 1 Account – Called Pastoral Services Main Checking Account

  - o This bank account was opened in May 2007 and will receive and disburse monies of the RCBSD typically handled by the former Pastoral Center Main Checking Account with the exception of the post petition PSDL Trust money and Service Recipient money which will be handled in the two new accounts described above.

- Mater Dei Checking Account – 1 Account

  - o Mater Dei High School will be operational for the 2007-2008 school year. This account has been established for receipt of tuition and fees and future payments of operating expenses.

in a footnote) but the Expert has located four accounts.

The 500 referenced "accounts" probably relate to the individual claims the parishes and schools assert upon funds located in the PSDL Trust. As will be further explained in the report, the Diocesan Bank, or PSDL Trust received monies from parishes and schools as deposits, Funds on Deposit, upon which the parishes and schools would be paid interest. The Debtor created separate deposit accounts ("Deposit Account") for each parish or school to account for their Funds on Deposit. Most parishes and schools have multiple Deposit accounts in the PSDL Trust (as of the Petition Date the number was 201 different accounts and as of July 7, 2007 the number had increased to 218). From the monies deposited by the parishes and schools, the Diocesan Bank or PSDL Trust provides loans[63] to parishes and schools from available funds thereby creating a "loan account"[64]. As of the Petition Date loans to parishes or schools was 33 (Exhibit 16, pages 28 through 30) and as of July 7, 2007 had increased to 36. As of July 7, 2007, the total of depositor and loan "accounts" was not 500 accounts as originally estimated but 254 (218 plus 36).

There was also discussion before the Court as to the number of checking accounts maintained at the parish and school level. That number was estimated to be approximately 700. Each parish or school maintains from one to 22 individual checking accounts at banks with which the parish or school receives donations, fees, tuitions, etc, and pays operating or construction expenses or transfers excess monies to the Diocesan Bank or PSDL Trust. The Expert currently estimates the total number of checking accounts at the parish and school level to be between 900 and 1000 accounts.

---

[63] These loans were subject to the approval of Bishop Brom and the Diocesan Finance Council. According to Bishop Brom (Exhibit 67), the Diocese had the authority to use these funds as the Diocese determined to be appropriate without the need to obtain approval from the parishes or schools.

<u>Pastoral Center</u>

From a business operations or accounting point of view, the Pastoral Center, sometimes called the Administrative Office provides the following services:

- Responsibility for the cash management of all funds flowing into the Administrative Office,
- Providing services to parishes and parochial schools in the form of centralized payroll and investments, receiving and disbursing monies for the RCBSD sponsored programs,
- Managing insurance programs,
- Accounting for Diocese transactions, assets and liabilities,
- Administration for Diocesan Bank or PSDL Trust transactions,
- Administration of Service Recipient monies,
- Human Resources,
- Financial Reviews,
- 1099 Reporting,
- Civil Affairs response to legal matters,
- Construction Services,
- Worker's Compensation and safety consulting,
- Handling of stock and investment transfers,
- Salary/Compensation guidance,
- Background checks for employees and volunteers,

---

[64] Assume the PSDL Trust is a stand alone entity, the loans to parishes and schools are assets of the PSDL Trust.

- Other safe environment programs including training and education, and

- Preparation of general ledgers and financial statements that report and support the other activities listed above.

Cash Management System Administration

The Pastoral Center, sometimes called the Administrative Office, maintains a cash management system ("CMS"), which is used to administer monies for its operations; monies in the PSDL Trust; and monies in servicing activities. It is intended to provided "an efficient and secure means of managing and disbursing cash for RCBSD's operations" incorporating all of the 38 banking accounts previously referenced. It contained a number of components, all of which are described in greater detail throughout the Expert Report. In its simplest terms, the CMS system provided the structure whereby the Administrative Office received and disbursed all cash flowing into the Administrative Office.

Since the Debtor's CMS revolves around the flow of cash, the report will first explain the actual flow of cash, and then explain how cash transactions are included in the Debtor's accounting system. At or about the filing of its bankruptcy petition the Debtor changed its cash management system. For reasons more fully described within the report, the Expert believes it is important to understand the comparative CMS and accounting treatment between pre-petition cash treatment vs. post-petition cash treatment.

Pre-petition Cash Management

Pre-petition the Administrative Office placed nearly[65] all cash flowing into the Administrative Center directly or indirectly into its Pastoral Center Main Checking Account at Union Bank of California. In essence, all water flowed into this pond.

The cash was received from three general sources .[66] Disbursements made from this account generally correlated to the requirements or purpose of the initial underlying receipt. (i.e., Service Activity monies from Service Recipients paid Service Activity obligations, etc.) In order to visualize the general manner in which cash flowed into the accounts of the Debtor, the Expert has prepared Chart #1 (in the following pages) with the following types of receipts (denoted in green or yellow) and disbursements (denoted in red):

1. Cash receipts from parishes and schools for deposit into the Diocesan Bank.
2. Cash disbursements from the Diocesan Bank.
3. Cash receipts for the Servicing Activities performed on behalf of parishes and schools.
4. Cash disbursements for the Servicing Activities.
5. Cash receipts for Diocese activities.
6. Cash disbursements for Diocese activities.

The arrows in Chart #1 represent the flow of cash or "in's and out's" from the various accounts.

---

[65] Relatively minor deposits were made directly into the lay or Priest Health checking accounts from Service Recipients rather than going through the Pastoral Center Main Checking Account and then being deposited into this account. Some exceptions existed for example ACA donations were first received by the ACA lockbox account where the bank cashed the check and the money was then transferred into the Pastoral Center Main Checking account. Credit card donations were "cashed" in the Merchant Credit Card account then the money was transferred into the Pastoral Center Main Checking account.

[66] The three sources are (1) Service Recipient monies, (2) inflows to Diocesan Bank or the PSDL Trust from parish and school deposits, loan repayments and investment income and, (3) normal Diocesan receipts from other sources including the 13% Chancery tax.



**Prepetition Pastoral Center Main Checking – *Cash Flows***

Disbursements from Diocesan Bank

Disbursements for Diocese

Deposits into Diocesan Bank

Receipts for the Diocese

Pastoral Center Main Checking Account

Parish or School Checking Accounts

900 to 1,000 Accounts

Deposits for Servicing activities

Disbursements for Servicing activities

*Chart 1*

A separate group of bank checking accounts (approximately 900 to 1000 - see current list at Exhibit 35) accounts denoted as small circles under the yellow parish or School checking accounts heading) existed at individual parishes or schools. The parishes or schools received donations into their Parish or School Checking Accounts and used the money for their operating, religious or construction activities. These accounts were to be managed by each local parish or school pursuant to guidelines established by the Diocese (Exhibit 36).

There were two primary purposes which would cause the parishes or schools to forward funds to the Diocese into Pastoral Center Main Checking Account of the Diocese. The first was

to place Funds on Deposit in the Diocesan Bank or the PSDL Trust. The second was to pay the

Diocese for Servicing Activities. Those disbursements are represented by two arrows flowing

from the parish or school checking accounts into the Pastoral Center Main Checking account for

both Servicing activities and placing Funds on Deposit with the Diocesan Bank or the PSDL

Trust.

The amount of receipts for each of the three main activities for the fourteen months prior

to the petition is depicted in Chart 2 below:



flowed into this "communal pool" of cash, how was it recorded?  What general ledger accounts were charged (debited or credited) to reflect the transaction?

The Expert has prepared Chart #3, which is a depiction of how the general ledger accounts were accumulated by activity to provide an accounting for the Diocesan Bank, Servicing Activities and the Diocese.  The general ledger accounts were numbered or named in such a way that the receipts and disbursements could be grouped by activity.  The black dashed lines represent the groups which were accumulated by activity for accounting purposes.



Chart 3

The other divisions of the Diocese presently maintain their own accounting systems separate from the Administrative Office and it should be noted that the Debtor's Monthly Operating Report for March 31, 2007 was the first time, other than the Debtor's bankruptcy schedules, that the Debtor prepared a consolidated financial statement including all of the Divisions of the Diocese.

## Post Petition Cash Management

The general cash flows of the Debtor have remained approximately the same in the post-petition period with similar receipts and disbursements by activities[67] with two exceptions. The Debtor opened two new bank accounts at the Administrative Office as previously described. The first account is the PSDL Trust Checking Account and appears to have been established to avoid commingling monies in the Pastoral Center Main Checking Account. The second account is called the Servicing Checking Account and also appears to have been established to avoid commingling those funds in the Pastoral Services - Main Checking II Account. The Pastoral Services - Main Checking II Account now receives automatic withdrawals from the parish or school checking accounts. The Diocese handles its own funds through the Pastoral Services Main Checking Account. In essence, there are now three separate checking account pools into which the water of these entities now flow. The CMS, on a post-petition basis, is summarized in Chart #4 below:

---

[67] There was a period after the Petition Date when transfers from the PSDL Trust were frozen and then later released.



**Post Petition Pastoral Center Main Checking – Cash Flows**

Disbursements from PSDL Trust

PSDL Trust Checking Account

Deposits into PSDL Trust

Pastoral Services Main Checking Account

Disbursements for Diocese

Receipts for the Diocese

Parish or School Checking Accounts

900 to 1,000 Accounts

Pastoral Services Main Checking II Account

Deposits for Servicing activities

Disbursements for Servicing activities

*Chart 4*

While the post-petition cash flow procedures have been adjusted to allow for cash to be sequestered into new bank accounts, the manner of recording those receipts and disbursements on the general ledger of the Diocese has not substantially changed (See Chart #5). The Debtor utilizes the same general ledger accounts and accumulations by activity in order for a separate accounting to be given to the PSDL Trust, Service Recipients and the Diocese.

Post Petition Pastoral Center Main Checking – **Accounting**

**PSDL Trust**

Disbursements from PSDL Trust

PSDL Trust Checking Account

Deposits into PSDL Trust

Pastoral Services Main Checking Account

**Diocese**

Disbursements for Diocese

Receipts for the Diocese

Parish or School Checking Accounts

**900 to 1,000 Accounts**

*Separately Accounted For At Each Parish*

Pastoral Services Main Checking Account

**Servicing**

Deposits for Servicing activities

Disbursements for Servicing activities

*Chart 5*

The ACA Lockbox account is also handled somewhat differently during the post petition period. Donations were received directly into the ACA Lockbox and the balances were swept into the Pastoral Center Main Checking Account wherein the ACA monies were commingled with other monies prior to the disbursement to the affected charities. Following the bankruptcy, donations are now received directly into the ACA Lockbox and the Debtor intends to hold the funds in that account until disbursements are made to third parties, thereby avoiding the commingling of funds in the Pastoral Services Main Checking Account.

<u>Debtor's Declarations With Regard to the First Day Motions</u>

It is the opinion of the Expert that the representations made by Mr. Mirando (See Exhibit 5), Mr. Linscott, (See Exhibit 6) and Mrs. Jassoy (See Exhibit 7) within their declarations as attached to the FIRST DAY MOTION NO. 1 DEBTOR'S MOTION FOR ORDER: (A) AUTHORIZING CONTINUED USE OF DEBTOR'S CASH MANAGEMENT SYSTEM, are by and large correct with the following clarifications:

<u>Linscott Declaration</u>:

Paragraph #12 - "RCBSD has traditionally subsidized parishes. Contrary to the allegations in the Unsecured Committee's Objection, this is not part of the Debtor's cash management system. Parish subsidies are active conscious gifts made pursuant to RCBSD's mission as a faith-based non-profit organization."

The Expert disagrees with the portion of Linscott's declaration wherein he asserts that the subsidies were not part of the Debtor's cash management system. The Expert believes all subsidizations, "gifts" or any transfers involving the PSDL Trust or Diocesan Bank were, by definition, a portion of the Debtor's Cash Management System.

Paragraph #15 - The PSDL Trust is not a component of the Debtor's operational cash management.

The Expert disagrees with the statement contained in the Linscott declaration, Paragraph 15, concerning the PSDL Trust not being a component of the Debtor's operational cash management. The Expert believes the PSDL Trust to be an integral element of the Debtor's Cash Management System.

Mirando Declaration;

Paragraph #10 – "The Service Recipients carry on their own activities and functions and maintain and control their own bank accounts into which deposits are made and expenses paid. No one at RCBSD has access to or control over any of the Service Recipients' accounts, any knowledge of location or depository for such accounts or the activity in those accounts."

It is the opinion of the Expert that this portion of the declaration is not fully inclusive of the operational and audit capabilities present within the Diocese. It is true that no one at the Diocese is a signatory or actively controls disbursements or receipts into the parish or school local checking accounts and accordingly, at any given time, the Diocese may be unaware of parish and school local checking account information. However, annual reports provided by the parish to the Diocese contain bank account information. Also, although the audits of the parishes by the Diocese are only conducted every five (5) years, the audit reports provide a limited amount of banking information. In addition, in accordance with the Handbook – Diocese of San Diego – 2007 ("Handbook"), see Appendix A, the Diocese can obtain information as to the location and activity within any of the parish and school local checking accounts should they choose to do so.

Jassoy Declaration;

The Expert has no comments or clarifications concerning Mrs. Jassoy's declaration.

<u>Holy Cross Cemetery</u>

Holy Cross cemetery is located at 4470 Hilltop Drive, San Diego, California. The cemetery covers approximately 40 acres and currently has approximately 65,000 buried at the cemetery and approximately 2,300 available sites in the form of graves, crypts and niches. Approximately twenty-five houses surrounding the cemetery have been acquired with the intention to expand the cemetery when sufficient demand requires. Some of the acquired houses are currently being rented. The existing cemetery layout is presented in Exhibit 37.

Mario DeBlasio is the Executive Director and General Manager. Before taking his current position with Holy Cross, Mr. DeBlasio was employed by a large commercial cemetery company. Holy Cross has approximately 25 employees and has a sales team of 4 family counselors, which negotiate terms of purchase for the burial sites.

The accounting system of Holy Cross operates autonomously from the Pastoral Center. The cemetery maintains a stand alone general ledger system and prepares financial statements separate from other divisions of the Diocese. The cemetery maintains a general bank account into which deposits from sales of burial sites, burial services and related items are placed. Expenses of the cemetery are paid from that account as well, including payroll[68] and related employee benefits. The bank account of Holy Cross is under the control of its director and not the Administrative Office of the Diocese.

When Holy Cross had accumulated surplus monies to be set aside for perpetual care or wanted to hold money separate for any reason, it transferred the money to the Diocesan Bank and designated it for the purpose for which it was being held. The Funds on Deposit were placed

---

[68] The Holy Cross Cemetery is the only Diocesan division that process and pays their own payroll.

in the Pastoral Center Main Checking account and commingled with other monies in that account.

Prior to the bankruptcy petition, the Holy Cross Funds on Deposit were included in the Diocesan Bank for financial reporting purposes. Following the bankruptcy, the Holy Cross Funds on Deposit are held by the Diocese and the Diocese[69] credits the Holy Cross Deposit Account with interest. Post-petition basis, the Holy Cross monies are no longer commingled with parish and school monies in the PSDL Trust.

Copies of the financial statements for Holy Cross as of the fiscal years ended June 30, 1999 through 2001 and as of April 30, 2007 are contained in Exhibits 38, 39 and 40. Ernst & Young LLP performed reviews of the financial statements up to the fiscal years ended June 30, 2001. No audits (external or internal) have been performed on Holy Cross since June of 2001. The former bookkeeper retired in 2006 and has been replaced by Bella Hael.

Examples of the purchase contract are contained in Exhibit 41 and 42. Prices vary depending on what is purchased and, almost always[70], include a fee for the future upkeep of the cemetery. According to Mr. DeBlasio the cemetery is not subject to regulation under the California Cemetery Act (the "Act") because it is owned by a religious organization. The Act requires non-religious owned cemeteries to set aside funds for future upkeep ("perpetual care"). Though he is not obligated to do so, Mr. DeBlasio has indicated that he uses the guidelines for perpetual care in the Act to determine the amounts to be charged to customers. He acknowledged that this has not always been the practice at the cemetery. The balance in the Holy Cross perpetual care fund as of the Petition Date is $6,537,885 and is listed as restricted in the Debtor's Bankruptcy

---

[69] This is an interdivision obligation of the Debtor and hence does not appear as a creditor's claim on the Debtor's schedules as an unsecured claim.
[70] The ability to pay is a consideration.

Schedules. A corresponding amount was transferred to the Diocese and held as Funds on Deposit, and is commingled with the other assets of the Diocese.

Holy Cross also carries what it calls "Deferred Revenue" as a liability in its balance sheet. This represents sales that have been made and booked but Holy Cross still needs to provide the goods or services. In some cases the purchaser still owes amounts to Holy Cross. As of the Petition Date the Debtor listed $3,197,475 of Deferred Revenue and as restricted assets. (See discussion on Restricted Assets below.)

Holy Cross uses the Diocesan tax identification number 95-1644613 for each of their accounts and no changes have been made post-petition.


Marian Catholic High School and Mater Dei Catholic High School

Marian is located at 1002 18th St, San Diego, California. It is a high school covering grades 9 through 12, with approximately 750 students. The school recently completed its last year of operations and the students will be transferred to Mater Dei commencing with the new school year. The Marian property is being prepared for sale.

Mater Dei is located at 1615 Mater Dei Drive, Chula Vista, California. It has a capacity of 2,000 students. First year attendance is estimated at 750. A copy of the map of the school property is contained in Exhibit 43.

The Mater Dei facility has been substantially funded from a loan of $22.8 million from the Diocesan Bank or PSDL Trust and advances from a loan the Debtor asserts is secured by the property of $50 million from Alsam Foundation. The loan with Alsam Foundation requires the Diocese to establish a $25 million scholarship fund for needy students of the school (see Footnote 15 to Exhibit 9).

The accounting function of Marian (as will Mater Dei) operates autonomously from the Pastoral Center. It maintains it own bank accounts through which it receives tuition and fee income along with income from various activities including the booster club and donations for an English second language class.

Marian has been audited by Ernst & Young LLP up to the fiscal year ended June 30, 2004. Copies of the financial statements for the fiscal years ended June 30, 2004, 2003 and 2002 are contained in Exhibits 44 and 45 and for the ten months ended April 30, 2007 in Exhibit 46.

Marian has the following five (5) bank accounts which are listed on Exhibit 31.

<u>Marian Main Checking</u> – This account receives tuition and fees and is used to pay the operating expenses of Marian. Excess funds were sent to the Diocese where they were deposited in the Pastoral Center Main Checking Account and held as Funds on Deposit in the Diocesan Bank. The Diocese accrues interest on these monies.

<u>Marian San Juan Diego Checking</u> – This account represents the donations toward an English second language program at Marian. The expenses associated with the program are advanced by Marian from the Marian Main Checking account and is then reimbursed from this account. The Debtor lists the funds in this account as restricted in the Debtor's Bankruptcy Schedules in the amount of $280,294. Marian had expended approximately $109,344 as of the Petition Date for which it had not been reimbursed.

<u>Mater Dei Checking</u> – This account has been created post petition to handle the tuition and other fees for schooling at Mater Dei. The balance in the account represents tuition for the next school year and is considered restricted by the Debtor.

<u>Marian Student Body Checking</u> – The money from student body activities are deposited into this account and the expenses related to such activities are paid from the account.

Marian Education Fund Checking – This account contains scholarship funds for needy students.

Marian Booster Club Checking – Money collected from booster club activities are deposited into this account and expenses related these activities are paid from the account.

Marian Funds on Deposit with Diocese – Marian had Funds on Deposit with the RCBSD of $1,380,216 as of the Petition Date. Pre-petition these funds were listed as Funds on Deposit with the Diocesan Bank. Because Marian is a division of the Diocese, post-petition Funds on Deposit are the responsibility of the Diocese and are not included in the PSDL Trust.

Mater Dei, the successor school to Marian, has $1,532,170 of Funds on Deposit with the RCBSD which represent donations through the Secondary Education Initiative which have been designated as such by the donors for Mater Dei. This amount is considered restricted by the Debtor.

Marian and Mater Dei both use the Diocesan tax identification number 95-1644613 for each of their accounts and no changes have been made post-petition.


Vincent Memorial Catholic High School

Vincent is located at 525 West Sheridan St., Calexico, California. It is a high school with a maximum enrollment of 350 students of which 52% of the students enrolled come from Mexico.

The accounting system of Vincent operates autonomously from the Pastoral Center. It maintains its own bank accounts through which it receives tuition and fee income, and income from various activities including the booster club, cafeteria, and other fund raising projects. The Debtor bankruptcy schedules show no restricted funds at Vincent even though it had prepaid tuition and deferred revenue in a manner similar to Marian. These two positions appear

inconsistent to the Expert. The Debtor's May 31, 2007 Monthly Operating Report now shows $120,000 as restricted.

Vincent has the following six (6) bank accounts which are detailed in Exhibit 31.

<u>Vincent Main Checking</u> – Tuition and fees are deposited into this account and recurring expenses are disbursed from this account.

<u>Vincent Cafeteria Checking</u> – Proceeds from the sale of food at the school's cafeteria are deposited into this account and operational expenses of the cafeteria, including food, are disbursed from this account.

<u>Vincent Booster Club Checking</u> – Proceeds from fundraisers for sports and concession sales at sporting events are deposited into this account.  The money is utilized for the purchase of equipment and new uniforms for the sporting teams.

<u>Vincent PTG</u> – This account contains a required contribution of $300 per family plus funds which result from fundraiser events. Expenses of approximately $4,000 are paid from the account and the excess is used to repay the non-interest bearing debt owing to the Diocese.

<u>Vincent 2001 Savings</u> – Funds paid by parents as a required part of tuition for facilities maintenance along with prepaid registration fees are deposited into this account.  The registration fees are held within this account until the new school year arrives after which the fees are transferred into the Vincent Main Checking account.  Maintenance expenses are also paid from this account.

<u>Vincent Gym Project Savings</u> – The balance in this account has accumulated from surplus funds over time.  It is not restricted by the Debtor and it is intended for refurbishment of the Gym.  The Gym did not have air conditioning until 2007.

Vincent has no Funds on Deposit at the Diocese. As of the petition date, Vincent owed the PSDL Trust $285,911.84 in a non-interest bearing obligation. The tax identification number for each of these accounts is the Diocesan tax number of 95-1644613 and has not been changed.

The financial statements provided to the Expert from Vincent are included herein as Exhibits 85 through 89.

Newman Centers

The Diocese sponsors Catholic activities for college age students at San Diego State University and the University of California, San Diego. Each center has maintained their own checking accounts and produces a general ledger and financial statement. Some of the checking accounts contain funds which were raised or collected for special projects such as a house building activity that is held annually in Tijuana, Mexico, the Hurricane Fund, and the Rice Bowl fund, which provides food to the poor. Each of the Newman Centers maintains a checking account which holds receipts from collections at Mass, the subsidy from the Diocese and other contributions. An account for the rectory is maintained at the Newman Center located on the campus of San Diego State University. The special projects monies are listed as restricted as of the Petition Date, but no balances are remaining as of the May 31, 2007 Monthly Operating Report[71] (Exhibit 47)

Cathedral Catholic High School ("CCHS")

According to the financial statements of CSE, for the year ended June 30, 2006 (Exhibit 30), CCHS is owned by CSE, which is a separate not-for-profit corporation. CCHS is located at 5555

---

[71] The Debtor reports that this was an oversight and will be changed in subsequent reports.

Del Mar Heights Road, San Diego, California. In addition to CCHS, according to its financial statements, CSE owns the land and facilities of the University of San Diego High School ("USDHS").

According to the financial statements of the USDHS for the years ended June 30, 2005 (Exhibit 49), the USDHS was a part of The Roman Catholic Bishop of San Diego, a corporation sole and had no separate legal status or existence and the USDHS was subsumed by CCHS July 1, 2005. It appears that the USDHS land and buildings were transferred into CSE for which the Debtor received no consideration.

The Debtor shows a contingent reversionary interest in the land and buildings of the USDHS upon the dissolution of CSE worth $65 million as part of its assets as of the Petition Date (Exhibit 50). The Debtor has indicated that upon sale of the USDHS land and buildings, the proceeds will be paid to the Debtor and available for creditor payments.

CSE received $29.6 million of California Statewide Communities Development Authority issued Variable Rate Demand Revenue Bonds on May 1, 2003 for the purpose of financing the construction of CCHS. Allied Irish Bank issued an irrevocable direct pay letter of credit on behalf of CSE for the purpose of paying principal and interest due on the bonds. The Debtor entered into a guarantee agreement with Allied Irish Bank to guarantee the repayment of amounts due by CSE (Exhibit 30, Footnote 6).

The RCBSD, as administrator of the Diocesan Bank, agreed to accept a non-interest bearing demand note payable from CSE in the amount of $14,551,403 for funds loaned to purchase the land for CCHS. The demand note is subordinated to the bonds (Exhibit 30, Footnote 6). The Debtor carried the $14,551,403 demand note as an asset of the Diocesan Bank up to the Petition Date and the PSDL Trust post petition (Exhibits 9 through 12, pages 2 and 3).

CSE had Funds on Deposit with the Diocesan Bank and the PSDL Trust in the in the amounts of $633,299 and $1,138,886 as of March 31, 2007 and June 30, 2006 respectively (Exhibit 48, third page).

## IV.

### Diocesan Trust Relationship and the PSDL Trust

Diocesan Bank – Pre-Petition

Prior to the Debtor's bankruptcy, the Debtor received money from parishes, schools, CSE and Diocesan divisions for deposit into their Deposit Account at the Diocesan Bank. The Debtor would physically deposit the check into the Pastoral Center Main Checking account and credit the respective parish Deposit Account.

The Debtor's general ledger system uses a unique series of numbers (231, 232 or 145) to identify Depositor Accounts from other accounts of the Debtor. An additional series of numbers are added to one of the three series above to identify the individual owner of the Depositor Account. For example St. John's account number might be 0452 231 00, 0452 being the identifier for St. John, "231" for the Diocesan Bank, and "00" for the number of accounts of St. John in the Diocesan Bank. If St. John's had more than one account the last digit would be changed to a "1" or "2" for each new account. (0452 231 01 or 0452 231 02) The Debtor provides a listing (Exhibit 16 Page 19-29) of Depositor Account balances in its Statements of Financial Affairs ("SOFA"). Some depositor accounts were closed pre-petition and accordingly they are not included in Exhibit 16. A complete activity report for each Depositor Account from January 1, 2006 through March 31, 2007 is contained in Appendix E.

The balances of each Depositor Account were subjected annually to testing and confirmation by Ernst & Young as part of their annual audit. Parishes and schools have access to information

on their accounts online.  It is the Expert's opinion, from working with many of the parishes and schools, that parishes and schools have been vigilant in insuring that the balances in the Depositor Accounts are correct.

Some of the Depositor Accounts would name the purpose of the funds and be entitled "restricted", such as "building fund" while other accounts would have no indication for the purpose of the money in the account.  Some of the funds deposited by parishes are designated as endowment funds. (Exhibit 16, pages 28 to 30).

The Administrative Office General Fund within the Diocesan Office Funds Financial Statements for the years ended June 30, 2002 through 2006 (Exhibits 9 through 12, page 2 and 3) and for the five months ended November 30, 2006 (Exhibit 52) have no restricted net assets.  All of the net assets[72] in the Diocesan Bank are shown as unrestricted. The Debtor's unrestricted net assets in the Diocesan Bank are further broken into two groupings, one designated for Diocesan purposes, such as construction work on parishes.  This amount exceeds the total of all unrestricted assets indicating the Diocese had designated more money to projects than it had available net assets.

Money in the Diocesan Bank could be borrowed by a parish or school if they met the requirements of the lending policies (Exhibit 53).  The total amount owing from all parishes and schools to the Diocesan Bank for the period ending November 2006 was $16,383,068, with an allowance for uncollectible accounts of $450,249.  The preponderance of the loans made to parishes and schools were for construction or renovation, but in a few instances loans were made for short term operating needs.  The Debtor, as part of the Diocesan Bank, has carried a reserve

---

[72] Net assets are computed as total assets less total liabilities and represent the "equity" of the not-for-profit.

between $450,000 and $1,479,743 for bad debts against the loans to parishes since 2002. A history of bad debt write-offs is contained in Exhibit 54.

As explained below, according to the Diocesan Office Funds Financial Statements prepared by the Debtor the Diocesan Bank during the fiscal years ended June 30, 2002 through 2006 and for the five months ended November 30, 2006, contained the following assets:

a) All the marketable securities of the Diocese,

b) The land and building for new high schools, and

c) Loans to parishes and schools.


The liabilities of the Diocesan Bank consisted of:

a) Parish and school Funds on Deposits,

b) Monies of Marian, Newman Centers, and CCHS Funds on Deposit, and

c) Administrative Office monies that were included in the Interfund account.[73]

The Diocesan Bank segregated no assets specifically to provide for one or more of its liabilities. In other words, all of the Funds on Deposit were commingled among the assets of the Diocesan Bank even though, on an accounting basis they maintained separate Depositor Accounts as referenced above.

---

[73] The Administrative Office funds are shown on the "Interfund account" line item.