PSDL Trust - Post Petition

In order to explain the changes made by the Debtor post petition, The Expert has prepared a comparative statement of financial position for the PSDL Trust/Diocesan Bank (Exhibit 55). The financial information contained in Exhibit 55 comes from the following sources:

1.  For fiscal years ended June 30, 2002 through 2006 the "Diocesan Office Funds of the Roman Catholic Diocese of San Diego" audited by Ernst & Young LLP (Exhibits 9 to 12).
2.  For the five months ended November 30, 2006, the "Diocesan Administrative Offices and the Diocesan Bank" unaudited, "For Internal Purposes Only Draft," unaudited and represented to be the last financial statement prepared by the Diocese accounting department prior to the Petition Date (Exhibit 52).
3.  Debtor's bankruptcy Statements of Financial Affairs ("SOFA"), page 19 to 30 (Exhibit 16).
4.  Debtor's Monthly Operating Report ("MOR") for May 31, 2007 (Exhibit 56).

Post petition the Debtor maintains the same deposit and recording procedures described above for the Diocesan Bank with the following changes the Debtor made as it approached the date of their filing:

1.  Began referring to the Diocesan Bank as the PSDL Trust.
2.  The Debtor set up a separate bank account in March 2007 to transact the receipts and disbursements which were previously handled by the Pastoral Center Main Checking account for the PSDL Trust checking account (Exhibit 31).
3.  The Diocesan Office Funds Financial Statements of the Debtor provided separate columns, representing the assets, liabilities, and net assets, for the Administrative Office General Funds, Administrative Office Restricted Funds, Bishop's Burse and the Diocesan Bank.  At or about the time of the petition the Debtor made the following changes to its account presentation.
    a.  A majority of the marketable securities, which were listed as assets of the Diocesan Bank were transferred to the Debtor.
    b.  The Depositor Accounts for Holy Cross, the Newman Centers, and Marian were withdrawn from the Diocesan Bank liabilities and were transferred to the

liabilities of the Debtor.[74]. The Funds on Deposit of CCHS remain with the PSDL Trust

    c.   Land and buildings for new high schools of $33,158,776 were likewise removed from the assets of the Diocesan Bank and placed into the Debtor's assets.

    d.   The "Interfund account", which represents a balance owed to the Debtor, in the amount of $19,284,604 was eliminated from both the Diocesan Bank and the Debtor.

    e.   From the Petition date forward there are no net assets in the PSDL Trust since the amount of assets and liabilities are equal. The Debtor reports that it has been and continues to be entitled to any increases in net assets[75] in the Diocesan bank or PSDL Trust.

The effect of the changes listed above is to separate the assets, liabilities and activities of the Debtor from the PSDL Trust in which it had previously been commingled.

Debtor's Authority to Maintain the PSDL Trust

The Diocese filed a "Certificate of Amendment to Articles of Incorporation of The Roman Catholic Bishop of San Diego, a corporation sole" on December 19, 2005 (Exhibit 4). This amendment contains an addition to Article 19 of the Articles of Incorporation of The Roman Catholic Bishop of San Diego, a corporation sole which states:

"(i) This corporation is formed for the purpose of administering and managing the affairs, property, and temporalities of the Roman Catholic Diocese of San Diego, and holding in trust (underline added) and managing in accord with the powers set forth in §10007 of the California Corporations Code, Canon, Law, and the other rules, regulations, laws, ordinances, and discipline of the Roman Catholic Church all of the real property, personal property, and funds of the Roman Catholic Diocese of San Diego in the name of The Roman Catholic Bishop of San Diego, a corporation sole, as trustee, in

---

[74] The Deposit Accounts of the Diocesan divisions do not create creditor claims because they are part of the Debtor's bankruptcy estate.

[75] A question remains as to who would be responsible for any decreases in the net assets of the PSDL Trust (Ex 68)

trust for specific beneficiaries, which are the parishes, schools, cemeteries, and laity (underline added) of the Roman Catholic Diocese of San Diego as those juridic persons and entities are defined by Canon Law and the established structure, rules, regulation, laws, ordinances, and discipline of the Roman Catholic Church, as may be amended or restated from time to time, and ensuring to said beneficiaries all of the use, benefits, rights and obligations of said property, conferred on them by Canon Law and the establishment, rules, regulations, laws, ordinances, and discipline of the Roman Catholic Church."

The Expert requested the Debtor to provide the Canon Law explanation which establishes the religious justification for parishes, as juridic persons, to be entitled to own property separate from the Diocese and the justification for the PSDL Trust. In response to that request, the Debtor provided an opinion and justification as propounded by Father William J. King, J.C.D.(Exhibit 57), wherein Father King discusses the various elements of Catholic Canon Law 1276. The Expert understands that the material quoted herein is the opinion of Father King and other similar scholars may have differing opinions. However, this was the material provided to the Expert by the Debtor with the understanding that it provided the basis for the Debtor's position concerning the proper accounting of such property.

Listed below are a few of the relevant portions of Father King's article which may pertain to the existence of a trust relationship:

1. According to Father King, Canon 1276 provides that juridic person's property held by the bishop does not imply ownership of that property:

"…Book V of the *Code of Canon Law* attributes rather broad authority for a diocesan bishop to establish either particular law or instructions regarding the administration of temporal goods in public juridic persons subject to his visitation or indirect oversight. <u>This does not imply ownership of these goods and properties by the diocese</u> (underline added), or the right of control over them by the diocesan bishop or any member of the diocesan curia, however. It does imply a structuring of administrative discretion by rule-making or the establishment of norms which broadly affect all who engage in temporal administration within a diocese…" (Exhibit 57, page 84, first paragraph)

2. Father King states that Canon 1276 provides that a bishop may mandate participation in centralized financial services and practices:

"…a diocesan bishop may mandate participation by parishes and other ecclesiastical entities subject to his temporal vigilance in centralized financial services and practices. This may include the mandate for diocesan management of parish monies through a joint investment fund, and therefore the mandate that all funds be deposited in that central fund. It may include the mandate that all parishes and other employee entities receive centralized payroll services, or centralized services for employee benefits and tax withholding. It may include as well the mandate to participate in other centralized accounting services provided for parishes and other entities, <u>even a diocesan "savings and loan" fund which services parishes and other Catholic institutions</u> (underline added). It may include services other than fiscal operations, such as management and maintenance of real property and physical plant." (Exhibit 57, page 87, top paragraph)

3. Father King says that Canon 1276 describes the independent relationship of parishes to the diocese:

"…Parishes and other independent entities <u>are not "branch offices" of the diocese (underline added)</u> and cannot be treated as such in any mandated accounting or

management system. The proper autonomy and discretionary authority of pastors and other must, as a matter of law, be maintained." (Exhibit 57, page 87, third paragraph)

4. According to Father King, the four principles which "…must be respected and protected in the design and implementation of a centralized diocesan financial system" (Exhibit 57, page 86, bottom) are as follows:

1. Proper ownership (dominium),
2. Proper control,
3. Proper accounting and
4. Scrupulous attention to intentions and rights.

5. Father King believes Canon 1276 requires ownership to be reflected in a centralized accounting or financial service:

"<u>Proper ownership of assets</u> – real, moveable, or financial – <u>must be reflected in every aspect of a centralized accounting or financial service</u> (underline added). The peril of not doing so is apparent, as it subjects the assets of any or all juridic persons to loss from any number of causes."

"A reflection of proper ownership (dominium) in every aspect of centralized practices and in all reporting of assets and services is an absolute requirement for any mandated central service." (Exhibit 57, page 87, second paragraph)

6. It is Father King's opinion that Canon 1276 requires consolidated financial statements to distinguish between parish monies and diocesan monies:

"Proper accounting is a requirement as well, namely that all accounting practices, methods, and reports need to indicate proper canonical ownership of properties, funds, and assets. <u>It is not proper to issue a consolidated statement or report which does not</u>

distinguish between, for instance, parish monies and diocesan monies, or which does not distinguish each parish's assets from all others (underline added). Not only must any centralized fiscal or property management service conduct its bookkeeping according to secular accounting standards, it must also observe rigorously the reality of its operations under canon law, and never commingle assets in accounting methods (underline added), but always reflect and observe proper ownership and control through accounting practices which make it clear that each parish or institution owns and controls its own assets and funds, even if certain services are offered or mandated by the diocese. Performing a service in managing assets and monies does not ever transfer ownership. Accounting methods and reports must be designed and carried out so that this reality is reflected and is evident…" (Exhibit 57, page 88, first paragraph)

The Debtor indicated to the Expert that the policies implementing that which is required by Canon 1276 are set forth in the *Handbook – Diocese of San Diego* (the "Handbook"). The Expert found no direct reference to a "trust" in the narrative of the Handbook. The Handbook (Appendix A) contains two pages (Exhibit 58) regarding these policies and the accounting related thereto.

Financial Statements of "The Diocesan Office Funds of The Roman Catholic Diocese of San Diego"

The Debtor prepared and issued financial statements for its fiscal years ended June 30, 2002 through 2006 (Exhibit 9 through 12). The names of the financial statements are "Diocesan Office Funds of The Roman Catholic Diocese of San Diego" ("Diocesan Office Funds Financial Statements"). The Diocesan Office Funds Financial Statements report on five different funds within the Diocese (Exhibits 9 through 12, pages 2 and 3) including the following:

1. Administrative Office General,
2. Administrative Office Restricted,
3. Property,
4. Bishop's Burse, and
5. Diocesan Bank.

1) The Administrative Office General Fund does not include the financial information for all of the divisions or programs of the Diocese. Specifically excluded are Holy Cross, Marian, Vincent, and the Newman Centers.

2) The Administrative Office Restricted Fund shows cash and cash equivalent assets equal to the amount of restricted net assets. An itemization of the restricted net assets is found in Footnote 8 (Exhibit 9, page 14). Contrary to this presentation, the Debtor did not maintain a separate bank account pre-petition which held the restricted cash[76] separate from the other assets of the Administrative Office.

3) The Property Fund existed for the years ended June 30, 2002, 2003 and 2004, representing property related to the construction of high schools in the Diocese. In later years these balances were combined with the Diocesan Bank (Exhibits 9 and 12, pages 2 and 3).

4) The Bishop's Burse Fund shows cash and cash equivalent assets equal to the amount of unrestricted designated assets. The Debtor provided no segregated assets for these amounts. This fund represents monies designated to provide a residence for the current bishop (Exhibit 9, page 10). This fund was first presented as a separate fund in the year ended June 30, 2004. Prior to that date, the Debtor did not maintain a separate cash bank account for the cash specified in this fund.

[76] See below for discussion on restricted assets vs. restricted net assets.

5) The Diocesan Bank reported that it held land which has now been utilized for the construction of parishes and schools, marketable securities, and loan receivable amounts from parishes and schools as assets. The liabilities shown in the Diocesan Bank are the Funds on Deposit from parishes, schools, and divisions of the Diocese[77].

The Diocesan Office Funds Financial Statements present each of the funds in four columns and totals them leaving the reader with the impression that the total represents the assets, liabilities and net assets of the Diocesan Office Fund.

In Footnote 6 to the audited financial statements for the years ended June 20, 2002 through 2006 the Diocesan Bank is described as:

> "The Administrative Office administers the "Diocesan Bank," *a program* (italics added) which finances the construction and renovation of parish and school facilities from deposits made by the parishes and schools of their excess fund. The deposits currently earn interest of 3 ½%. Loans to parishes and schools generally have fixed terms which can range up to 25 years…" (Exhibits 9 through 12, page 13, Footnote 6)

The Diocesan Office Funds Financial Statements were audited by Ernst & Young LLP for the years ended June 30, 2002 through 2006. In the course of their audit, Ernst & Young LLP obtained representations concerning the financial information from the management (a "management representation letter") of the Diocese (Exhibit 8). Management representation letters are obtained by an auditor in the normal course of their engagement for the purpose of obtaining written representation by the management attesting that the information in the financial statement is correct. The management representation letters were signed by Bishop Robert H. Brom, Hal Gardner, Director of Finance, (now deceased), and Karen Jassoy, Controller.

---

[77] The Diocesan Bank had Funds on Deposit from Holy Cross, Marian and CCHS (Exhibit 69)

Concerning the ownership of assets in the Diocesan Bank, the Debtor's management representation letters for the year ended June 30, 2205 and 2006 state:

"Ownership and Pledging of Assets"

"The Diocesan Office *has satisfactory title to all assets* (italics added) appearing in the statement of financial position. No security agreements have been executed under the provisions of the Uniform Commercial Code, and there are not liens or encumbrances on assets, nor has any asset been pledged." (Exhibit 8, page 2)

The Diocesan Office Funds Financial Statements make no disclosure of a trust relationship and give no indication that any asset in the Diocesan Bank belongs to anyone other than the Diocese. Should such a position be taken, it would be in direct conflict with the representations made by the Debtor's officers in the management representation letters

It appears that contrary to Father King's opinion as outlined in his article concerning Canon 1276, the Debtor issued consolidated statements or reports which do not distinguish between the ownership of parish monies and Diocesan monies (Exhibit 57, page 88, first paragraph).

The Diocesan Office Funds Financial Statements were provided to a number of financial or other institutions in connection with financing or other arrangements. From an accounting perspective, it would also be a critical misrepresentation to report that assets belonging to others are included in the Diocesan Office Funds Financial Statements as the Debtor's assets,

particularly in light of the potential third parties reliance thereon[78].  Some of the entities

receiving financial statements[79] are as follows:


- Union Bank of California,
- Bank of America,
- Allied Irish Bank,
- California Department of Insurance for Gift Annuities,
- California Department of Insurance – Self Insurance Plans for Workers' Comp,
- Insurance carriers CMG and CMU, and
- The Department of Motor Vehicles.

According to the minutes of the Finance Council, the Diocesan Office Funds Financial

Statements were intended to be made available to the public.  A printout of the current summary

financial information contained on the Debtor's website (www.diocese-sdiego.org) can be found

in Exhibit 59.  The website presentation has been modified and only presents the funds for the

Administrative Office, General and Restricted[80] which was different from the financial

presentation made to the above referenced entities.


Reliance on the Diocesan Office Financial Statements to Meet Debt Guarantee

Footnote 10 of the Diocesan Office Funds Financial Statement for the years ended June

30, 2002 through 2006 (Exhibits 9 through 12) describe a guarantee between the Debtor and the

revenue bonds that in part financed the construction of the Cathedral Catholic High School,

originally in the amount of $29.6 million and with annual principal reductions of $600,000.

Certain loan covenants of the guarantor are discussed in Footnote 10 to the financial statements

---

[78] Perhaps this is acknowledged in Exhibit 57, page 87, second paragraph when Canon 1276 refers to, "…The peril of not doing so is apparent, as it subjects the assets of any or all juridic persons to loss from any number of causes."
[79] The Expert does not  represent this to be a complete list of all of the parties that may have received and relied upon the Diocesan Office Funds Financial Statements of the Debtor, but these parties have been currently identified by some of the Debtor responsible parties as being recipients.

and the management of the Debtor and auditor declare the Debtor in compliance with the covenants of the guaranty.

Noting that the debt was funded in May of 2003, two of the covenants described in the Footnote 10 could not be met in subsequent years without including all the assets of the Diocesan Bank, which are supposedly held in trust by the Diocese in behalf of the parishes and schools and other claimants.

The first covenant is the requirement to maintain a minimum of $10 million in unrestricted cash and readily marketable securities[81] which was only possible in the years ended June 30, 2004 and 2006[82] with the inclusion of all of the cash and marketable securities in the Diocesan Bank. The calculations in Exhibit 13 demonstrate this fact. There is a complete absence of cash or marketable securities in the Administrative Office Fund in fiscal year 2006 sufficient to comply with this covenant without including the funds supposedly being held in trust. Even adding to the Administrative Office Fund amounts the Bishop's Burse Fund does not satisfy the financial covenant. Only by adding the cash and marketable securities in the Diocesan Bank can the covenant be met.

The second covenant mentioned in Footnote 10 is the requirement to maintain a ratio of assets of unrestricted cash and temporarily restricted cash and marketable securities[83] to debt of

---

[80] The Diocesan Bank and Bishop's Burse are not included.

[81] The Guarantee Agreement (Exhibit 60, page 2) defines unrestricted cash and readily marketable securities as, "…all cash, cash equivalents, and Readily Marketable Securities held by the Guarantor and treated under GAAP in a manner consistently applied, as historically applied by the Guarantor as unrestricted and available for use for the payment of principal or premium, if any, and interest on Debt or for the payment of operating expenses (underline added) of the Guarantor."

[82] When the Diocesan Office Financial Statements were first issued for the year ended June 30, 2004, the Property fund was shown as a separate fund. In 2005 the Property fund was merged with the Diocesan Bank and a correction was made which moved the Accounts Receivable, CSE from the Administrative Office General fund to the Diocesan Bank. Hence, the 2005 presentation of the 2004 financial information would qualify on this loan covenant where the 2004 presentation would not.

[83] The Guarantee Agreement (Exhibit 60, page 2) defines unrestricted cash and temporarily restricted cash and marketable securities as, "…all cash, cash equivalents, and Readily Marketable Securities held by the Guarantor and

not less than .75:1.  That ratio, as detailed in Exhibit 14, cannot be met without including the assets of the Diocesan Bank which are supposedly being held in trust in behalf of the parishes and schools.  The Administrative Office unrestricted cash and temporarily cash and marketable securities are shown in Exhibit 14.  The ratio to the then outstanding debt balance is calculated and demonstrates the failure of this loan covenant based solely upon these Administrative Office General Fund assets in 2004, 2005 and 2006.  If the Bishop's Burse is added and the ratio to the then outstanding debt balance is recalculated there still exists a failure to meet the loan covenant in these three years.  With the addition of the Interfund account balances, assuming them to be cash (which they probably are not for purposes of the covenant definition), there is a failure to meet the loan covenant in these three years.  Only after adding the Diocesan Bank assets does the Debtor meet the required loan covenant.

The definitions in the loan covenants (Exhibits 60, page 2) refer to cash, cash equivalents, and Readily Marketable Securities held by the Guarantor that are available for the payment of "operating expenses of the Guarantor."  Including the Diocesan Bank cash, cash equivalents and Readily Marketable Securities in the loan covenant implies that the assets of the Diocesan Bank are available to pay the operating expenses of the Debtor.

Ernst & Young LLP and the Debtor advised the Expert they are not in possession of a workpaper which provides their computations of compliance with the loan covenants.  When the Expert spoke with Kristin Janix, manager at Ernst & Young LLP, who was assigned to the audit of the Diocese Office Funds of the Roman Catholic Diocese, she agreed that in order to comply with the loan covenants, it would be necessary to include all of the assets of the Diocesan Bank.

---

treated under GAAP in a manner consistently applied, as historically applied by the Guarantor as unrestricted or temporarily restricted by the Governing Body of the Guarantor…available for use for the payment of principal or premium, if any, and interest on Debt or for the payment of operating expenses (underline added) of the Guarantor."

## Gift Annuities Administered for Parishes for the Benefit of Others

The Diocese obtained a license from the State of California to sell annuities. Many of the annuities are managed by Union Bank of California and the newer annuities are managed by US Bank. The Debtor lists these assets as being held for others in the SOFA (see Exhibit 61). There are three types of annuities; (1) gift annuities, (2) charitable remainder unitrusts, (3) pooled income funds. Donors transfer property to the parish or Diocese in exchange for an annuity which is paid to the donor during their life and the remainder becomes a donation to the parish or Diocese.

The annuities or funds are held at and administered by a bank. A copy of the operative agreements is contained in Exhibit 62, 63 and 64. Union Bank and US Bank have served as agents for the Diocese as trustee. The information the Expert obtained is summarized in Exhibit 61. The Debtor has only been able to provide documentation for $3,295.269 of the $5,357,998 (62%) of annuities listed in the SOFA (Exhibit 16, pages 30 and 33).


## Accounting Treatment for Land Held in Trust for Parishes

It is the policy of the Diocese to provide a parish, upon establishment, a sufficient amount of developable land by the Diocese on which to build their parish (Exhibit ). According to statements made by Father Steven Callahan at the Debtor's 341a meeting, new parishes also received an interest free loan of $2 million for up to 10 years (Exhibit 70). With a few exceptions, which are in the start up phase, the Diocesan Office Funds Financial Statements for the years ended June 30, 2002 through 2006 (Exhibits 9 pages 2 & 3 ) do not include the cost or other basis for land allegedly held for the benefit of parishes.

The financial statements of the parishes the Expert analyzed do not include the cost or other basis for land used by the parish in their financial statements. At the parish level, when construction costs are incurred they are expensed and therefore no capital asset is created, including land gifted to the parish from the Diocese. Hence, the land held in the name of The Roman Catholic Bishop of San Diego which the Debtor claims is held for the benefit of the parishes (Exhibit 16, pages 1 to 19) is not carried on the books of the Diocese or the parishes.

Diocese Construction Management

The Diocese provides construction supervision and management to the parishes for all projects over $100,000. Joel King, AIA, serves as Director of Construction Services ("CS") within the Pastoral office. Parishes that wish to build facilities submit their proposals to the Building and Renovation Committee (the "BRC"). A copy of the bylaws of the committee and other policies concerning parish project construction are contained in Exhibit 17.

CS has preliminary discussions with the parishes and assists in developing the plans into a workable project. The Office of Civil Affairs assists in the acquisition of land if needed. A parish building committee is formed. The BRC is required to give approvals at two points during the course of the project; first, for concept approval and, second, for final approval. In some instances, an approval may also be needed from the Art and Architecture Committee.

After final approval of the project by the BRC, a letter is sent to the parish which indicates the approval of the project and sets forth the terms for any loan from the Diocesan Bank. Mr. King coordinates with the parish to choose a general contractor and also negotiates a construction contract.

Mr. King provided the Expert with three samples of Construction Contracts. (Exhibits 72, 73 and 74). It should be noted that all three of the sample contracts provided by Mr. King have the Roman Catholic Bishop of San Diego, a corporation sole (or variation thereof), as the owner of the project even though each of the projects were for construction of parish facilities. The Expert has seen certain contracts and documents where the individual parish is named as the owner (Exhibit 75). Mr. King indicates that some parishes wish to be named as the owner, while others have no preference or specifically do not want to be listed as owner on the contract.

## V.

### Restriction(s) or Limitations on Funds in the Accounts

The Court has requested that the Expert analyze "any alleged restriction(s) or limitations with respect to funds in the Accounts." (Exhibit 76, ¶5 (d) ). The Expert will provide information herein concerning the restrictive accounting treatment which may, or may not, be afforded various transactions involving restricted assets. As a basis for analyzing restrictions we have used attributes that define restricted assets or net assets as promulgated by under Generally Accepted Accounting Principles. ("GAAP") [84] The Expert primarily focused on the restrictions as asserted by the Debtor in light of the aforementioned GAAP standards[85] and the understanding of the priority system of claims in bankruptcy[86].

Although GAAP does not have a dispositive relationship with the law, prior to refining their position on any accounting issue the various accounting governing bodies, such as the Financial

---

[84] GAAP represents the various accounting standards and interpretations for the purpose of preparing a financial statement for presentation to third parties for their analysis, review and reliance. The GAAP standards are generally set by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants and are called Financial Accounting Standards ("FAS").

[85] The FASB statements of GAAP apply to financial accounting in many legal jurisdictions in the United States and sometime outside the United States. Of course there are different laws, interpretations and precedents in different jurisdictions and the FASB can only consider the general legal principles in providing accounting guidance to accounts in jurisdictions with possible differing laws.

Accounting Standards Board ("FASB"), often take into consideration the legal elements of any restricted asset or net asset. Within this portion of the report, the Expert simply wishes to provide for the Court a review of the attributes in which GAAP may determine what restrictions as proposed by the Debtor may be recognized on the financial statements in accordance with GAAP along with his understanding of the priority system employed in the bankruptcy process. The Court may place whatever weight upon these factors as she sees deems appropriate.

The Debtor's bankruptcy schedules of assets and liabilities ("BSAL") contain a "Schedule of Restricted Assets and Assets Subject to Security Interests" (Exhibit 77). The Expert has reviewed the Debtor's underlying documentation, stated purpose, and use of funds in order to provide an opinion as to the appropriateness of designating these items as restricted under GAAP standards.

We considered the following attributes as described in GAAP which may have some relevance as to the determination of whether an asset is ultimately deemed restricted for bankruptcy purposes.

- To determine the accounting treatment for restrictions upon assets, FAS 116 states, "…a restriction on an organization's use of the assets contributed results either from a donor's explicit stipulation or from circumstances surrounding the receipt of the contribution that makes clear the donor's implicit restriction on use." (Exhibit 78, ¶14, page 3 of 7).

- Revenues from providing services, producing and delivering goods are considered to be unrestricted assets (Exhibit 79, ¶16, page 4 of 8).

- A contribution is not restricted if the imposed restriction is not more specific than the broad limits resulting from the nature of the organization, the environment in which it

---

[86] Of primary interest are in this report are FAS 116, FAS 117, FAS 124 and FAS 136 (Exhibits 78, 79, 80, and 81).

operates, and the purposes specified in its articles of incorporation or bylaws (Exhibit 79, ¶7, page 2 of 7). Hence, a donation that is given for the same general purposes for which the not-for-profit exists would be unrestricted as to that entity. For example, weekly contributions without specificity as to the intended use would not be afforded a restrictive treatment.

- A restricted asset may become unrestricted if the stipulated time has elapsed or the stipulated purpose for which the resource was restricted has been fulfilled, or both (Exhibit 78, ¶17, page 4 of 7).

- A donor imposed condition requiring the return of the assets transferred after a future and uncertain event whose occurrence or failure to occur gives the donor a right of return of the assets (Exhibit 78, ¶7, page 2 of 7) is a valid restriction.

- Restrictions can be placed on assets or net assets[87]. A restricted asset designation implies that the restricted asset has been separately accounted for and separately maintained pursuant to those restrictions.

- Unrestricted funds can be designated by the governing board of an organization to designate a portion of its unrestricted net assets to a specific function (Exhibit 79, Page 4 of 8), a "self-imposed restriction." The Debtor does not assert this claim of restriction for any of the assets at the Diocese level included in Exhibit 77; however this practice appears to have been a common occurrence at some of the parishes. Taken to the extreme, allowing this type of restriction would allow a Debtor to self-impose restrictions

---

[87]A net asset implies the net value of assets in general without looking to one or more specific assets following the payment of liabilities or claims. A restricted asset implies that specific assets have been separately accounted for and separately maintained for the specified restriction (i.e. See Exhibit 9, page 2 Administrative Office, General or Restricted columns, noting the "Net Assets" section at the bottom).

on all of its assets, thereby preventing creditors not covered by the restrictions from being

paid.

The Debtor asserts that certain of the amounts listed on Exhibit 82 represent trust funds

which are being held in trust by the Debtor in behalf parishes and schools by virtue of the

donor's designated intended use of payments to the Debtor (Exhibit 77). As examples of this

trust relationship, the Debtor uses:

1.  Trust fund employee taxes,
2.  Parish payments to the Diocese to pay employees[88],
3.  Tuition paid by students or parents for current year education, or
4.  Payments for the perpetual care of the Holy Cross cemetery.

The Expert has inspected the documentation and evidence available to determine the intent of

the donors in regards to the above referenced areas.  The Expert has also considered evidence of

intent if any of the following items were present:

1.  Letter or document from the donor stating the intent,
2.  Check with indication of intent,
3.  Special fund raising events for the restricted purpose and that was coincidental with
    the receipt of the funds,
4.  Memorandum created by the Diocese at or about the time of the donation indicating
    the intent, or
5.  Recordation directly into the specific general ledger account for the restricted purpose
    at or about the time of the contribution.

In performing the analysis, the Expert has considered how the Debtor previously represented

the nature of what it now calls restricted assets.  Prior to bankruptcy, the Debtor prepared the

---

[88] The Debtor does not separate amounts paid by the parishes and schools from those of the Diocese, which amounts
are described in the schedule as "Various Employees at Diocese, Parishes & Schools."  However, Karen Jassoy has
indicated that the amounts in these restricted funds are the obligations of the Diocese.

following financial statements, some of which were either audited or reviewed by Ernst & Young LLP:

1.  The Diocesan Office Funds of The Roman Catholic Bishop of San Diego (Exhibit 9 through 12, and Exhibit 52);
2.  Holy Cross (Exhibits 38 through 40);
3.  Catholic Secondary Education – Diocese of San Diego, Incorporated, and The University of San Diego High School General Fund (Exhibits 30 and 49); and,
4.  Marian High School (Exhibit 44 through 46).

Based upon the representation of the management of the Diocese and the work performed by Ernst & Young LLP, it appears, based on those financial statements, that more assets were designated as restricted by the Debtor in the post-petition period than were listed as restricted in the financial statements in the period just prior to the bankruptcy (Exhibit 8).

The Expert has reviewed the disbursements related to the restricted assets in order to determine if they are consistent with the intent underlying the asset. The Expert would conclude that the restricted net assets were used as intended, if the following factors were present:

1.  Invoices supporting payment for the restricted purpose,
2.  Entries into the general ledger account consistent with the restricted purpose or
3.  Checks paid to vendors whose activities were consistent with the intended purpose.

With the general considerations described above, the Expert has analyzed the Debtor's restricted assets as presented in Exhibit 77. Our focus has been on determining if the following attributes exist for each restricted asset:

1.  Did the claim arise from a donor making a contribution?
2.  Were goods or services provided to the claimant in exchange for the payment?
3.  Does the Debtor claim to be holding the money in trust, and, if so, on what basis?
4.  Was the intended restriction documented and, if so, how?
5.  What was the purpose of the donation/payment?

6.     Has any stipulated time elapsed or the stipulated purpose been fulfilled?
7.     Is there a donor imposed condition requiring a return of the assets?
8.     Is there a specific asset separately accounted for and separately maintained to provide for the restricted intent?
9.     How did the Debtor report the restriction in its audited financial statements?
10.    Were the funds used as intended by the restriction?

After considering the information provided to the Expert in the books and records of the Debtor pertaining to restrictions, the Expert has summarized his findings in Exhibit 83 by placing each of the Debtor's restricted assets into one of three groups which summarize the Expert's recommendations:

1.     Allowable claim as a restricted asset,
2.     Allowable claim as a restricted net asset, or
3.     Claims which require further legal determination.

The Expert believes that the restriction claims in the first group have separately maintained segregated assets with supporting evidence of the intent of the donor and such intent has been followed by the Debtor.

The Expert believes that the restriction claims in the second group have not separately maintained segregated assets, but do have supporting evidence of the intent of the donor and such intent has been followed by the Debtor.

The Expert believes that the third group of restriction claims, even though the Expert found evidence of the intent of the donor and such intent has been followed by the Debtor, may have problems which will require a legal determination.  The problems include:

1.     The Debtor represented in its financial statements that there were no restrictions for these amounts, or

2.    The amounts are payable for services rendered or to be rendered by the Debtor or for services provided or to be provided to the Debtor.

Other Observations Concerning Restricted Assets

1)    Unsecured creditors who provided services covered by the restricted net assets may be entitled to be paid from the proceeds of restricted net assets.  In the opinion of the Expert, the Debtor's schedules did not provide sufficient clarity as to which unsecured creditors may be entitled to some form of payment from services or claims provided which fulfilled the intent of the restricted net assets.

2)    Historically the Debtor has not allocated any administrative cost to restricted activities thereby granting to donors' restricted activities a cost free service.  This cost has been borne by unrestricted assets and impacts the amount of unrestricted assets available to pay creditors.  The Diocese charges and collects an administrative charge called the Diocesan Tax at a rate of 13% of revenue to cover the administrative cost of services provided to the parishes.  Perhaps this is an appropriate amount to be charged against the restricted amounts listed in Exhibit 83.

3)    The Debtor's pre-petition financial statements as of June 30, 2006 disclose unrestricted "designated" net assets, which are not listed as restricted assets[89] as of the Petition Date on the Debtor's schedules.  They include earthquake reserve/future loss fund of $2,948,840, worker's compensations of $1,466,441, and employee health insurance reserve of $864,346, state unemployment insurance of $844,144 and priest health insurance reserve of $421,319.

---

[89] The Expert agrees these amounts should not be restricted in the context of the Debtor's bankruptcy.

The amount listed as restricted assets of the Debtor is a fluid number. Post-petition the Debtor has consumed some of the amounts in their restricted asset lists (see Exhibit 84) and continues to add to certain of the restricted amounts with additional contributions.

# VI.

## Audit Results of Parish and School Accounting

Since the creation of the Mission San Diego de Alcala on July 16, 1779 the Diocese has evolved to encompass 98 Parishes and 16 missions which addresses the spiritual and ecclesiastical needs of the approximately 980,000 Roman Catholics presently residing in the San Diego/Imperial County areas.

The Diocese also offers educational opportunities through 43[90] elementary schools[91] and three high schools in San Diego and Imperial counties. The three high schools are Marian Catholic High School[92] in Chula Vista, Vincent Memorial High School in El Centro, and Cathedral Catholic High School in San Diego[93].

In order to comply with the provisions of the Court's Order appointing the Expert concerning the existence, operational and informational basis regarding bank accounts as well as any restrictions which may be imposed with respect to those funds, the Expert was required to

---

[90] The 2007 Catholic Directory lists 45 elementary schools which are either pre-school through 8th grade or Kindergarten through 8th grade. However, two of these elementary schools have an association through a Parish but are independently owned by separate Catholic Orders and are therefore not under Diocesan administration. Thus, there are 43 elementary schools as designated in the Directory.

[91] Our Lady's School is actually associated with two separate parishes and operates two separate campuses, one campus enrolls students in the upper grades and the other campus enrolls students in the lower grades.

[92] RCBSD is in the process of constructing a new high school, Mater Dei, which will replace Marian. The proposed enrollment in Mater Dei will approximate 2,500, substantially larger than the present enrollment of 700 in Marian High.

[93] RCBSD owns two of the high schools – St. Vincent and Marian. The other high school, Catholic Cathedral, is owned by Catholic Secondary Education – Diocese of San Diego Incorporated ("CSE") of which RCBSD is the sole member.

conduct an audit[94] (or accounting analysis) of various Diocese and Parish accounting records. The audit was also required to determine whether the Cash Management System operates in a manner consistent with declarations as provided by responsible officials in the Diocese.

Due to appropriate and understandable time constraints, the Expert was not able to audit all 98 Parishes and 43 Elementary schools. However, the Expert reviewed data related to all 98 parishes from the list below and based upon that data selected 48 parishes to review. A summary of this selection criteria information is included as Exhibit 92.

- Cash on hand at February 28, 2007 (Per Schedule K)
- Number of bank accounts (Per Schedule K)
- Whether or not the tax identification number was changed (Per Schedule K)
- Amount of Funds on Deposit at the Diocese in the PSDL as outlined in the bankruptcy schedules (Per Form 7)
- Amount of debt from the PSDL at the Diocese (Per Form 7)
- Annual ordinary contributions for 2006 (Per Diocesan Records)
- Annual extraordinary contributions for 2006 (Per Diocesan Records)
- Geographic location

The Expert also audited all of the 26 schools affiliated with these parishes.

Exhibit 18 is a schedule of all the parishes in the San Diego Diocese with a notation of the 48 parishes the Expert chose to audit. Exhibit 19 is a full schedule of the 43 schools in the San Diego Diocese and the 26 schools which were reviewed by the Expert.

---

[94] The Expert utilizes the terms "audits, visits, and reviews" throughout this report to describe the accounting analysis which he conducted. However, the term "audit" as well as "review", as defined herein, is not to be

Accounting for the Parishes & Schools

Approximately $165 million flows through the annual collective coffers of the Diocese, Parishes and Schools of the RCBSD[95].  One would naturally assume that such a large financial enterprise would establish a standard system of accounting and reporting, which would allow for meaningful financial measurement standards to be imposed throughout the entire organization. If such a system were in place, an entity, such as the Diocese, should be able to access financial information concerning each of the Parishes or Schools within the Diocese in order to monitor their financial performance or adherence to established procedures.  However, the Diocese has no such system and, absent a personal visit, cannot independently access Parish or School accounting information.  As a result, they are often woefully unaware of the specific financial operations of the individual Parishes.

According to the Handbook, "A PARISH is a grouping of the faithful set up within a diocese and entrusted to a pastor who associates with himself all its members in accomplishing their common mission."   "The PASTOR is the proper shepherd of the parish to which he is assigned, exercising pastoral care in the community entrusted to him under the authority of the diocesan bishop, in whose ministry of Christ he has been called to share;…"

In practice, each Parish and School is responsible for their individual method of accounting and bookkeeping. This lack of standardized accounting leads to an incredible array of accounting programs and methods to record their financial transactions. As a result, the accounting programs within the Parishes range from a handwritten system of ledgers[96] to an advanced Parish accounting software package.  The disparity between the sophistication of

---

construed as complying with the standards of an audit or review as defined by the AICPA.
[95] Excluding the funds flowing from the High Schools and other  separate Divisions associated with the Parish.

Parish and School accounting systems is due to a number of factors.  Probably the primary reason is related to our inherent reticence to change.  Rather than adopt new accounting software, there is a natural human tendency to resist that which is unfamiliar and find comfort in that which is familiar.  There is also a low turnover rate among the office personnel which is mostly a desirable state but can also lead to the calcification of existing procedures.

Another reason for the disparity of standard accounting systems relates to the primary focus of the Parish upon the spiritual needs of their Parishioners.  The implementation of a sophisticated accounting program is simply not a priority to those Parishes.

Regardless of the method used, the Expert determined that the parishes and schools were reasonably well organized and sufficient detail was generally available to allow the Expert to analyze the receipts and disbursements of each parish.  This availability is probably due, in part, to the fact that each parish and school is required to send an annual report to the Diocese.  This requirement is detailed in the Diocesan Handbook included as Appendix A.  The accounting system of the Parish must be standardized and sufficiently adequate for the Parish or School to prepare these annual reports to the Diocese.[97]

The Expert reviewed all of the annual reports for the fiscal years ended 2003 through and including 2006 as provided by the Diocese and the 48 Parishes and 26 Schools which were audited by the Expert[98].  The financial data in the annual reports to the Diocese is primarily a receipt and disbursement based analysis.  It also contains information concerning restricted (or extraordinary) donations, as well as a supposed list of the bank accounts maintained by the

---

[96] It should be noted that the handwritten system was meticulously maintained.
[97] Some of the Parishes use specialized software for Parish accounting which allows the report to be printed from their software system.
[98] To the extent provided, copies of each of the annual reports for the 48 Parishes and 26 schools are included in the binders maintained by the Expert containing the supporting accounting information obtained during the audit.

parish. As in most parish related accounting issues, there is a wide disparity between the accuracy or inaccuracy of the information. Susan Boswell, legal counsel for the Debtor, described the annual reports provided by the Parishes to the Diocese as "incomplete and inaccurate."[99] However, the Expert found that not all of the reports were "incomplete or inaccurate." In fact, some reports were quite complete and very accurate. On the other hand, it is true that a goodly portion of the Parish annual reports were "incomplete and inaccurate" and provided limited insight, especially in the area wherein the Parish was required to list all bank accounts. The Expert found that most major Parish bank accounts were reported, however, there was often a plethora of smaller bank accounts for disparate organizations operating under the auspices of the Parish which were routinely left off the annual reports.

In conjunction with the duties of the Pastor, the guidelines, as outlined in the Handbook, regarding Parish cash state, "Accounts with financial institutions may be established _only with the permission of the pastor_. All accounts _must be_ in the name of the parish. The pastor _must be_ a signer on all such parish bank accounts. Anytime a change of signature(s) on an account is required, _the pastor must_ sign the new signature card(s)….Separate accounts for parish organizations (altar society, etc.) are permissible. However, such accounts must contain reference to the name of the parish to which they pertain (e.g. St. Vincent Altar Society) and the pastor must be an authorized signatory on such accounts. Subsequent changes in authorized signatures must likewise be made only with the pastor's approval and signature on the new signature card(s)." (Emphasis added) The Expert is not aware of any procedures which require the Parishes or Schools to report new accounts to the Diocese other than at the end of the fiscal year as detailed within the annual report. Thus, a Parish can open and close accounts during the

---

[99] Per the Debtor's response to Objections of the Creditors Committee to the CMS.

year without any notification to the Diocese. As previously stated, the Expert found that certain bank accounts of Parishes were routinely missing from the annual reports. In fact, the exclusion of such accounts was widespread throughout the Parish annual reporting system.

The most likely time for the Diocese to review any change in these bank accounts or become aware of new accounts would be in the performance of a Diocesan review[100]. However, even during that financial review the Diocese is not specifically looking for new accounts. They are primarily concerned with how many accounts are presently open, the balances being carried in those accounts, and whether bank reconciliations are being prepared in a timely manner.

As outlined above, the pastor has ultimate responsibility for the administration of the parish. He may delegate certain responsibilities but according to the Handbook he retains supervisory control. The first general responsibility outlined in the Handbook is "All parish receipts and disbursements shall be entered in the parish financial records according to the parish chart of accounts." During the audits conducted by the Expert, it was determined that a good faith effort was made to accurately record all receipts and disbursements in accordance with the aforementioned policy. When there were deviations from the parish chart of accounts, it was generally due to the inexperience of the person making the entry as many lay personnel, who lack detailed accounting skills, are designated that task. However, those entries which were designated incorrectly did not have a material effect upon the financial reports.

---

[100] The Handbook calls for a Parish financial review by the Diocese to occur at least every five years or upon the change of the Priest in the Parish. The Expert found this requirement to be intermittently ignored by the Diocese. Certain Parishes assert they have gone for as long as 10 years without any Diocesan financial review.

Collection of Donations and Designation of Restricted Funds

Within the 48 Parish audits conducted by the Expert, he found the collection of ordinary and restricted/designated donations for Parishes is generally handled in a similar manner from Parish to Parish. The collections are gathered and separated by type, i.e., ordinary or extraordinary. Ordinary receipts are those designated for the general operation of the Parish. Extraordinary donations are those which fall outside the general operational nature and may include building funds, special purpose donations such as hurricane or other disaster relief, Diocesan special collections, and ACA rebates[101]. The manner of designation or segregation is normally determined by the color, notation or other distinguishing factor on the donation envelope. Based on that designation, or occasionally through verbal directions to the Pastor, the donation is categorized as either ordinary receipts or designated/restricted receipts for specific causes[102]. The funds are generally counted by a group of at least three parishioners who verify the amount and the classification. Following that verification, count sheets are prepared which can then be used to track the money in the general ledger or accounting system.

In some cases the general collection process may be modified to create a designation. For example, the pastor might have a second collection on the first Sunday of a month and designate those collections for the building fund or some other cause. Occasionally, the Parish will contract with an outside entity to assist in carrying out a capital campaign. These companies assist in obtaining, tracking and collecting pledges. The fees are not necessarily large and the decision to use them is made on a Parish by Parish basis. Parishes with more personnel

---

[101] Diocesan special collections include such pass through collections which go directly on to the Diocese, such as Peter's Pence and the Annual Lenten Appeal. The Annual Catholic Appeal (ACA) rebates represent the return of funds advanced to the Diocese as contributory amounts which are estimated by the Diocese in the first part of the year and a Parish may ultimately have advanced more than required under the final assessment.

sometimes find it easier to spread the work among their people and save the expense of raising the funds.

Occasionally, the Parish will receive a larger than normal donation that may or may not necessarily be designated for a specific purpose. Often the donor will direct the Pastor to use the funds in areas where he feels the Parish may have the greatest need. In those instances, it is not uncommon for the Pastor to designate these donations as an extraordinary contribution and allocate it to a specific purpose, such as a new construction campaign. This procedure, which is used regularly in the Parishes, is not in accordance with the handbook as when handling unspecified purpose receipts, such as those mentioned above, the handbook states, "funds that are not restricted by the donor and are internally designated by the parish are to be classified as ordinary receipts".

Most, but not all, large contributions the Expert reviewed included a letter or other documentation designating the purpose and intended use of such contribution. The Expert has retained copies of all such letters in the binders of supporting documentation for each individual audit.

In summary, with the exception of those contributions whose purpose have been supported by a specific letter detailing the intentions of the donating party, the Expert has relied upon the procedural descriptions as provided by the Pastor and the lay personnel assigned to each Parish as to which contributions have been designated for general operations or extraordinary or specifically designated contributions

---

[102] It should be noted that the Diocesan tax of 13% (sometimes called the Parish Assessment) is not charged against those collections designated as extraordinary. Thus, in certain instances, it is beneficial for a Parish to designate certain collections as extraordinary as it reduces the Diocesan tax due from the Parish.

Following receipt and counting by three or more Parishioners, the funds can then be deposited into one or more accounts established at the Parish. Most Parishes have separate accounts for general donations, building funds, or other designated gift accounts. The number of bank accounts maintained by the Parishes range from one general account to as many as twenty two separate accounts at the Our Lady at Mount Carmel, San Ysidro.

The above procedures generally comport with the procedures outlined in the Handbook under the section "Administration – Parish" (see Appendix A). This section contains detailed counting and accounting procedures. The pastor and parish personnel generally try to strictly follow these guidelines based on specific circumstances at each Parish. The handling of cash is one of the primary areas addressed whenever the parishes are audited by the Diocese and accordingly, Parishes attempt to comply with all of these requirements.

Likewise, with few exceptions, the Pastors and Parishes make a good faith attempt to comport with the guidelines enumerated in the Handbook regarding disbursements at the Parish level.

Actually, a significant amount of the funds spent for normal operating expenses are paid directly to the Diocese. On a post-petition basis, most clergy salary and benefits, religious and lay salaries and benefits, diocesan tax, clergy pension tax and insurance for property and auto are directly transferred to the Diocese from the parish accounts by automatic transfers twice a month. It should be noted that those withdrawals cannot occur without the express approval of the respective Parishes as the Diocese is not a signatory on any of the Parish accounts and accordingly cannot unilaterally make such withdrawals. Prior to the bankruptcy these funds were paid to the Diocese with checks written from the parish accounts. According to Diocesan policy, as detailed in the handbook, all personnel are to be paid from the Diocesan payroll system.

Based on Exhibit 20, which shows the operating expense analysis for the 48 parishes visited by the Expert, these operational expense transfers to the Diocese account for approximately 71.15% of the total general operating expenses. The results from Exhibit 20 can be analyzed as follows:

| | |
|---|---|
| Clergy salary and benefits | $ 3,166,395 |
| Religious & lay salaries and benefits | 16,957,768 |
| Diocesan tax & clergy pension | 5,271,475 |
| Insurance – property & auto | 944,820 |
|     Totals | $ 26,340,458 |
| | |
| Total operating expenses of all Parishes | $ 37,023,119 |
| | |
| Percentage paid to the Diocese | 71.15% |

Parishes and the PSDL

The Parish Administration section of the handbook provides the following clear direction as to the procedure for transfer of surplus funds from the Parish to the Diocese. "Surplus funds must be on deposit with the diocese in accordance with diocesan policy. Surplus funds are amounts above what is needed for normal operations for a two month period, which is estimated to be $50,000". The Expert has found a veritable plethora of interpretations at the Parish and School level of the Surplus Funds requirement which range from good faith adherence to absolute disregard. The designation of surplus funds as being those funds in excess of $50,000 and an additional two months operating expenses was the most common interpretation of the surplus funds procedure the Expert received from the parishes during the course of his review.

Thus, if a parish were to adopt that interpretation and had monthly operating expenses of $60,000, then surplus funds would be those funds greater than $170,000, or two times $60,000 plus $50,000. A goodly number of the Parishes visited by the Expert tried to comply, at least to some degree, with their interpretation of this policy. There were also a significant number of Parishes, such as Our Lady of Mt. Carmel, San Ysidro Parish, who demonstrated a willful disregard of this procedure.

The Diocesan policy dated November 1, 2006, and referenced above, regarding Funds on Deposit and surplus funds offers further clarity to the issue. It states, "Parishes are required to deposit with the diocese (i.e. in the "Diocesan Bank") all parish funds, including those generated and/or held for the benefit of parish operations, organizations, project or programs over and above funds needed for normal operations. This policy also applies to parochial schools and Diocesan high schools." The definition becomes even clearer under the implementation section of the policy, wherein it states, ""Funds needed for normal daily business" is defined as the normal operating expenses for a two-month period, which for most parishes is approximately $50,000". Very few, if any, parishes or schools strictly adhere to this diocesan policy as outlined herein.

To further cloud this issue, the general handbook, in the Parish section as outlined in the recommended chart of accounts, states, "Parish funds and investments in excess of current needs (normally 3 months) are to be on deposit with the Diocese". While there is some similarity between these requirements, it is easy to see why multiple interpretations may arise as to the meaning of surplus funds and the required amount of funds to be sent to the Diocese for deposit into the Diocesan Bank/PSDL Trust.

The audits of the Parishes and schools demonstrated this wide variation as strict adherence to this policy would mean that each of the 74 parishes and schools audited should have each had approximately $50,000, while only nine (9) of the seventy-four (74) parishes and schools visited by the Expert had less than $100,000 on hand at the petition date and three (3) had more than $1.1 million. Another eighteen (18) had between $400,000 and $1,100,000, and seventeen more had between $250,000 and $400,000. If this policy were construed to limit each of the 74 parishes and schools the Expert reviewed to a total of $50,000, the amount remaining at the Parish level would be approximately $3.70 million ($50,000 X 74). However, the total cash on hand at the petition date, as reported on Schedule K, for the same 74 parishes and schools is $25.46 million, which results in excess or surplus funds of approximately $21.76 million being held by the 74 parishes and schools in their 511 bank accounts. Even if the base amount was raised to $100,000, the surplus funds at the parishes and schools would still be in excess of $18 million.

The transfer of funds from the parishes to the Diocese PSDL account is almost always transacted through a check. The Expert is not aware of any parishes or schools that consistently[103] used wire transfers or any other form of electronic transfer to send funds to the Diocesan bank. Withdrawals made from the Diocesan bank are also almost always made in the form of checks. They are generally written to third parties for construction costs or to the parish or school for redeposit into their bank accounts. The Diocese may use Funds on Deposit for assessments, insurance and other obligations, but only with the consent of the parish or school[104].

---

[103] During the Expert's review of records only one instance of a wire transfer between the Parishes and the Diocesan Bank was found.
[104] Per Handbook guidelines.

<u>Loans to Parishes</u>

There is a separate diocesan policy dated November 1, 2006, that addresses loans from the Diocesan Bank to individual parishes which is primarily used for construction of new projects, but may also include purchases of assets, maintenance projects and even the purchase of Rectories.

As of the date of petition, there are 30 separate loans from the PSDL Trust to the parishes and schools totaling $21,929,960[105].

The requirements and implementation procedures imposed by the Diocese are generally designed to protect the financial well-being of the individual parishes and to assure some form of repayment.

In order for a loan to be given the parish must have obtained the following:

- The approval of the parish finance council,

- All the required approvals of the Building and Renovation Committee and the Bishop have been obtained,

- One-third of the approved cost of the project must be on deposit with the Diocesan Bank or PSDL Trust; evidence that the loan will not jeopardize the pastoral and financial responsibilities of the parish and

- An agreed upon plan for repayment.

In order to obtain authorization for a loan from the Diocesan Bank, the provisions must be strictly adhered to. By way of example, the records reflected that one of the parishes which had been audited by the Expert had applied for a construction loan but was unable to secure approval from the Diocese as they had not actually deposited their funds with the Diocesan

Bank, although they had accumulated over $1.5 million in their own parish building fund bank account. In late 2006 and early 2007 these funds were transferred to the Diocesan Bank in order to fully comply with the 1/3 Funds on Deposit requirement to have their loan request approved.

Although a number of previous and present loans from the Diocese to the parishes were intended for parochial school construction only the parishes have outstanding loans from the Diocesan bank or PSDL Trust as the parishes assume responsibility for the financial viability of the parochial schools[106]. Of the 30 outstanding loans at the petition date, eight were interest free loans. Generally, the parishes have been very diligent in paying off outstanding loans. As would be expected, of the parishes visited by the Expert with outstanding loans, most had smaller combined cash balances in the parish accounts. This trend is demonstrated as shown on Exhibit 92, where the selection criteria is set forth.

The Expert has included as Exhibits 93 , 94 ,95 and 21 summaries of all parish and school accounts in the Diocesan Bank/PSDL Trust for the years ended June 30, 2005, June 30, 2006, July 1, 2006 through February 28, 2007, and March 1, 2007 through early July 2007, respectively. These summaries include funds on deposit, endowment funds and loan accounts in the Diocesan Bank/PSDL Trust.

Parish to Parish Loans

The Expert has found one instance where a parish borrowed funds from other parishes. The parish that borrowed the funds was St. Brigid Parish. The Expert visited St. Brigid on May

---

[105] These 30 loans include two relatively small loans to Cathedral Catholic High School and Vincent Memorial High School.

[106] There is only one loan that is assigned to a parochial school which resulted from a capital project related to a convent and was assigned to the school by the parish. The school was unsure why they were responsible, but they were making payments, and had sufficient cash to pay off the entire loan. They chose not to do so as the loan was interest free.

31, 2007. At the time of the bankruptcy petition, St. Brigid had a new rectory construction project underway which was scheduled for completion in July 2007.

At the petition date, the parish had three accounts in the PSDL Trust. In the PSDL Trust the parish had an Organ Fund #0640-231-08 with a balance of $99,570.04 at February 28, 2007. The second account in the PSDL Trust was the "New Rectory" account #0640-231-01 with a balance of $47,504.34. Finally, the parish's third account in the PSDL Trust was the "Funds on Deposit" account #0640-231-00 with a balance of $1,869,380.80. The parish made consistent deposits to the various funds in the Diocesan Bank in a good faith effort to comply with the Diocesan policy.

According to parish personnel, because of the bankruptcy, they were unable to access the funds in these three accounts in the PSDL Trust. The construction was ongoing for the new rectory and the parish didn't have sufficient funds on hand to pay for construction costs. St. Brigid had only one parish bank account with a balance of $69,179 as listed on the Schedule K.

Because of the financial constraints described above, St. Brigid borrowed funds from three parishes in March 2007. The parish borrowed $50,000 each from St. Therese of Carmel, St. Gregory and Guardian Angel. The parish also borrowed $20,000 from a retired priest associated with the parish during March 2007. As of the date of our visit these loans had not been repaid. Subsequent to our visit the parish was able to access its funds in the PSDL Trust. The parish subsequently withdrew $38,722.70 from the "Funds on Deposit" account in the PSDL Trust and $47,000 from the "New Rectory" account in the PSDL Trust.

The Expert spoke with parish personnel on July 11, 2007, and was informed that the three loans from the parishes remain unpaid. The $20,000 loan from the retired priest has been repaid.

Post Petition PSDL Trust Activity

The Expert was provided a schedule of activity relating to the PSDL Trust for all parishes and parochial schools from the petition date through early July 2007.  This information is summarized in Exhibit -.  The following summarizes the activity in the PSDL Trust for this period:

| | |
|---|---|
| Deposits & credits to Funds on Deposit | $ 4,521,870 |
| Payments on Debt | 1,415,237 |
| Total Receipts | $ 5,937,107 |
| | |
| Withdrawals & Debits from Funds on Deposit | $ 3,475,733 |
| Draws | 3,425,018 |
| Total Withdrawals | $ 6,900,751 |

From the 74 parishes and schools the Expert selected for review he looked at the fifteen with the most cash on hand at the petition date based on Schedule K.  The fifteen all had more than $500,000 in their parish or school accounts according to Schedule K.  As a combined group these 15 parishes and schools had $11,965,094 on hand at the petition date according to Schedule K.  Six of the fifteen had principal activity in the PSDL Trust from February 28, 2007 through early July 2007.  As a group, these fifteen parishes and schools had no withdrawals of Funds on Deposit or draws on debt from the PSDL Trust during this time frame.  During this same period, as a combined group, the six parishes and schools either deposited into the PSDL Trust or made debt payments to the PSDL Trust totaling $902,126.

It appears the parishes and schools continued to ignore the Diocesan policy regarding the deposit of excess funds into the PSDL Trust. This disregard for the policy is even more troubling given a memorandum sent to the Pastors, Administrators and Principals on Mary 24, 2007 by Monsignor Steven Callahan. This memorandum has been included as Exhibit 22. The document states, "At a hearing in the bankruptcy court on May 10, 2007, both the Diocese of San Diego and the Organization of Parishes agreed to comply with the diocesan policy that surplus funds be deposited in the Parish and School Deposit and Loan (PSDL) Trust (formerly known as the diocesan bank)…_Therefore, you are directed to deposit surplus funds no later than May 31, 2007"_ (emphasis added). The memo closes with the statement, "Your cooperation is essential so that the diocese and parishes are in compliance with the commitment to the Court". It is apparent, according to the most recent information available to the Expert that most parishes and schools continued to ignore the diocesan policy, the direction of this memo and their commitment to the court.

School Accounting

The Pastor of the sponsoring parish has the primary responsibility for the financial administration of the school, as stated in the handbook, "The pastor shall have the responsibility for the financial administration of the school in consultation with the parish Finance Council. This responsibility may be delegated to the school principal". According to the handbook, the pastor of the sponsoring parish is also a member of the executive board of the school. In addition, the pastor must be a signatory on all school bank accounts and has approval responsibility for fundraising and activities that involve publicity. The parish also assumes

responsibility for the building and maintenance of the school and equipment following construction.

The same accounting and internal control procedures which apply to the parishes as outlined above also apply to the schools. Schools have reporting requirements similar to the parishes which include an annual report in a standard format issued by the diocese or in a form substantively equivalent to that form.

The major source of revenues for the school is tuition and student fees. The tuition rate is usually set by the principal with input and approval of the pastor and parish Finance Council with due consideration for the local economic conditions. A summary of the tuition charged by the schools audited by the Expert is included as Exhibit 23. The Expert did not specifically request this information from the schools, but most provided it as an act of courtesy. Accordingly, Exhibit 23 contains information for only 19 of the 26 schools the Expert audited. The schools receive a limited amount of restricted gifts and those gifts generally relate to tuition assistance or equipment needs of the school. For the fiscal year 2006, 38[107] of the schools analyzed had total restricted gifts of just under $900,000. By way of comparison, the total tuition and fees for the 38 schools was $44.61 million.

The parish may have the responsibility to supplement tuition and fees with parish funds if required by the approved budget. Many of the parishes visited by the Expert provide at least some subsidy to the school. As reported by 38 of the 43 schools in fiscal year 2006, the parishes provided total subsidies of $1.22 million. However, many of the schools have established reputations and accordingly generate sufficient tuition and fees to cover all expenses and often generate excess operating funds. In fact, the aforementioned 38 schools generated excess

---

[107] The Expert audited only 20of the schools but reviewed the annual reports of 38 schools.

operating revenues of approximately $2.86 million. During fiscal year 2006, those schools increased their funds on deposit in the Diocesan Bank by a net amount of approximately $760,000.

Schools are entitled and required to participate in the PSDL Trust in the same manner as the parishes. The diocesan policy is clear that surplus funds of the schools must also be on deposit in the Diocesan Bank/PSDL Trust. It is common for the schools to deposit tuition funds in the PSDL Trust because substantial amounts are collected at the beginning of the school year and at mid-year. These funds are then sent to the PSDL Trust and drawn as required by the school to meet ordinary operating expenses. The schools generally designate these Funds on Deposit in the PSDL Trust as restricted or designated as they represent prepaid tuition and fees for the students. The schools also may have excess operating funds or excess funds from fundraising efforts which are used to fund designated accounts for new construction or endowments for tuition assistance.

The major fundraising vehicle for the school is the parent teacher group, parent teacher guild or parent student association, collectively known as the "PTG". Regardless of their designated name, their function is similar in all schools. Some of the fees collected from the students are deposited to an account or accounts of the PTG. The PTG can also hold additional fundraisers which they use to fund normal school operations or meet special needs of the school. Some of the PTG's and the schools the Expert audited have contributed to the building campaign of new school facilities being handled by the parish. For the 38 schools mentioned above, the various PTG's generated and donated a total of $2.87 million to the individual schools.

Teacher salaries and benefits represent the preponderance of expenses and operational costs for the schools. For example, in 2006, these payroll expenses represented almost 98% of

the total tuition collected by the 38 schools analyzed[108].   The payment of teacher payroll and benefits are administered through the diocese in the same manner as the payroll for the parishes.

Results of Parish/School Visits and Analysis

The Expert reviewed the financial operations of a total of 48 parishes and 26 schools. Prior to the Expert's visit to a parish or school a written request for documents was sent to each entity.  A sample of the request is included as Exhibit 96. Detailed reports for each parish and school which document the audit results are located in 74 separate Appendices designated as Appendices B.1 through B.74.  The information below is intended to highlight some findings of the Expert as a result of those audits:

Bank Accounts

As outlined on Exhibit 24, the 74 parishes and schools the Expert chose to audit had reported a total of 511 bank accounts as listed on Schedule K.   This exhibit contains the information as outlined in Schedule K.

Exhibit 25 utilizes the previous Exhibit 24 and denotes corrections which are required in the original Schedule K information for updates, new accounts, closed accounts and other issues which were uncovered during the course of the Expert's audit.  These changes have been highlighted so they can be easily identified.  (The Expert has used the date of February 28, 2007 for all of this information to establish consistency)  It should be evident from the attached corrections that Schedule K, which was provided in response to a request for further

---

[108] There are additional income streams which flow into a school, such as parish subsidies, fees, and special fundraisers and other fund raising efforts.  Even taking those supplemental fund sources into consideration, teacher salaries and benefits consume 75% of all revenue sources, including tuition.

clarifications as to outstanding cash balances in the Parishes from the Court, had a significant number of errors. Based on the Expert's audit analysis he found 9 accounts that should have been included on Schedule K but were omitted as well as 51 accounts that listed the incorrect tax identification number ("TIN"). This exhibit also includes a list of those bank accounts identified by the banks pursuant to the subpoena process not listed on Schedule K or given to the Expert as a result of his requests during the audit process. This list is constantly increasing as banks are continuing to respond to the subpoenas requesting additional information. Based on the most recent information available this list identifies 19 additional bank accounts.

Exhibit 26 lists 21 accounts, discovered during our audits of the 74 parishes and schools, which were opened post-petition. Almost all of these new accounts used new tax identification numbers applied for and received by the parishes and/or schools.

Exhibit -27 is a summary of the 74 parishes and schools the Expert audited and information regarding application for and use of new tax identification numbers. As shown on this Exhibit 58 parishes and schools applied for and received new tax identification numbers. Of these, 22 used their newly acquired TIN numbers to open new accounts or change existing accounts. Exhibit 27 also demonstrates that of the 74 parishes and schools audited by the Expert, 16 did not apply for a utilize a new tax identification number.

Exhibit 97 is a summary of the 67 parishes and schools the Expert did not audit and information regarding the use of new tax identification numbers as outlined in Schedule K. This exhibit demonstrates that 22 of the 67 parishes and schools applied for and used new TIN's

The Expert has included as Exhibit 98, Schedule K information for the 351 bank accounts for the 50 parishes and 17 schools that were not subjected to an audit by the Expert. He has included the information from Schedule K regarding changes in tax identification numbers. This

exhibit also includes a list of those bank accounts identified by the banks pursuant to the subpoena process which were not listed on Schedule K. This list is constantly increasing as banks are continuing to respond to the subpoenas requesting additional information. Based on the most recent information available to the Expert, 9 additional bank accounts have been uncovered.

Finally, he has included as Exhibit 28, information regarding twenty bank accounts identified by the banks pursuant to the subpoena process which could not be identified as belonging to the Diocese or a specific parish or school. This list is constantly increasing as banks are continuing to respond to the subpoena and provide additional information.

Bank Reconciliations & Cash Control

Pursuant to the Handbook, "Parish related organizations should reconcile their bank accounts on a timely basis and the reconciliation and the bank statements (or copies thereof) should be kept in the parish office." During the course of the Experts audits it was apparent that this policy was not strictly followed. The Diocese does not request, nor as a matter of course receive, the Parish reconciliations. In fact, the Diocese has no way of knowing whether or not the reconciliations are being prepared until they ask for copies of Parish reconciliations as part of their 5-year financial review for compliance testing of internal controls.

The general handbook also states that the pastor must be an authorized signatory on parish organization bank accounts. Based on our visits the Expert found that this policy was not always followed.