The Handbook has detailed procedures for the parishes for counting cash and donations and safeguarding cash. While each parish may differ slightly, the Expert found that the parishes make a sincere effort to comply with these procedures.

Parish & School Cash Management

Under Handbook guidelines, each parish and school is requested to deposit their excess funds in the Diocesan Bank/PSDL Trust at the Diocese. As previously stated, there are wide variations of the manner in which the individual parishes and schools choose to comply with those guidelines. The Expert has provided below a number of illustrative examples, including a few of the Parishes and Schools with the largest comparative cash balances, to provide the Court with a descriptive analysis of the full range and manner in which Parishes and Schools interact with the PSDL Trust or the Diocesan Bank[109].

- Our Lady of Guadalupe Academy
  - (See Appendix B.3)

The school with the largest amount of funds held in their school accounts is Our Lady of Guadalupe Academy in Calexico. According to school personnel this school is highly profitable as the student body is primarily made up of children from wealthy families in Mexico who commute from across the Mexican border to pursue their studies at the school. According to Schedule K the school had a total of $1,628,804 on hand at February 28, 2007, in three separate accounts. As part of the audit, the Expert determined that Schedule K was incorrect and overstated the cash on hand by $90,000. The actual amount on hand as of February 28, 2007, was $1,538,804. The

school has had a substantial increase in available funds over the past few years. According to the annual school reports filed with the Diocese, the cash balances at June 30, 2004, totaled approximately $659,691. For the year ended June 30, 2005, the school had excess operating revenues of just over $500,000, including capital improvements thereby increasing the school's cash balances to $1,050,741. For the year ended June 30, 2006, the school had excess operating revenues of approximately $428,987 and the cash balances subsequently increased to 1,451,937. Due to further excess operating revenues the balance increased over the next 8 months to $1,538,804. Thus, from June 2004 to February 2007, the cash balances available at the school increased by close to $1 million. Almost all of these monies are being held in a non-interest bearing checking account.

The only "Funds on Deposit" in the PSDL Trust for Our Lady of Guadalupe Academy was approximately $34,573 in an endowment account. The deposit to fund this account was made during late 2002. As of the date of the Expert's audit, July 7, 2007, no other funds have been transferred to the Diocese in accordance with the Handbook and Diocesan policy.

- St. James Parish - includes the St. Leo Mission
  - o (See Appendix B.60)

The parish with the most cash on hand is St. James Parish, which includes the St. Leo Mission. The detailed report for this parish is located in Appendix B.60. According

---

[109] A full report of each parish or school audit results for all of the examples listed hereafter can be found in

to Schedule K the parish had a total of $1,336,822 deposited in 15 separate parish accounts as of February 28, 2007. According to the 2006 annual report as filed with the Diocese a significant amount of this cash came from the building funds collected as part of the capital campaign. For the year ended June 30, 2006, the parish had excess operating funds of $256,519 and excess extraordinary income (primarily building fund) of $897,190.

The parish had "Funds on Deposit" in the PSDL Trust of $346,418 in three accounts at February 28, 2007. From June 30, 2004, to February 28, 2007, the parish sent $111,807 to the Diocesan Bank. Through July 7, 2007, the Expert was not aware of any additional funds sent to the Diocese in accordance with the Handbook and Diocesan policy.

- Church of Nativity Parish
    - (See Appendix B. 68)

    The Church of Nativity Parish stands in stark contrast to the St. James Parish as described above. The detailed report for this parish is located in AppendixB.68. According to Schedule K the parish had $222,865 on hand at February 28, 2007, in three bank accounts. From June 30, 2003, through February 27, 2007, the parish sent $1,755,000 to the Diocesan Bank for a gymnasium fund. A portion of these funds came from designated building fund donations and the remainder from excess operating revenues. As of each of the years ended June 30, 2003, June 30, 2004, June

Appendices B.1 through B.74.

30, 2005, June 30, 2006 and February 28, 2007, the parish only maintained total funds in their bank accounts of approximately $200,000 to $250,000.

While the parish may not have strictly adhered to the two month operating expense or $50,000 limit established by the Diocese[110], they consistently transferred significant excess funds to the Diocesan Banking accordance with the Handbook policy.

- Corpus Christi Parish
  - (See Appendix B.67)

  A designated building fund account with the Diocesan Bank  was established to sequester funds for a new parish hall and classrooms, and eventually to build a new school.  The building fund campaign has been underway since approximately late 1999 or early 2000.  As of the petition date, Corpus Christi had $2,357,884.77 on deposit with the Diocese.  Checks were written to the Diocese for deposit from the main checking account whenever a large balance of designated building funds accumulated.

  The following is a summary of Corpus Christi Parish designated funds on deposit with the Diocesan Bank.  The account is identified by the parish as a designated building fund account   Records from the Diocese refer to this account as simply "Funds on Deposit".  The account is earning interest at a rate of 3.5% annually.

---

[110] The actual monthly operating expenses for the parish were $37,500.

Corpus Christi – Funds on Deposit (900-231-00)

| Period Ended | Deposits | Interest | Withdrawals | Balance |
|---|---|---|---|---|
| 6/30/02 | | | | 240,472 |
| 6/30/03 | 515,000 | 8,206 | - | 763,678 |
| 6/30/04 | 445,000 | 20,525 | - | 1,229,203 |
| 6/30/05 | 375,000 | 49,357 | - | 1,653,560 |
| 6/30/06 | 1,166,529 | 54,382 | 852,600 | 2,021,871 |
| 2/27/07 | 285,000 | 51,014 | - | 2,357,885 |

The Corpus Christi parish accounts recorded the following transactions during the similar period:

For the year ended June 30, 2003, the parish received building fund donations of $533,061. Disbursements from this account for new property & construction totaled $10,368. The amount sent to the Diocesan Bank for funds on deposit was $515,000 (see schedule above). Included in the building fund donations is approximately $125,000 representing rental income from an adjacent building being used as a daycare center. The parish categorizes these receipts as being specifically designated for building fund contributions. Approximately this same amount is included each year in the building fund donations. Because the parish is operating at an operating deficit some of the designated funds are also being used to supplement the operating shortfalls. Also based on the above, all of the funds deposited into the account in the Diocesan Bank represent building fund donations[111].

---

[111] It should be noted that the Diocesan or Chancery tax is to be computed as 13% (with minor adjustments) of "ordinary" receipts. When income is designated as building fund donations or extraordinary receipts, as is the case

For the year ended June 30, 2004, the parish received building fund donations of $566,669. Disbursements from this account for new property & construction totaled $26,195. The amount sent to the Diocesan Bank for funds on deposit was $445,000. Included in the building fund donations is approximately $125,000 representing rental income from an adjacent building being used as a daycare center. As in prior years, the parish designates these receipts as building fund contributions. Approximately this same amount is included each year in the building fund donations. Because the parish is operating at a deficit some of the designated funds are being used to supplement the operating shortfalls. Also based on the above, all of the funds deposited into the Diocesan Bank represent building fund donations.

For the year ended June 30, 2005, the parish received building fund donations of $527,104. Disbursements from this account for new property & construction totaled $19,379. The amount sent to the Diocesan Bank for funds on deposit was $375,000. Included in the building fund donations is approximately $125,000 representing rental income from an adjacent building being used as a daycare center. The parish designates these receipts as building fund contributions. Approximately this same amount is included each year in the building fund donations. In a similar manner to prior years, because the parish is operating at a deficit some of the designated funds

with this designation, the Parish is not charged a Diocesan or Chancery tax upon those receipts. Thus, each year with this designation of rental receipts as building fund or extraordinary receipts, the parish avoids a yearly Diocesan tax of $16,250. ($125,000 X 13%)

are being used to supplement the operating shortfalls. Also based on the above, all of the funds deposited into the Diocesan Bank represent building fund donations.

For the year ended June 30, 2006, the parish received building fund donations of $601,630. Disbursements from this account for new property & construction totaled $80,230. The amount sent to the Diocesan Bank for funds on Deposit was $450,000. Again, included in the building fund donations is approximately $125,000 representing rental income from an adjacent building being used as a daycare center and the parish designates these receipts as building fund contributions. Approximately this same amount is included each year in the building fund donations. Because the parish is operating at a deficit some of the designated funds are being used to supplement the operating shortfalls. Also based on the above, all of the funds deposited into the account in the Diocesan Bank represent building fund donations.

In November 2005, $852,600 was paid from the designated building fund account in the Diocesan Bank to purchase a new home for the pastor. Proceeds from the sale of the old home totaling $715,970 were deposited in the Diocesan Bank in March 2006.

For the period ended February 28, 2007, the parish received building fund donations of $571,582. Disbursements from this account for new property & construction totaled $109,051. The amount sent to the Diocesan Bank for funds on deposit was $285,000. Included in the building fund donations is approximately $125,000

representing rental income from an adjacent building being used as a daycare center. The parish designates these receipts as building fund contributions. Approximately this same amount is included each year in the building fund donations. Because the parish is operating at a deficit some of the designated funds are being used to supplement the operating shortfalls. Also based on the above, all of the funds deposited into the account in the Diocesan Bank represent building fund donations.

The above activity is summarized as follows:

| For the Period Ended | Designated Building Fund Receipts | Proceeds from Property Sales | Withdrawals from accounts in the Diocesan Bank | Spent for new construction & Property | Deposited to Accounts in the Diocesan Bank | | Over/(Under) Available Designated Funds |
|---|---|---|---|---|---|---|---|
| 6/30/03 | 533,061 | - | - | (10,368) | (515,000) | | 7,693 |
| 6/30/04 | 566,669 | - | - | (26,195) | (445,000) | | 95,474 |
| 6/30/05 | 527,104 | - | - | (19,379) | (375,000) | | 132,725 |
| 6/30/06 | 601,630 | 715,970 | 852,600 | (932,830) | (1,166,529) | | 70,841 |
| 5/14/07 | 571,582 | | - | (109,051) | (285,000) | | 177,531 |
| | | | | | | | |
| Totals | 2,800,046 | 715,970 | 852,600 | (1,097,823) | (2,786,529) | | 484,264 |

From July 1, 2002 through February 28, 2007, the parish received more donations to the capital campaign than it has spent on new construction and major furniture and fixtures and/or advanced into the designated building fund in the Diocesan Bank. Accordingly, all funds in the designated account in the Diocesan Bank represent designated proceeds from the building fund campaign and the rental income designated as building funds by the

parish. The parish has been operating at a loss for several years and has used designated building fund donations to supplement operations of the parish.

- St. Therese of Carmel Parish
  - (See Appendix B.71)

A building fund on deposit with the Diocesan Bank was established to hold funds for the new chapel and a new pastoral office. There were two separate capital campaigns in which pledges were made for donations to be used for the new chapel and the new pastoral office. In the first capital campaign, $5,895,257 was pledged and $5,508,493 has been collected as of 5/21/07. For the second capital campaign, $6,512,456 was pledged of which $4,310,675 has been collected as of 5/21/07. In addition to the capital campaigns, several large donations have been made from individuals, which have been designated for the building campaign. The largest of these individual donations was for $2,000,000. This donation and other large donations were reflected in donor letters and/or other supporting documents.

In addition to the activity in the Diocesan Bank for the building fund, significant funds were raised and spent on an ongoing basis at the Parish level for construction of new facilities. During the period July 1, 2003 through May 31, 2007, in excess of $12.29 million was spent on construction of new facilities. A significant portion of this amount was raised and spent in the same period without being deposited or withdrawn from the Diocesan Bank. The designated funds held on deposit in the PSDL Trust will be used to build new parish offices/hall.

The following is a summary of St. Therese of Carmel Parish funds on deposit in the Diocesan Bank. The first account identifies general non-designated amounts held for the parish, although the parish has treated these funds as restricted and used the withdrawals for construction. The second account identifies designated building funds held awaiting ongoing construction needs. Both accounts are earning interest at a rate of 3.5% annually. The funds withdrawn from the designated building funds account were either paid directly to contractors for the new construction or were deposited into the parish accounts and used to pay construction related expenses.

St. Therese of Carmel – Funds on Deposit – 1000-231-00 (Not-Designated)

| Period ended | Deposits | Interest | Withdrawals | Balance |
|---|---|---|---|---|
| 6/30/02 | | | | 347,975 |
| 6/30/03 | 200,000 | 6,122 | - | 554,097 |
| 6/30/04 | 1,539,128 | 13,677 | 189,700 | 1,917,202 |
| 6/30/05 | 12,005 | 68,413 | - | 1,997,620 |
| 6/30/06 | - | 61,381 | 500,000 | 1,559,001 |
| 2/27/07 | - | 36,699 | - | 1,595,700 |

St. Therese of Carmel - Building Fund – 1000-231-02 (Designated)

| Period ended | Deposits | Interest | Withdrawals | Balance |
|---|---|---|---|---|
| 6/30/02 | | | | 2,591,540 |
| 6/30/03 | 1,334,054 | 55,783 | - | 3,981,377 |
| 6/30/04 | 127,303 | 64,034 | - | 4,172,714 |
| 6/30/05 | 491,106 | 153,077 | 477,225 | 4,339,672 |
| 6/30/06 | 1,427,834 | 149,973 | 1,830,605 | 4,086,874 |
| 2/27/07 | 311,057 | 96,618 | 100,000 | 4,394,549 |

The Parish activity regarding the building fund campaigns, new construction and Funds on Deposit can be summarized in the following chart:

| For the Period Ended | Designated Building Fund Receipts (a) | Decrease (Increase) in Parish Building Fund Bank Account (b) | Amounts Withdrawn from accounts in the Diocesan Bank (c) | Amounts Spent for new construction from Parish and Diocesan Bank (d) | Amounts Deposited to Accounts in the Diocesan Bank (e) | | Over/(Under) (f) |
|---|---|---|---|---|---|---|---|
| 6/30/03 | 1,252,751 | 488,471 | | (338,416) | (1,534,054) | | **(131,248)** |
| 6/30/04 | 2,670,318 | (718,775) | 189,700 | (580,043) | (1,666,430) | | **(105,230)** |
| 6/30/05 | 1,984,375 | (440,747) | 477,225 | (2,510,102) | (503,111) | | **(992,360)** |
| 6/30/06 | 4,888,015 | (235,029) | 2,330,605 | (5,758,670) | (1,427,834) | | **(202,913)** |
| 5/14/07 | 1,639,760 | 1,208,518 | 100,000 | (3,110,943) | (311,057) | | **(473,722)** |
| | | | | | | | |
| Totals | 12,435,219 | 302,438 | 3,097,530 | (12,298,174) | (5,442,486) | | **(1,905,473)** |

The amounts included in column (a) represent amounts collected by the parish as designated building funds and deposited into parish accounts.  The amounts shown in column (b) represent the increase or decrease in parish building fund bank accounts.  If the number in this column is positive this means that the parish building fund bank

account balances decreased providing a source of funds.  If the number in this column is negative this means that the parish building fund bank account balances increased signifying a use of funds.  The amounts shown in column (c) represent withdrawals from the Diocesan Bank accounts for construction expenses.  These amounts were either paid directly to third parties for construction related costs or were deposited into the parish accounts and used for construction related expenses.  The amounts shown in column (d) represent the total amount spent for new construction by the parish.  The amounts shown in this column represent amounts paid from parish bank accounts as well as payments made directly to third party vendors from accounts in the Diocesan Bank.  The amounts reflected in column (e) represent amounts deposited to the two accounts in the Diocesan Bank.  These amounts were paid from parish bank accounts.  Finally, the amounts shown in column (f) represent the net of all sources and uses of funds related to the building campaign, construction costs and Diocesan Bank account activity.  For each year the amounts are negative.  The negative amount means that parish used excess operating proceeds or non-designated funds on hand to fund construction costs or transfer funds to the Diocesan Bank.  In other words, the designated sources of cash were insufficient to pay the ongoing construction costs and fund the amounts deposited into the Diocesan Bank accounts.

- Our Mother of Confidence Parish

  - (See Appendix B.44)

    There have been three main capital campaigns in recent years which have all been conducted in a similar manner, i.e., parishioners fill out pledge cards, and make their

donations via envelopes or by mailing a check within a designated envelope to the parish office.

Capital Campaign for Building Fund "Share the Vision, Meet the Challenge"

This campaign began in November 2002. Phase 1 included the redesign of the church interior, building a larger gathering plaza, building a baptismal font, constructing a Eucharistic chapel, building larger bathrooms, and installing an elevator. Phase 2 will include building a parish hall, and Phase 3 will be to develop a larger garden.

Memorials Campaign

This campaign began in October 2005 to pay for various items for the church (statues, crucifix, candle stands, chalices, etc.) Parishioners could specify the item and have it dedicated in memory of a loved one.

Debt Reduction

This campaign began in October 2006 to raise funds to pay down the original $3 million loan used for church renovation.

A building fund on deposit with the Diocesan Bank was established to hold funds for major renovations and construction. According to the general ledger and other internal accounting documents provided by the parish, it appears that this account was

designated for renovation and construction.  All funds from the account were used for construction.  The account activity is summarized below.

Our Lady of Confidence – Funds on Deposit – 0600-231-00 (Designated)

| Period Ended | Deposits | Interest | Withdrawals | Balance |
|---|---|---|---|---|
| 6/30/02 | | | | 1,259,926 |
| 6/30/03 | 1,007,766 | 29,963 | - | 2,297,655 |
| 6/30/04 | 375,000 | 49,064 | 51,840 | 2,669,879 |
| 6/30/05 | 350,000 | 76,676 | 2,228,793 | 867,762 |
| 6/30/06 | 694 | 1,083 | 869,539 | - |
| 2/27/07 | - | - | - | - |

The following is a summary of Our Mother of Confidence Parish loan from the Diocesan Bank. These funds were loaned to the parish after all funds on deposit in the Diocesan Bank were consumed to fund the renovations and construction.  The draws were all paid directly to third party vendors for renovations and construction costs.

Our Mother of Confidence – Debt – 0600-145-00

| Period Ended | Payments | Interest | Draws | Balance |
|---|---|---|---|---|
| 6/30/04 | - | - | - | - |
| 6/30/05 | - | - | - | - |
| 6/30/06 | 565,696 | 60,764 | 2,929,388 | 2,434,456 |
| 2/27/07 | 542,000 | 67,526 | - | 1,959,982 |
| 4/30/07 | 90,000 | 7,490 | - | 1,877,472 |

The following is a summary of the capital campaign and construction activity for the years 2003 through April 30, 2007.

| Period Ended | Designated Building Funds Collected (a) | Funds Deposited to the Diocesan Bank (b) | Funds Withdrawn from the Diocesan Bank (c) | Funds Spent for New Construction (d) | Funds Drawn from Diocesan Bank Debt (e) | Payments made on Diocesan Bank Debt (f) | (Over) Under (g) |
|---|---|---|---|---|---|---|---|
| 6/30/03 | 1,087,581 | (1,007,766) | - | (163,060) | - | - | (83,245) |
| 6/30/04 | 653,681 | (375,000) | 51,840 | (460,067) | - | - | (129,546) |
| 6/30/05 | 560,265 | (350,000) | 2,228,793 | (2,633,149) | - | - | (194,091) |
| 6/30/06 | 632,021 | (694) | 869,539 | (4,117,333) | 2,929,388 | (565,696) | (252,775) |
| 4/30/07 | 425,205 | - | - | (130,913) | - | (632,000) | (337,708) |
| | | | | | | | |
| Totals | 3,358,753 | (1,733,460) | 3,150,172 | (7,504,522) | 2,929,388 | (1,197,696) | (997,365) |

The amounts included in column (a) represent amounts collected by the parish as designated building funds and deposited into parish bank accounts. The amounts shown in column (b) represent amounts deposited to the funds on deposit account in the Diocesan Bank. These amounts were paid from parish bank accounts. The amounts shown in column (c) represent withdrawals from the Diocesan Bank accounts for construction expenses. These amounts were paid directly to third parties for construction related costs. The amounts shown in column (d) represent the total amount spent for new construction by the parish. The amounts shown in this column represent amounts paid from parish bank accounts as well as payments made directly to third party vendors from the funds on deposit and loan accounts in the Diocesan Bank. The amounts reflected in column (e) represent amounts drawn from the Diocesan Bank as debt. These amounts were paid directly to third party vendors from

the Diocesan Bank at the diocese for construction related expenses and were included in the funds spent for new construction. The amounts shown in column (f) represents amounts paid on the Diocesan Bank debt account. These payments were made from the parish bank accounts. Finally, the amounts shown in column (g) represent the net of all sources and uses of funds related to the building campaign, construction costs and Diocesan Bank account activity. For each year the amounts are negative. The negative amount means that parish used excess operating proceeds or non-designated funds on hand to fund construction costs. In other words, the designated sources of cash were insufficient to pay the ongoing construction costs and fund payments to the Diocesan Bank.

- St. Gabriel Parish
  - (See Binder Appendix B.34)

  St. Gabriel Parish Building Fund

  As of February 28, 2007, St. Gabriel Parish had $5,220,671 on deposit in the PSDL Trust at the Diocese. The current building fund capital campaign started on January 1, 2003. St. Gabriel Parish's building fund balance held in the Diocesan Bank at the Diocese on June 30, 2002 was $2,616,461. The objective of the most recent campaign was to raise enough money to build a new church for the parish. To date the drive has received $4,466,631 in pledges, of which $1,718,093 has been collected and deposited into parish accounts.

The following is a summary of St. Gabriel Parish funds on deposit with the Diocesan Bank.

St. Gabriel Parish Building Fund – 0430-231-00 (Designated)

| Period Ended | Deposits | Interest | Withdrawals | Balance |
|---|---|---|---|---|
| 6/30/02 | | | | 2,616,461 |
| 6/30/03 | 404,926 | 48,512 | - | 3,069,899 |
| 6/30/04 | 635,679 | 55,023 | 930,000 | 2,830,601 |
| 6/30/05 | 1,489,799 | 102,908 | 764,500 | 3,658,808 |
| 6/30/06 | 695,000 | 142,008 | 95,000 | 4,400,816 |
| 2/27/07 | 710,000 | 109,855 | - | 5,220,671 |

The following is a review of funds received and disbursed regarding the building fund. At the time the funds were deposited into this account the parish was using two parish bank accounts to make the transfers; the general account at Bank of America and the Building Fund account at Wells Fargo:

2006-2007

Bank of America Parish general account – This account received building fund donations of $237,363.27. Disbursements from this account for new property & construction equaled $229,826.53. The amount sent to the Diocesan Bank for funds on deposit was $230,000.00. Post petition, an additional amount of at least $100,000 was used to create a certificate of deposit for the building fund. In the Expert's opinion, this amount could have only been generated from excess operating funds.

Wells Fargo Parish building fund account – This account received building fund donations of $684,701.37. Disbursements from this account for new property & construction equaled $1,433.14. The amount sent to the Diocesan Bank at the Diocese for funds on deposit from this account was $480,000.00. An additional $130,000 was used to purchase certificates of deposit for the building fund which were retained at the parish level.

2005-2006

Bank of America Parish general account – This account received building fund donations of $210,191.89. Disbursements from this account for new property & construction totaled $98,489.52. The amount sent to the Diocesan Bank at the Diocese for funds on deposit was $540,000.00. In the Expert's opinion, the deposits in excess of the donations, less construction costs, should be more accurately designated as excess operating funds.

Wells Fargo Parish building account – This account received building fund donations of $309,923.32. Disbursements from this account for new property & construction equaled $162,361.93. The amount sent to the Diocesan Bank for funds on deposit were $155,000.00.

2004-2005

Bank of America Parish general account – This account received building fund donations of $232,727.55. Disbursements directly from this account for new property & construction totaled $47,249.38. The amount sent to the Diocesan Bank for funds

on deposit were $540,000.00.  In the Expert's opinion, the deposits in excess of the

donations, less construction costs, should be more accurately designated as excess

operating funds.


Wells Fargo Parish building fund account – This account received building fund

donations of $408,935.37.   Disbursements made directly from this account for new

property & construction totaled $117,770.83.  The amount transmitted to the

Diocesan Bank for funds on deposit was $355,000.00.

Additional Transactions:  Deposits to the Diocesan Bank fund include proceeds from

the sale of property located at Woodhollow Lane, which the Expert believes was

former Rectory property. In November 2004, the sale of this property contributed

$594,197.13 to the capital campaign, and the funds were deposited directly to the

PSDL at the Diocese.  St. Gabriel also purchased property located at 14726 Budwin

Lane, Poway, CA 92064 in July of 2004 in the amount of $769,500.  This purchase of

land/residence includes the new rectory and future driving access for new church.

$764,500 was withdrawn directly from the Diocesan Bank to accommodate this

purchase.


2003-2004

Detailed bank account activity for this year was not available to the Expert.  The

following information was obtained from parish annual reports filed with the Diocese.

Gifts restricted by donor – for extraordinary purposes equaled $448,757, a majority of

which would be allocated to the building fund.  There were also withdrawals from

this fund of $930,000. $878,000 of this amount was used to purchase a piece of adjacent vacant land to be used for a future church site. Funds expended for new property and construction totaled $915,777. During the same year St. Gabriel deposited $690,023 to the Diocesan Bank.

Questionable Transactions

As a result of the Audits the Expert discovered several questionable transactions, which he believes should be brought to the attention of the Court and are described below.

- Our Lady of Guadalupe Parish, Calexico
  - (See Appendix B.2)

On February 21, 2007, just days before the bankruptcy petition, but clearly after the parish was made aware of a possible bankruptcy filing, Our Lady of Guadalupe Parish set in motion a series of transactions which deliberately hid $49,685.47 from the bankruptcy court. The February 21, 2007, transactions include the following:

- $4,000 was withdrawn (possibly in the form of cash; the bank statement simply shows it as a withdrawal) from a Sun Community Federal Credit Union ("SCFCU") account #4993950 (as a side note the activity from this account is not included in the parish general ledger, nor was the account listed on Schedule K since it was closed February 21, 2007, following the four transactions described). The general ledger does not reflect that this $4,000 was deposited or transferred to another parish bank account. Following this withdrawal the balance in the account was $27,636.32.

- $12,726.00 was transferred from the general checking of the parish into the SCFCU account #4993950. This amount represents the exact amount of an ACA rebate which was deposited into the general checking the same day.
- $9,323.15 was transferred from the Union Bank designated gifts account #3710005477 into the SCFCU account #4993950. This left a $100 balance in the designated gift account.
- As a result of the three items above the balance in the SCFCU account #4993950 was $49,685.47. This amount was then withdrawn in the form of a cashiers check. This check was then held by the parish for approximately 30 days, during which time bankruptcy filing took place.

These funds held in the form of a cashiers check by the parish are not disclosed on Schedule K.

On or about March 20, 2007, Our Lady of Guadalupe Parish changed the tax identification number for only one of its bank accounts. The account changed was the Our Lady of Guadalupe Church Parish Hall Account at Sun Community Federal Credit Union #005-010430. Generally the funds deposited into this account originated from the rental of the Parish Hall. All expenses needed to operate the hall were paid from this account.

On March 20, 2007, the Parish hall bank account was used to further the series of transactions started on February 21, 2007. The before described cashiers check for $49,685.47 was deposited into the Parish Hall bank account and a $40,000 withdrawal for the purchase of another cashiers check happened the same day. These transactions became readily apparent to the Expert because the transactions in this account were normally substantially smaller. These two transactions were discovered on the day of the Expert visit and back-up documentation was requested concerning the two transactions. From June 14, 2007 through June 26, 2007, five to six telephone calls were made to Lenna Ivies, Office Manager, asking for documentation for the $49,685.47 deposit and $40,000.00 withdrawal. On June 28, 2007, the documents were received in the Los Angeles, CA office of LECG, LLC from Our Lady of Guadalupe, Calexico. The documents were received and reviewed by the Expert on June 29, 2007, at the Diocese. These documents provided detail for the two transactions. From the documents we determined that the $49,685.47 deposit was the cashiers check dated February 21, 2007. Rev. Fernandez explained the source of the funds to be from a drawing and festival held in early 2007. As more fully described above we know that some of the funds represented an ACA rebate and a transfer from the designated gift bank account. Rev. Fernandez further explained that the finance council and fundraising committee agreed that the funds raised would be used to make repairs to the church and offices. The $40,000.00 withdrawal on March 20, 2007, was in the form of a cashiers check drawn in the name of Our Lady of Guadalupe.

After reviewing the documents, we were still unable to determine what happened to the $40,000 cashiers check. On June 29, 2007, a voice message was left with Lenna Ivie regarding the whereabouts or use of $40,000.00 cashiers check. Lenna promptly returned the voice message and a discussion ensued regarding the $40,000.00 cashiers check. Lenna was unable to answer the questions, so Rev. Fernandez was contacted to provide additional information. Lenna and Rev. Fernandez participated in the conversation via the speakerphone. When asked where the funds were currently located, Rev. Fernandez replied they were deposited into the Parish hall bank account. Rev. Fernandez stated the money was re-deposited into the Parish Hall bank account last week, (week of June 22, 2007). The next question for Rev. Fernandez was where the money was held from March 20, 2007, through its re-deposit. There was no immediate response to the question. After a lengthy pause Rev. Fernandez replied he could not understand the question and Lenna would have to translate it into Spanish for him. Lenna asked Rev. Fernandez the question regarding the storage of the cashiers check and he replied he had placed the funds in the church safe. The Expert subsequently received documentation reflecting the re-deposit of the $40,000 into the same account from which it was withdrawn.

It is the Expert's opinion that the withdrawal of $49,685.47 in the form of a cashiers check and the subsequent withdrawal of $40,000 through the issuance of another cashiers check was a purposeful attempt on the part of Rev. Fernandez, who has the ultimate responsibility for the Parish funds, to evade the direction of the Court to report all cash available. With the $49,685 cashiers check and later the $40,000

cashiers check safely secured in the safe, the Parish would not need to list amount as cash being maintained by the Parish thereby escaping the control of the Court.

- St. Mary of El Centro Parish
  - (See Appendix B.15)

The following transaction was uncovered during the Expert's audit of the financial records of St. Mary of El Centro Parish:

In late December 2006, the parish received a $300,000 donation for the building fund. The money was deposited into the building fund account at Union Bank of California. On March 7, 2007, in two separate transactions, $290,000 was withdrawn from this account to purchase six (6) cashier's checks; five (5) cashier's checks for $50,000 each and one (1) for $40,000. As of the date of our visit the checks were being held in the parish safe and according to parish personnel the money will be used for new carpet and remodeling. It was also asserted by parish personnel, that the Parish Finance Council made the decision to handle these funds in this manner.

It is the Expert's view that the parceling of a $300,000 donation into 6 separate cashier's checks totaling $290,000 was a willful attempt on the part of the Parish and the Parish Finance Council to circumvent the intent and direction of the Court requesting transparency in the recognition of financial cash balances by all of the Parishes. It is unfortunate the Pastor and the Parish Finance Council would engage in such deliberately misleading behavior.

The Expert has received subsequent confirmation from the Diocese that the entire sum of $290,000 has been re-deposited into the Parish accounts and subsequently deposited into the PSDL Trust.

- Our Lady of Mt. Carmel San Ysidro Parish ("San Ysidro Parish")
  - (See Appendix B.58)

The financial condition of the San Ysidro Parish and financial concessions provided by the Diocese are somewhat contradictory and are therefore perplexing to the Expert.

The parish has consistently maintained that they are one of the poorest parishes in the Diocese, yet the parish held $1.2 million in the banking accounts of the Parish at February 28, 2007, which sum is only exceeded by one other parish in the entire Diocese. The Parish also holds the largest number of private bank accounts (22) which far exceeds the normal range of parish bank accounts. In fact, there are a few parishes who maintain only one general account. In addition, Our Lady of Mt. Carmel, San Ysidro Parish asserts that nineteen (19) of the accounts hold restricted funds while only three (3) hold unrestricted funds.

The Expert believes that the parish inappropriately designates the preponderance of funds flowing into the parish as restricted. For example, the parish owns rental property which is rented for $1,800 a month. All of the rental proceeds are designated as restricted yet almost all of the expenses associated with the rental

property, including property taxes are included as normal operating expenses and are paid from the ordinary donations of the parish. In addition, the parish holds weekly Sunday breakfasts and all proceeds from the Sunday breakfasts are designated as restricted, yet almost all of the expenses associated with the breakfasts are categorized as ordinary expenses and paid from ordinary donations. It is a common practice for parishes to hold specialized events for specific fund raising activities and designate those funds as restricted. However, the holding of a weekly breakfast event wherein all of the funds are designated as restricted is unprecedented in the Diocese.

The Diocesan Bank loaned funds for the construction of a school which is associated with the parish. As of June 30, 2004, the outstanding debt to the Parish was $436,326.52 and the loan is an interest free loan[112]. The debt, under normal Diocesan procedure, is the responsibility of the parish. Therefore, an agreement for repayment was made between the parish and the Diocese which provided for an annual payment of $12,000. Three payments of $12,000 were made in 2005, 2006, and 2007 for a total reduction of $36,000. In addition, the parish requested payments of $5,000 a month from the school to reduce the parish obligation to the Diocesan Bank. In furtherance of that agreement, the school paid the Diocesan Bank $50,000 in 2002/2003 to reduce the debt. In addition, during October 2003, the school paid the Diocesan Bank another $48,000 which was applied to the debt. Finally, during June 2006, the school changed their previous procedure and paid $40,000 directly to the parish for ultimate transmittal to the Diocesan Bank to further reduce the debt. Instead

of sending the funds to reduce the debt, the parish retained the funds. In addition, during the year ended June 30, 2006, while the parish was holding close to $1 million in their parish bank accounts, the Diocese granted the parish rebates of $96,000 further reducing the loan from the Diocesan Bank.  Also, from the period 2004 through 2007, interest free loans have been made by the parish to two employees in the total amount of $13,520 of which $10,491 still remain outstanding. The Expert finds this to be confusing and certainly not indicative of an impoverished parish unable to pay their obligations to the Diocese.

Perhaps the most disconcerting aspect of the Experts audit concerns the  JCCG Foundation.  On February 20, 2007, one week prior to the bankruptcy filing the Parish received and deposited into the foundation bank account $100,290 from the Most Reverend Gilbert E. Chavez,[113] Auxiliary Bishop of San Diego until his retirement on May 31, 2007 and previous pastor of the parish. An additional $15,000 was transferred to the JCCG Foundation bank account from another parish account which had recently received $40,000 from Bishop Chavez.  The funds for the JCCG Foundation were placed in a restricted bank account at the parish on February 20, 2007.  Subsequent to the bankruptcy filing, from March 2, 2007 through March 8, 2007, seven (7) checks, each for $8,572 and another check for $9,959 (for a total of $69,963) were written from the restricted account.  According to the personnel at the parish, the checks were written directly to Raul Gonzalez, a deacon at the same

---

[112] Since the Parish has an outstanding interest free loan, it is not entitled to interest on funds deposited in the PSDL Trust, which may explain the retention approximately $1.2 million in parish bank accounts.

parish, Our Lady of Mt. Carmel, who supposedly transferred the funds to an individual named Mauro Tovar who had expertise in importing and exporting goods from Columbia. Again according to personnel at the parish, Mr. Tovar was to facilitate the transfer of funds to the sister parish in Columbia in order to allow them to purchase 67 computers and several printers. This sister parish in Columbia, was the former parish of Reverend Castillo, the present Pastor of the San Ysidro parish. An additional $23,000 was also disbursed from the JCCG Foundation account later in March and early April 2007, but the Expert has not received any supporting documentation for those transfers.

The Expert understands the compassionate service which has been graciously provided to the parishioners of the San Ysidro parish and the sister parish in Columbia. Notwithstanding such generosity, the Expert believes that the transparency inherent in the bankruptcy system does not allow for such transfers to occur while the parish still maintains a significant obligation to the Diocese.

The Diocese has informed the Expert that they are in the process of responding to the Expert's comments. At this stage the Expert has not been able to independently confirm those actions.

---

Annual Catholic Appeal and Designated Special Collections

Since 1991, the goal of the Roman Catholic Bishop of San Diego has been to raise an annual sum of $2.5 million[114].  Among other things, the ACA proceeds, at the direction of the Diocese, are to be used to benefit schools, religious education, care of priests, and other Catholic charities.

Each year, each parish is assessed an allocable amount by the Diocese for the ACA.  This amount is based on a calculation of each individual parish's total plate and envelope collections for the previous fiscal year as compared proportionally to the total plate and envelope collection from all parishes in the Diocese, less approved deductions.  The approved deductions include:

- Parish contributions from ordinary sources to its Catholic school or the Catholic school attended by its children,

- Interest paid on indebtedness to the Diocese and

- Donations to other parishes and other charitable religious organizations.

The Finance Officer at the Diocese, and Msgr. Callahan (Vicar General), decide if any adjustments are required in the calculated ACA amounts[115].  For example, if a parish is holding a building campaign, plate and envelope collections may be less than normal, therefore an increase may be made to their assessed amount.  Special adjustments are also made if the parish experiences a disaster or emergency, or is in a particularly poor area. The parish also has the opportunity to appeal any fair-share adjustment within ten days of notification.

---

of his own funds to the parish.
[114] In addition, the Diocese includes in the ACA assessment to each parish an additional 10% administrative charge. This charge is to cover the costs incurred by the Diocese to administer the program.

The ACA is generally collected in one of two ways and Parish involvement differs depending on the method selected. According to Diocesan personnel it can be collected in a "regular" or "irregular" way.

The "regular" method commences during the first few weeks of February when the pastor makes an appeal to all parishioners for contributions to the ACA. The parish is responsible for creating their own individual pledge cards. Parishioners complete the pledge cards and return them during mass or at a later point in time to the parish office. The pledge card usually gives the option to pay in full, pay installments over ten months, charge immediately with a credit card, and also gives instructions on how to pay over the phone or online. The parish normally records the amount of individual pledges, then sends the payments and pledge cards to the bank. The bank processes the payments and the credit cards, and forwards the pledge card information to the Diocese. The Diocese is then responsible for billing the individual parishioners, tracking collections, and providing monthly reports to the parish.

If the Diocese collects any amounts exceeding the original parish assessed amount (which is regularly done), rebates are forwarded to the parish. The parish is then free to use the rebated money in any manner they feel is appropriate. In the case of a shortfall, the parish will be billed and requested to remit the shortfall directly to the Diocese.

The "irregular way" requires the parishes to assume primary responsibility to collect their entire ACA assessment utilizing the methods they feel are most effective. Historically, parishes

---

[115] Such adjustments are called "fair share adjustments".

using this approach typically generate more money, which in turn, may benefit the parish as they are allowed to retain all funds in excess of the assessed amount.

Designated Donations - Special Collections

The Diocese sponsors seven special collections. They are approved, but not mandated, by the U.S. Conference of Catholic Bishops. All parishes generally participate in these seven special collections. The Diocese receives a 3% administrative fee for all collections except items 4 and 7 listed below. The seven special collections are outlined below:

1. Annual Lenten Collection – 4th Sunday of Lent

   Charities selected for collection efforts:

   - Catholic Relief Services,

   - Operation Rice Bowl (encouraged),

   - Church in Africa and

   - Church in Latin America (including Dioceses of Tijuana and Mexicali).

2. Church in the Holy Land (recommended) – Good Friday.

3. Missions of the Holy Father (Peter's Pence) – 4th Sunday of June.

4. Mission Sunday (Propagation of Faith) – Next to last Sunday of October.

5. Collection for National Needs – Sunday before Thanksgiving

   Charities selected for collection efforts:

   • Black and Indian Mission,

   • Catholic Campaign for Human Development,

   • Catholic Communication Campaign,

   • Catholic Home Missions and

   • Catholic University of America

6. Retirement Fund for Religious – 2nd Sunday of December.

7. Missionary Cooperative Plan – Various.

<u>(#1) Annual Lenten Collection and (#5) Collection for National Needs</u>

The Diocese administers two collections internally: the Annual Lenten Collection and the Collection for National Needs. As noted above, a number of charities benefit from these collections. The Diocese creates and prints an envelope which allows the parishioner check a box next to the specific charity of their choice. In the alternative, the parishioner may choose not to check a specific charity, in which the case the Diocese will make the decision as to the manner of allocation from among the charities. The parish collects the envelopes and deposits all of the checks into a parish account. Next, the parish will prepare a form provided to them by the Diocese, and forward to the Diocese an amount equal to the entire collection. The parish discards all opened envelopes with no specific charity selected; those envelopes with specific charities designated are forwarded to the Diocese for tracking purposes

The Diocese determines in advance the amount ("predetermined amount") they wish to allocate to each of the charities selected. The envelopes with the marked boxes are tallied, and if the totals exceed the predetermined amounts, there is an adjustment to those amounts. Additionally, if over time there seems to be a shift in amounts chosen or designated by parishioners to specific charities, the Finance Officer will adjust the predetermined amounts. Finally, because parishioners are more inclined to check the box listed first, every year the order of the charities listed is altered. After the Diocese receives all of money from the parishes, they disburse the funds to the individual charities.

(#4) Mission Sunday (Propagation of Faith) and (#7) Missionary Cooperative Plan

The Mission Sunday and the Missionary Cooperative Plan collections are handled by the Missions Office at the Diocese. They send envelopes to the parishes, and the parishes send the parishioners' checks directly to the Mission Office. If the donation is made in cash, the parish deposits the cash and prepares a check to the Missions Office. The funds are then sent to the office of the Pontifical.

(#3) Missions of the Holy Father (Peter's Pence) and (#6) Retirement Fund for Religious

These collections are organized by the respective organizations, but are overseen by the Diocese. The Diocese collects the money from the parishes on behalf of the organizations, and submits a single check to the organization.

<u>(#2) Church in the Holy Land</u>

There are no envelopes for this collection. It is simply a second collection held on Good Friday, if the pastor chooses to participate. If they participate, the parish prepares a check to the Diocese for the full amount of the donations, which is ultimately sent to the organization.

<u>Parish Finance Council</u>

According to the Parish Administration section of the Handbook, "Every parish in the Diocese of San Diego is to have a PARISH FINANCE COUNCIL as required by canon 537." Under the Parish Finance Council Charter, Article II, it states, "The Parish Finance Council is consultative. It is not the function of the Parish Finance Council to implement policies. Policy implementation is the domain of the pastor, parish staff and members of the parish who assist them." The charter then outlines ten specific responsibilities of the council.

The Expert did not require specific evidence from each parish which was audited that a parish finance council was functioning, although almost all of the parishes had finance councils with varying degrees of activity and involvement. There seemed to be a direct correlation between the size and activity of the parish and the activity of the finance council. Within the larger parishes there was a greater tendency to have a more active parish finance council.

<u>Diocesan Financial Review of Parishes</u>

In the Handbook, "Guidelines for Parish Financial Procedures and Controls," it states,

"The purpose of this guideline is to provide parishes with the basic controls and procedures that should be employed by each parish and parish-related organization…."

"At least every five years, the internal auditor of the diocese will perform a financial review of each parish. Financial reviews will also be performed whenever a parish has a change in pastors. The internal auditor will be going over these procedures with the pastor and others on his staff and will be in a position to recommend how internal controls may be improved and how procedures may be performed more efficiently. These recommendations will be sent to the pastor after the review is complete."

From our discussions with the various parishes and pastors the Expert has concluded that the Diocesan reviews were not always conducted following a pastor change and were only sporadically performed during each five years. In fact, some parishes contend they have not experienced a Diocesan review in over 10 years.

Attached as Exhibit 99 is a copy of a Diocesan form letter routinely sent to a parish setting forth the information required for the review. As detailed in Exhibit 99, the letter sets forth 12 areas of specific information and additionally informs the pastor he will be required to provide a knowledgeable person to be interviewed regarding accounting procedures. The pastor is also required to provide access to canceled checks, paid invoices and personnel files of the parish.

During the Expert's review of the parishes and schools he found few parishes able to provide copies of previous diocesan financial reviews. In some cases the parishes informed the Expert that reviews had been performed, but the parish was unable to locate copies of the supporting documentation. The parishes often contacted the Diocese who was also unable to locate copies. The Expert was able to review copies of several parish financial reviews maintained on file at the Diocese, although not necessarily for the parishes visited by the Expert. These reviews provided specific "recommendations" but not directives to the parish. Routinely, the parish was sent a copy of these recommendations but not the complete review file. As far as the Expert could ascertain, the Diocese conducted no follow-up in order to determine whether their "recommendations" were implemented and what changes, if any, were made at the parish level.

One of the functions of the parish finance council, as delineated in the Handbook, is to annually assess internal controls and procedures for compliance with Diocesan policies and review the recommendations resulting from Diocesan directed financial reviews. The Expert only rarely found any written reports from the parish finance council regarding an assessment of internal controls. The Expert believes that an active Parish Finance Council often provides significant input, but that input was almost always provided in a verbal format during finance council meetings and not in the form of formal written reports.

The Expert appreciates the opportunity to be of service to the Court and other interested parties.

Respectfully submitted,

R. Todd Neilson, CPA
Expert

July 30, 2007